Westlaw.

Not Reported in F.Supp.                                                                                                    Page 1

Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Malik ALLAH
v.
STACHELEK, et al.
Malik Allah
v.
Beard, et al.
Davis
v.
Horn, et al.
Davis
v.
Stachelek, et al.
Evans
v.
Horn, et al.
**Nos. CIV. A. 95-7593, CIV. A. 96-0502, CIV. A. 95-7700, CIV. A. 96-0466, CIV. A. 95-7922.**

May 29, 1998.

MEMORANDUM OF DECISION

RUETER

TABLE OF CONTENTS

| I.   | Procedural Background. | 3 |
|------|------------------------|---|
| II.  | Factual Background.    | 5 |
| III. | Standard of Review.    | 8 |
| IV.  | Discussion.            | 9 |

|   | A. | First Amendment. | 10 |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                       Page 2
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

|   |   |   |
|---|---|---|
| i. | Policies. | 10 |
| ii. | Ramadan. | 19 |
| B. | Substantive Due Process. | 26 |
| C. | Equal Protection. | 28 |
| D. | Retaliation and Harassment | 30 |
| V. | Conclusion. | 33 |

## I. PROCEDURAL BACKGROUND

*1 Plaintiffs in the instant case are Michael Malik Allah [FN1], Vincent X. Davis [FN2] and Richard X. Evans. [FN3] They are prisoners at state correctional facilities in Pennsylvania. Plaintiff Malik Allah was incarcerated at the State Institution at Graterford ("SCI Graterford") until May 17, 1996; he was transferred to the State Correctional Institution at Camp Hill, Frackville, and subsequently to SCI Greene. Plaintiff Davis was incarcerated at SCI Graterford until March 25, 1997, at which time he was transferred to SCI Huntingdon. Evans has been incarcerated at Graterford at all times relevant to this lawsuit. Plaintiffs initiated this action by filing individual Complaints. On or about May 13, 1996, plaintiffs filed a consolidated Amended Complaint (Doc. No. 14, hereinafter "Pls.' Am. Compl.") [FN4] Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983 for alleged violations of the First and Fourteenth Amendments. Plaintiffs also brought claims alleging violations of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000(bb). This court must dismiss plaintiffs' RFRA claims. [FN5] Plaintiffs also alleged certain state law claims which they subsequently agreed to dismiss. (See Pls.' Am. Compl., ¶¶ 23, 26, 82-86; Stipulation of Voluntary Dismissal in Part, filed May 24, 1996.) Plaintiffs seek damages, as well as injunctive relief from the court [FN6]. These claims for injunctive relief are moot as to plaintiffs Malik Allah and Davis, since these plaintiffs have been transferred from Graterford, and are no longer subject to the conditions of which they complain. [FN7] Plaintiffs also agreed to dismiss claims against defendants Vaughn, Neiderhiser, Gysen, Davis, Judge, and the corrections officers with respect to the formulation of Department of Corrections policies Nos. 819, 819-1 and 819-2. (See Plaintiffs' Response to Defendants' Supplemental Motion for Summary Judgment, hereinafter "Pls.' Resp.", at 9). [FN8]

FN1. Michael Malik Allah is currently serving an 8 1/2 to 17 year sentence for robbery and aggravated assault. (Defs.' Ex. II, Dep. of Malik Allah, at 18.)

FN2. Vincent X. Davis is serving a life sentence for murder. (Defs.' Ex. III, Dep. of Davis, at 26.)

FN3. Richard X. Evans is serving a sentence for third-degree murder. (Defs.' Ex. IV, Dep. of Evans, at 8.)

FN4. In the Amended Complaint, plaintiffs named as defendants the following officials and employees of the Commonwealth of Pennsylvania, the Pennsylvania Department of Corrections and SCI Graterford: Governor Thomas Ridge, Corrections Commissioner Joseph D. Lehman, Commissioner Martin L. Horn, Deputy Commissioner Jeffrey A. Beard, Ph.D., Superintendent Donald A. Vaughn, Deputy Superintendent Thomas D. Stachelek, Chaplain Edward Neiderhiser, Captain Jasper Davis, Captain John E. Gysen, Captain Guy C. Smith,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Lieutenant Robert Astary, Lieutenant Charles Judge, Lieutenant Robert J. Zahn, Sergeant Vincent C. Mason, Corrections Officer Eric W. Tice, Corrections Officers Joseph Schwenk, Raymond A. Marburger, James J. Orzehowski and Ralph R. Riegel. Twelve of the nineteen defendants moved for summary judgment, and the plaintiffs agreed to dismiss eight of the defendants. Thereafter, the Honorable Marvin Katz denied the summary judgment motion as moot as to these eight defendants, dismissed these defendants, and denied the motion as to the other four defendants. (*See* Order filed December 5, 1996.) Presently, the remaining defendants are Horn, Beard, Vaughn, Stachelek, Neiderhiser, Davis, Gysen, Judge, Marburger, Orzehowski and Riegel. These defendants now move for summary judgment.

FN5. Since the filing of the Amended Complaint, the Supreme Court declared the Religious Freedom Restoration Act unconstitutional on the basis that Congress, when enacting RFRA, exceeded its enforcement power granted under Section 5 of the Fourteenth Amendment. *City of Boerne v. P.F. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Therefore, plaintiffs' claims brought pursuant to RFRA in Counts IV and VII of the Amended Complaint are hereby dismissed.

FN6. Plaintiffs request that the court enjoin defendants from violating their religious rights and to provide them with a paid, outside religious coordinator. (Pls.' Am. Compl. I, at ¶¶ 34A-E.)

FN7. Federal court jurisdiction is limited to actual cases and controversies in which a plaintiff has a personal stake in the outcome. *See United States Parole Commission v. Geraghty,* 445 U.S. 388, 396-97, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). The case or controversy must be a continuing one and must be live at all stages of the proceedings. *Weaver v. Wilcox,* 650 F.2d 22, 27 (3d Cir.1981) (citing *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). Thus, since plaintiffs Allah and Davis have been transferred from SCI Graterford, and are officially "separated" from the institution, they are therefore no longer subject to the conditions of which they complain. Therefore, they no longer possess standing to seek injunctive relief. *Abdul-Akbar v. Watson,* 4 F.3d 195, 206-07 (3d Cir.1993); *Weaver* at 27 (citations omitted); *See also,* separation data attached to defendants' reply to answer to supplemental motion for summary judgment.

FN8. Plaintiffs also concede that they do not have an Eighth Amendment claim relative to the type of food they were served during Ramadan. Plaintiffs state that they "agree with the Defendants that there is no Eighth Amendment claim relative to the food which they were served and that the Court should not consider this issue." (Pls.' Resp., at 16.)

Presently before the court for decision are defendants' supplemental motion for summary judgment, (Doc. No. 47), plaintiffs' response, (Doc. No. 49), and defendants' reply (Doc. No. 50.) For the reasons that follow, defendants' motion is granted.

II. *FACTUAL BACKGROUND*

Plaintiffs are members of the Nation of Islam, and while incarcerated at SCI Graterford, they are/were associated with Muhammad's Temple of Islam, ("MTI"), a recognized faith group at Graterford. [FN9] As members of MTI at Graterford, plaintiffs are presently permitted to hold weekly Jumah services and a discretionary weekly study session in the presence of a prison chaplain or volunteer coordinator. [FN10] Muslims do not eat pork, and accordingly, plaintiffs are provided with meals at Graterford which accommodate their dietary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 4
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

restrictions. Furthermore, they are permitted to observe the month-long fast of Ramadan [FN11] in December of each year. During Ramadan, Muslim inmates are provided with a breakfast meal before sunrise in their cells, since during the daylight hours of Ramadan, Muslims fast. Muslims break this fast with prayer at sunset, and then consume their evening meals. At the conclusion of Ramadan, Muslims celebrate the Feast of Eid.

> FN9. Plaintiffs maintain that as members of MTI, they are followers of the Honorable Elijah Muhammad. (Defs.' Ex. II, Dep. of Malik Allah, at 6); (Pls.' Am. Comp., at ¶ 28.) Plaintiffs allege that the Nation of Islam subscribes to the belief that black people are divine, and that white people are not. According to plaintiff Malik Allah, "Every black man is God. Some know it; some don't ... and [T]he white man is the devil." (Defs.' Ex. II, Dep. of Malik Allah, at 66-85.)
>
> FN10. As part of a Settlement Agreement (Defs.' Ex. XV) entered into between Michael Malik Allah and the Pennsylvania Department of Corrections, the parties agreed that Sweeney Brown, a/k/a Al Muntaquin Ali, would serve as the qualified representative of Muhammad's Temple of Islam at Graterford. In addition, plaintiffs testified in their depositions that they desired Mr. Brown to continue in that capacity.
>
> FN11. According to the expert report of Humza al-Hafeez, Ramadan is observed during the month of December. Mr. al-Hafeez maintains that "contrary to the plaintiff-inmates' claims, December is not ' a holy month.' For the Nation of Islam, every day is a holy day." (Defs.' Ex. XIV, Report of Humza al-Hafeez, at 5.)

*2 In October 1995, the Department of Corrections, ("DOC"), with the assistance of the Pennsylvania State Police, conducted a raid at Graterford to search for contraband, including drugs and weapons, and for evidence of illegal activities which allegedly were occurring at Graterford. (Defs.' Ex. V, Dep. of Beard, at 38, 40, 76.) At the time of the raid, Graterford was placed in a "State of Emergency," which "essentially suspend[ed] all administrative directives and policies of the Department of Corrections." *Id.* at 72. According to the administration, there was a "legitimate concern on the inmates' reaction to that activity [the raid]," and the prison was locked down so that the DOC could implement new rules and regulations at Graterford. (Defs.' Ex. V, Dep. of Beard, at 75-76). One of the temporary rules instituted was the suspension of all volunteer activities, including religious activities, pending an investigation of all volunteer activities at Graterford. *Id.* The administration reviewed the outside religious coordinators first, and after this assessment, religious services resumed, and the volunteer religious coordinators were permitted to return to Graterford to conduct weekly religious services. (Defs.' Ex. V, Dep. of Beard at 48, 61-62; Defs.' Ex. VII, Dep. of Stachelek, at 12.) However, other activities, including study sessions, were suspended throughout most of the winter of 1995-96. (Defs'. Ex. I, ¶ 32; Defs.' Ex. VII, at 42). In 1996, the non-Orthodox Muslims celebrated the Feast of Eid on January 7, 1996. (Defs.' Ex. XXIV.) At that time, SCI Graterford was still operating under certain restrictions, since this feast followed so close in time to the raids at Graterford. Due to these restrictions, only one outside guest per religious group was permitted to attend the Feast of Eid. [FN12] On or about February 9, 1996, each recognized religious group was permitted to conduct one weekly religious study group. [FN13]

> FN12. In the past, the inmates were permitted to have a number of outside guests attend the Eid celebration. However, in January of 1996, MTI was permitted only one guest-Sweeney Brown. (Defs.'Ex.I, ¶ 33.) The Nation of Islam was also permitted only one guest. (Defs.' Ex. XVII.)
>
> FN13. Previously, religious groups were permitted to conduct two weekly religious

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 5
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

study sessions.

Prior to January 1, 1996, inmates were permitted to choose a leader from the inmate population to conduct services. On January 1, 1996, a new prison policy came into effect which prohibited prisoners from leading their own religious services. (Defs.' Ex. I, ¶ 33; Defs.' Ex. VII, at 13-14). Policy 819-1 established that only outside religious leaders could conduct religious services at the prison, and these outside leaders or coordinators were selected by prison officials. [FN14] On April 11, 1996, prison authorities implemented Policy 819-2, which provided that in the absence of an outside religious leader, inmates would be permitted to conduct religious services, provided there was a prison chaplain present at the services. [FN15] Policy 819-2 does not allow inmates to conduct study sessions without the presence of an outside coordinator. (Defs.' Ex. VIII, p. 48.)

> FN14. According to the testimony and the declaration of Deputy Commissioner Beard, this policy was instituted to prevent inmate religious leaders from exercising power over other inmates. (Defs.' Ex. V, at 26, 75.) Deputy Commissioner Beard explained that prison authorities had learned lessons from riots which occurred at Camp Hill prison in 1989, and caused over $17 million in damages. Specifically, Deputy Commissioner Beard noted that during the investigation of the riots, officials ascertained that some inmate religious leaders had "in fact been leaders of the riot." Mr. Beard opined that allowing an inmate to be a group religious leader empowers him to an extent which is undesirable from a corrections' standpoint. (Defs.' Ex. V, at 26-27.)

> FN15. Deputy Commissioner Beard testified that Policy 819-2 was implemented in an attempt to accommodate the inmates in the event their outside minister was unable to conduct religious services, while simultaneously allaying the security concerns of the prison authorities. (Defs.' Ex. V, at 29-32; 34-38.)

### III. *STANDARD OF REVIEW*

Fed.R.Civ.P. 56(c) provides that if "there is no genuine issue as to any material fact", "the moving party is entitled to judgment as a matter of law." The moving party bears the burden of showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party sustains its burden, the non-moving party must then "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Harter v. GAF Corp.,* 967 F.2d 846, 852 (3d Cir.1992). The " non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact," *Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 511 (3d Cir.1994), or replace "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In assessing whether the non-moving party has met its burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the non-movant. An issue is "genuine" only if there is sufficient evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248. A factual dispute is only " material" if it might affect the outcome of the case. *See id.* A dispute over irrelevant or unnecessary facts will not preclude summary judgment. *Id.*

*3 When considering a motion for summary judgment, the court must draw inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. *See id.* at 255. The court may not make credibility determinations or weigh the evidence. *Id.* at 252. If the record thus construed could not lead

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                               Page 6
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

the trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushia Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### IV. *DISCUSSION*

In the instant case, plaintiffs seek compensatory and injunctive relief under 42 U.S.C. § 1983. To bring a claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived him of his constitutional rights. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Furthermore, " [a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior.*" *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988); *Saunders v. Horn,* 960 F.Supp. 1085 (E.D.Pa.1997). Allegations of personal direction or of actual knowledge and acquiescence are evidence of personal involvement. *Rode,* 845 F.2d at 1207.

Plaintiffs allege in their Amended Complaint that: (1) certain defendants deliberately deprived plaintiffs of their First Amendment rights and harassed certain plaintiffs for exercising these rights; (2) certain defendants violated plaintiffs' due process rights; and (3) plaintiffs were denied equal protection of the laws.

### A. *First Amendment*

#### i. *Policies*

In Counts I and II of their Amended Complaint, plaintiffs contend that defendants violated their First Amendment rights by implementing certain policies which restricted their right to free exercise of religion. Specifically, plaintiffs complain that Policies 819, 819-1 & 819-2 prohibited plaintiffs from conducting weekly study groups, and thus prevented plaintiffs from practicing their religion.

(Pls.' Am. Compl., Ct. I, ¶ 32.) Furthermore, plaintiffs argue that policies instituted subsequent to the Graterford raids, i.e., the secession of volunteer activities, prevented them from properly observing their religious holy days. Plaintiffs also aver that they were not permitted to participate in religious services for a period of time after the raids. In addition, plaintiffs contend that they were prevented from properly observing Ramadan, the Muslim holy period of fasting, since they were served food which violated the tenets of their faith. Specifically, plaintiffs allege that they were served the meat of land animals and products made with land animal byproducts. (Pls.' Am. Compl., Ct. V, ¶¶ 57-58); Furthermore, they assert that they were forced to break their fast, and were not given milk with their breakfast meal. They also aver that outside religious volunteers were not permitted to visit Graterford to celebrate the Feast of Eid, the feast which follows Ramadan. (Pls.' Am. Compl., Count II, ¶ 39.) [FN16]

> FN16. According to the plaintiffs, the following rules must be followed by all members of the Muslim faith during Ramadan: (1) the observant is to pray five times daily; (2) the observant is to eat a well balanced meal together in a single brotherhood after sunset; but may include fish, but may not include any meat of land animals including all poultry. This prohibition includes all products and by products of land animals; (3) no consumption of liquids during the daytime hours; (4) the observant is to engage in no disputes or arguments with anyone; (5) the observant is to engage in no sexual activity for the entire month of Ramadan; (6) the observant shall do all things timely and as promised; and (7) the observant shall engage in no Christian festivities.

*4 It is well established that "convicted prisoners do not forfeit all constitutional protections in prison. " *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Although incarcerated, inmates retain protections afforded by the First Amendment. *Pell v. Procunier,* 417 U.S. 817, 822

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

(1974). The Supreme Court has stated, however, that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). The First Amendment rights of inmates, therefore, may be limited when they pose a " likelihood of disruption to prison order or stability." *Wilson v. Schillinger,* 761 F.2d 921, 925 (3d Cir.1985) (citation omitted), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986).

Prisoners retain their First Amendment right to free exercise of religion while incarcerated. However, as noted above, incarceration, by its nature, infringes upon this right. The Supreme Court has held that prison regulations "alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). A regulation is upheld if it is "reasonably related to legitimate penological interests." *Id.* Factors considered relevant in evaluating the " reasonableness" include: (1) the connection between the regulation and a legitimate government purpose; (2) the existence of alternative means of exercising the right; (3) the impact accommodation of the right would have on guards, other inmates, and prison resources; and (4) the absence of ready alternatives to the regulation. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Plaintiffs maintain that they were precluded from attending religious services subsequent to the raids at Graterford. Defendants counter that religious services were suspended for only one week, due to the "lockdown" which occurred at Graterford following the raids. After one week, the outside religious coordinators were permitted to return to Graterford for one weekly service. FN17 Defendants contend that the one-week suspension of religious services was necessary because searches of the whole institution were being conducted, and the prison administration was concerned for the safety of both the inmates and the staff. (Defs.' Ex. V, at 76-77.) According to Mr. Beard, the "State of Emergency" and lockdown which precipitated the cessation of services "had nothing to do with religious activities or services," but was a necessary security measure since "there was a legitimate concern on the inmates' reaction to that activity." *Id.* at 76.

> FN17. According to an October 30, 1995 memorandum sent from Thomas D. Stachelek, Deputy Superintendent, "one external religious coordinator will be permitted into the Institution for each religious community service." (Defs.' Ex. XVII, at 1.) However, other activities, such as "Community Night, Bible Study, Yokefellows, etc." were temporarily suspended. *Id.*

*5 This court concludes that the one-week suspension of religious services was reasonably related to legitimate security concerns, and accordingly, the brief cessation of religious services does not constitute a violation of the First Amendment. As defendants correctly point out, the inmates had alternative means of exercising their religious beliefs. Though plaintiffs were precluded from conducting formal religious services, they were free to pray in their cells and read religious materials, thereby assuring that the plaintiffs were " not deprived of all forms of religious exercise, but instead freely observe[d] a number of [their] religious obligations." *O'Lone,* 482 U.S. at 352. The Third Circuit has also stated that when exploring whether there are alternative means to allow a prisoner to exercise his right, the right " should be broadly construed to include 'general religious activity.' " *Stroud v. Roth,* 741 F.Supp. 559, 562 (E.D.Pa.1990)(citing *Cooper v. Tard,* 855 F.2d 125, 129 (3d Cir.1988)).

Since plaintiffs were afforded an opportunity to participate in "general religious activity", they had alternative means of exercising their religious beliefs. Furthermore, the week following the raids, Sweeney Brown, the outside coordinator chosen by MTI, was permitted to return to Graterford to minister to the plaintiffs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                              Page 8
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

The fourth *O'Lone* factor is the consideration of the adverse impact of accommodating the right to free exercise of religion on the administration of the prison. The officials justifiably believed that the resumption of religious services so close in time to the raids posed a potential security threat. This court finds that it was reasonable for prison officials to conclude that permitting religious groups to meet the week following the raid would jeopardize the security of both the inmates and the prison personnel.

Lastly, this court must consider whether there existed any easy and less restrictive alternative to the prison's policy, i.e., the one-week suspension of religious services. The burden of suggesting an alternative which " 'fully accommodates the prisoner's rights at de minimus cost to valid penological interests' falls on the plaintiff inmate." *Hobbs v. Pennell,* 754 F.Supp. 1040, 1049-50(D.Del.1991)(citing *Turner,* 482 U.S. at 91). Plaintiffs have not suggested a feasible alternative to the one-week suspension of the religious services which would have mollified the security concerns of prison administrators. FN18 Moreover, in their brief they state that the " 'crackdown' did not justify the prohibition of the plaintiffs from exercising their religious beliefs for *an extended period of time.*"( Pls.' Resp., at 11) (emphasis added.) Implicitly, plaintiffs concede the crackdown did justify a brief suspension of religious activities, such as the one-week suspension.

> FN18. However, this court acknowledges that the plaintiffs advanced some "less restrictive alternatives" to Policy 819-2. Plaintiffs aver that they "could have been permitted to exercise their religion at certain times in a small group setting that would not have jeopardized the institution. Times could have been arranged whereby the Plaintiffs could have practiced their religious beliefs and continued exercising their freedom of religion." (Pls.' Res., at 11.) However, permitting smaller meetings during the week period still would have posed security problems given the highly volatile atmosphere at Graterford which immediately followed the crackdown by state police.

*6 Plaintiffs also complain that Policy 819-1 banned inmate-led religious activity, improperly " chilling the free exercise of the plaintiffs' religion." (Pls.' Am. Compl., Ct. I, ¶¶ 32-34.) Policy 819-1 did not permit inmates to lead religious services or study groups. However, the policy did allow outside ministers to come into Graterford to minister to the inmates for religious services.

Defendants maintain that the ban on religious activity was reasonably related to legitimate security concerns. (Defs.' Mot. Summ. J., at 18.) Defendants explain that this regulation was implemented in all correctional facilities within the state of Pennsylvania and was prompted by the Department of Corrections' investigation of the Camp Hill uprising. The investigation of the Camp Hill riots revealed that inmates who held religious leadership positions were capable of wielding tremendous influence over other inmates. This court concludes that the defendants had a legitimate penological interest, namely prison security, for implementing the aforementioned restriction. Since prison security and order have been deemed " central to all other corrections goals," *Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), this court finds that the restriction was reasonable under the circumstances. In addition, this court agrees with the approach of numerous courts which have held that a prohibition on inmate-led religious services by prison officials does not violate the First Amendment. *See O'Lone,* 482 U.S. at 353 (recognizing legitimate security concerns regarding potential for affinity groups to result in organizational structure and leadership roles that may challenge institutional security); *Anderson v. Angelone,* 123 F.3d 1197 (9th Cir.1997) ("Requiring an outside minister to lead religious activity undoubtedly contributes to prison security."); *Cooper v. Tard,* 855 F.2d 125, 129 (3d Cir.1988) (sustaining a prison regulation that prohibited inmates from leading religious services); *Hadi v. Horn,* 830 F.2d 779, 784-85 (7th Cir.1987) (holding that cancellation of religious services when outside chaplain was not available was reasonable). Policy 819 decreases the likelihood that an inmate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 9
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

will exert undue influence upon other inmates. Furthermore, this regulation did not foreclose plaintiffs' ability to practice their religion. The policy allowed for outside individuals to administer to the inmates. In addition, the inmates had alternative means of practicing their religion, i.e., by individual prayer, meals to accommodate religious beliefs, etc., during the brief cessation of religious services. In light of the heightened security concerns at the prison due to the raids, this court concludes that at the time of the implementation of Policy 819-1, there was no ready alternative to this regulation. Therefore, this court finds that this policy passes the reasonableness test set forth in *Turner* and *O'Lone*.

*7 Subsequent to the implementation of Policy 819-1, it became evident to prison officials that some religious groups were unable to conduct religious services due to the unavailability of outside leaders. As a result, the Department of Corrections implemented a second regulation, Policy 819-2. [FN19] (Defs.' Ex. V, at 57). This policy provides inmates with two alternatives: religious services may be conducted by an outside clergyman, or they may be conducted by an inmate with the supervision of the prison chaplain. This policy still prohibits inmates from conducting religious services without supervision, due to the Department's concern about the potential control an inmate religious leader could exert over other prisoners.

> FN19. This policy went into effect on April 11, 1996, approximately six months after the Graterford raids. (Defs.' Ex. VIII, at 48.)

Plaintiffs assert that despite the foregoing policies, they were still precluded from practicing their religion for four months, since there were occasions when the "Plaintiffs' minister, Sweeney Brown, was unable to attend for religious services, the Plaintiffs were not permitted to have services because there was not another minister approved by Graterford to conduct services." (Pls.' Resp., at 10.)

As stated above, Sweeney Brown is the outside, volunteer coordinator for MTI. As part of a settlement agreement in a previous lawsuit, plaintiff Malik Allah agreed that Sweeney Brown would serve in this position. (Defs.' Ex. XV, at 1.) Plaintiffs acknowledge that they do not object to Sweeney Brown serving as religious coordinator for MTI, and want him to continue in this role. [FN20] Furthermore, plaintiffs acknowledge the fact that Sweeney Brown did not come to Graterford on a regular basis is not attributable to the actions of the defendants. [FN21] While it is true that plaintiffs requested that Sweeney Brown be compensated for his services at Graterford, there is no evidence in the record that Mr. Brown ever asked payment for his services, or that if he were paid, Mr. Brown's attendance at Graterford would improve.

> FN20. During his deposition, Malik Allah testified "that I don't have no objection about Sweeney Brown still coming to the institution." However, Allah did state that he also wanted a paid representative for MTI. (Defs.' Ex. II, Dep. of Malik Allah, at 157.) Plaintiff Davis testified that he " definitely" wanted Sweeney Brown to continue in his position as outside minister for MTI at Graterford. (Defs.' Ex. III, Dep. of Davis, at 85.) Mr. Davis never asked any Graterford officials to have an outside coordinator besides Sweeney Brown come to Graterford, (*Id.*, at 99), nor has he spoken to anyone in the Graterford administration about having Sweeney Brown serve as a paid representative. (Defs.' Ex. II, Dep. of Davis, at 100.) Plaintiff Evans stated that he never asked anyone at Graterford for a paid chaplain. (Defs.' Ex. III, Dep. of Evans, at 172.)

> FN21. When asked "to the extent that Sweeney Brown does not come to the institution, is that, in any way, the institution's fault that he doesn't come," Mr. Davis replied: "I can't see how." (Defs.' Ex. II, Dep. of Davis, at 91.); (Defs.' Ex. II, Dep. of Malik Allah, at 145.)

Furthermore, our Court of Appeals has held that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                       Page 10
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

state has no affirmative duty to furnish every inmate with a clergyman. *Gittlemacker v. Prasse,* 428 F.2d 1, 4 (3d Cir.1970). The court noted that there was a distinction between burdening an inmate's free exercise of religion and choosing not to take affirmative steps to supply inmates with a clergyman or services. The court stated that "[T]he requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice." *Id.* This court does not interpret defendants' decision not to furnish plaintiffs with a paid minister as a burden on their free exercise of religion. Plaintiffs Malik Allah and Evans are no longer at Graterford. As discussed above, their claims for injunctive relief, including their request for a paid minister, or their demand that Sweeney Brown be paid for his ministerial services, are therefore moot. Moreover, plaintiffs acknowledge that they want Mr. Brown to continue as the approved MTI minister at Graterford, and that Mr. Davis never submitted a proposal to request that either Sweeney Brown or another individual be paid to minister to the inmates at Graterford (Defs.' Ex. III, Dep. of Evans, at 172). Accordingly, this court finds that the fact that the defendants did not furnish plaintiffs with a paid religious coordinator did not violate plaintiffs' First Amendment rights.

*8 Plaintiffs also complain that the policies implemented by defendants subsequent to the raids at Graterford improperly infringed upon their freedom to exercise their religion, in that the regulations suspended study sessions from October of 1995 until approximately February of 1996. Plaintiffs further argue that in February of 1996 plaintiffs were only permitted one weekly study session conducted by the religious coordinator, when prior to the enactment of the Policy 819-1 and 819-2, they had been permitted to have twice weekly inmate-led study sessions. Furthermore, plaintiffs maintain that they were unable to attend these sessions even after February of 1996, since their approved minister did not always come to Graterford to lead these study sessions.

Defendants have submitted the uncontested expert report of Minister Humza al-Hafeez in support of their contention that study sessions were not religiously mandated by the Nation of Islam. Mr. Humza al-Hafeez has been a minister in the Nation of Islam since 1979. According to Minister Humza al-Hafeez, members of the Nation of Islam are only religiously obligated to attend a "weekly worship service/study period. Attending additional study sessions, observing Ramadan and participating in the Feast of Eid are discretionary/personal matters for members of the Nation of Islam." (Defs.' Ex. XIV, Affidavit of Minister Humza al-Hafeez, at 4.) Plaintiffs have submitted no documentation to refute this contention. Even assuming arguendo that the study sessions were mandatory, as stated above, there were alternative ways for plaintiffs to participate in general religious activity. [FN22] Accordingly, the temporary cessation of and modification of the schedule for study sessions did not violate the First Amendment rights of the plaintiffs.

> FN22. As discussed above, the fact that Sweeney Brown may not have attended weekly study sessions once they were reinstated is not attributable to the defendants.

ii. *Ramadan*

Plaintiffs complain that they were unable to invite guests to the Feast of Eid, a post-Ramadan celebration. Defendants counter that the feast is not a religious requirement, and the presence of outside visitors at previous feasts was completely gratuitous. (Defs.' Mot. Summ. Judg., at 25.) In addition, Minister Huma al-Hafeez submitted an affidavit which related that "observing Ramadan and participating in the Feast of Eid are discretionary/personal matters for members of the Nation of Islam." (Defs.' Ex. XIV, Affidavit of Minister Humza al-Hafeez, at 4.) Once again, plaintiffs have offered no submissions to refute this contention. Furthermore, plaintiffs were permitted to have one guest at the Feast of Eid, Sweeney Brown, just as the members of the Nation of Islam were permitted one guest. For all aforementioned

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 11

reasons, this court holds that the plaintiffs' complaint regarding guests at the Feast of Eid fails.

Plaintiffs aver that they were denied access to a facility in which to pray during Ramadan. Specifically, they complain that they were compelled to break their fast during Ramadan in the dining room where hundreds of other inmates, who were not Muslims, were also present. The Supreme Court has held that prison officials need not provide worship facilities for all inmates. "We do not suggest, of course, that every religious sect or group within a prison-however few in number-must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz v. Beto,* 405 U.S. 322 n. 2 (1972). This court holds that the defendants' refusal to allow plaintiffs to break their fast in a separate facility advances the legitimate governmental interest of maintaining security and order in the institution. Mr. Stachelek explained that since there were 3,500 inmates at Graterford to feed, it would be impractical to allow plaintiffs to eat in a separate area. (Defs.' Ex. VII, at 34.) Furthermore, defendants made reasonable efforts to accommodate the plaintiffs' desire to eat as a unit by allowing the members of MIT to be the last group to enter the dining facility, and by permitting them to sit together. (Defs.' Ex. VII, at 34.) Due to the fact that defendants' denial of a group facility was precipitated by concern for institutional order and security, and defendants made reasonable attempts to accommodate plaintiffs' religious needs, this court holds that defendants' denial of plaintiffs' request for a separate dining facility did not violate plaintiffs' First Amendment rights. *See Allen v. Tombs,* 827 F.2d 563, 569 (9th Cir.1987); *Gittlemacker v. Prasse,* 428 F.2d at 4.

*9 Plaintiffs also argue that defendants violated their First Amendment rights in that on several occasions during Ramadan, they were forced to eat their evening meals before sunset. (Pls.' Am. Compl., at ¶¶ 54-60; Pls.' Reply, at 13.) As stated above, prison officials made reasonable efforts to accommodate the inmates' religious need to eat after sunset by allowing MTI to be the last group to enter the dining facility. Furthermore, defendants also accommodated plaintiffs' religious needs by distributing calendars during Ramadan which denoted the time of sunset. (Defs.' Ex. XX.) Plaintiffs Davis and Evans testified that they never ate a meal before sunset during December 1995. (Defs.' Ex. III, Dep. of Davis, at 79; Defs.' Ex. IV, Dep. of Evans, at 148.) In addition, defendants submitted the affidavit of Humza al-Hafeez, wherein Mr. al-Hafeez indicated that "[w]ith respect to the timing of the evening meal, the Honorable Elijah Muhammed taught that that meal should be eaten between 4:00 and 6:00 p.m." (Defs.' Ex. XIV, at 6.). For all the forgoing reasons, this court finds that the First Amendment rights of plaintiffs were not violated since defendants made reasonable efforts to accommodate plaintiffs' need to consume their evening meals before sunset.

Plaintiffs also aver that their First Amendment rights were violated since defendants continually served them food during Ramadan "that specifically violated the Muslim faith." [FN23] Plaintiffs complain that as Muslims, it violates their religious beliefs to consume pork or pork by-products. Plaintiffs contend that they were served foods containing pork products, including cheese, pastries, and ice cream, without their knowledge. (Defs.' Ex. II, Dep. of Malik Allah, at 174-178.) [FN24]

FN23. Plaintiffs state that "[D]espite requests for other foods which would be in accordance with their belief, Plaintiffs and others were continually served the meat of land animals as well as products made with land animal byproducts." (Pls.' Am. Compl., ¶ 56.)

FN24. Mr. Malik Allah testified that he determined that these items contained pork by-products by reading the food labels which he obtained from an inmate who worked in the prison kitchen. He explained that if the labels did not contain a "U" or a "K" in a circle, or state that the food was kosher, the food contained pork by-products. Mr. Malik Allah stated if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 12
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

label were devoid of the symbol, "then you can bet you're eating willie." (Defs.' Ex. II, Dep. of Malik Allah, at 176.) Mr. Malik Allah stated that he forwarded these food labels to his attorney. Mr. Malik Allah also testified that he consulted a book, *How Not to Eat Pork,* written by Mrs. Ali, to determine whether the food contained pork by-products. Mr. Allah had no knowledge of Mrs. Ali's professional credentials; he did not know if she is a doctor, or if she earned any degrees. (Defs.' Ex. II, Dep. of Allah, at 174-178.)

In general, prisoners who are practicing Muslims are entitled to a diet which provides them with adequate nourishment without the consumption of pork. To this end, prison officials should provide inmates with alternative foods when pork products are served. *Muslim v. Frame,* 854 F.Supp. 1215, 1224 (E.D.Pa.1994). Defendants maintain that due to the fact that there is a large inmate population of Orthodox Muslims at Graterford, pork meals are rarely served. If pork products are served, there are notices posted on the cellblock bulletin boards. Plaintiffs have the option of not consuming the pork dishes. (Defs.' Ex. VII, at 21.)

As stated above, Fed.R.Civ.P. 56(c) provides that if the party moving for summary judgment sustains its burden by demonstrating that he is entitled to judgment as a matter of law, the non-moving party must then "make a showing sufficient to establish the existence of every element essential to its case, based on the affidavits or by depositions and admissions on file." *Harter,* 967 F.2d at 852. Plaintiffs have provided no credible evidence to refute defendants' assertion that when meals containing pork were served at Graterford, substitute or alternative foods were available to all inmates who did not consume pork for religious reasons [FN25]. Plaintiffs have presented no affidavits or reports from expert witnesses to support their contention that they were routinely served food containing pork or pork by-products without their knowledge, nor have they supplied the court with other plausible evidence that they were not provided with a diet with adequate nourishment without the consumption of pork. [FN26]

Furthermore, by providing alternatives to pork at meal time, defendants have demonstrated that they accommodated the religious needs of the plaintiffs. Accordingly, this court finds that plaintiffs have not sustained their burden with respect to their claim that defendants violated their First Amendment rights by furnishing them a diet which violated their religious tenets.

> FN25. Furthermore, Deputy Stachelek testified that when Graterford "bids out food product, they're bid out in such a way that the bidders have to disclose whether or not there is a pork or pork byproduct in it. And generally, they're precluded. They're bid out to say no to pork or pork byproduct." (Defs.' Ex. VII, at 22.). Deputy Stachelek opined that this was done to accommodate the Muslim population. There is no requirement that an institution certify by any particular means that a diet is consistent with an inmate's religious requirements. *Davidson v. Coughlin,* 914 F.Supp. 1011 (S.D.N.Y.1996). Since plaintiffs have failed to provide more than naked assertions that they were served pork or pork by-products without their knowledge, this court finds that plaintiffs' claim regarding pork consumption fails.

> FN26. This court notes that plaintiffs have not provided the court with any depositions, affidavits, etc., to support any of their contentions, except for a four-page excerpt from the deposition of Richard X. Evans, which pertains to breaking the fast at Ramadan, (Pls.' Ex. A), and an excerpt from the deposition of Vincent X. Davis which pertains to the alleged verbal harassment by corrections officers Marburger, Riegel and Orzehowski. (Pls.' Resp., at 20.)

*10 Plaintiffs state that during Ramadan, non-Orthodox Muslims do not eat the meat of land animals, i.e., chicken, beef, etc. Plaintiffs maintain that defendants violated their religious tenets, and

Not Reported in F.Supp.                                                                                                              Page 13
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

thus their First Amendment rights, by providing them with a diet during Ramadan which contained " meat of the land animal." Plaintiffs assert that "[d]espite requests for other foods which would be in accordance with their beliefs, Plaintiffs and others were continually served the meat of land animals as well as products made with land animal byproducts." (Pls.' Am. Compl., at ¶ 56.) According to plaintiffs, defendants denied these requests until mid-December 1995; at that time, cheese was added to the food line as a meat substitute. (Defs.' Ex. V, at 74; Defs.' Ex. VII, at 25, 33, 36, 40-41.) Defendants counter that providing food to inmates is not a restriction on the exercise of religion, but is "merely the provision of food." Defendants add that plaintiffs were free to abstain from eating the meat which was on the menu during Ramadan, and regardless of what the inmates were served during December 1995, the plaintiffs did not violate their religious beliefs by eating the meat of land animals. FN27 (Defs.' Mot. Summ. J., at 22.) Furthermore, defendants assert that plaintiffs were able to supplement their diets with extra portions of food served in the dining room, food from the commissary and from inmate-run stores.

> FN27. Plaintiff Malik Allah testified that he did not eat any pork or meat during Ramadan. (Defs.' Ex. II, at 236.) Vincent X. Davis testified that he was able to refrain from eating improper foods during Ramadan 1995. (Defs.' Ex. III, at 65.) Furthermore, Richard X. Evans testified that he was a vegetarian. (Defs.' Ex. IV, at 150.)

Plaintiffs have not demonstrated that defendants' refusal to provide them with a meatless diet is tantamount to placing a restriction on their ability to practice their religion. Additionally, plaintiffs have not shown that the food they were provided was nutritionally inadequate. As stated above, the Supreme Court has held that prison regulations FN28 "alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone,* 482 U.S. at 349. As stated above, a regulation is upheld if it is "reasonably related to legitimate penological interests." *Id.*

> FN28. The court interprets the regulation under discussion to be the provision of certain types of food to plaintiffs, or the refusal thereof.

Deputy Stachelek testified that his decision to deny plaintiffs' request FN29 for a meat free diet during Ramadan came on the heels of the State of Emergency which had been declared at Graterford. However, Deputy Stachelek testified that the Department of Corrections' general policy on Ramadan made no provision for meatless dinner meals FN30. (Defs.' Ex. VII, at 26-27, 37, 39-40; Defs.' Ex. XIX.) In addition, during the thirteen years he organized Ramadan for Muslim inmates at Graterford, he had never been asked that no meat be served to Muslims during Ramadan. Furthermore, Deputy Stachelek testified that another group of non-Orthodox Muslims at Graterford had requested that the meat meal be served at dinner. FN31 (Defs.' Ex. VII, at 23, 29.)

> FN29. Defendants acknowledge that plaintiff Malik Allah made a request to Deputy Superintendent Stachelek, wherein he asked that the members of MTI not be served meat of land animals during Ramadan 1995. Defendants also acknowledge that the Orthodox Muslim Chaplain recommended, albeit without explanation, that Deputy Stachelek approve Mr. Malik Allah's request. (Defs.' Ex. VII, at 26, 38-39; Defs.'Ex. XX.)

> FN30. Deputy Stachelek testified that he did not have the authority to deviate from these policies, and only after he received approval from Superintendent Vaughn and Commissioner Beard did he add cheese to the menu as a meat substitute during Ramadan. (Defs.' Ex. VII, at 40.)

> FN31. Deputy Stachelek testified that in his "13 years of experience in organizing,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 14
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

coordinating and setting up Ramadan, I've never encountered a situation where inmates said they could not eat meat. As a matter of fact, they took the opposite position and insisted that they get the better meals of the day in the evening. For example, if a chicken meal were scheduled at noon, the Muslims would insist that the meal be switched to the evening so that they could get the chicken or they could get the roast beef." (Defs.' Ex. VII, at 23.) Mr. Stachelek added that the members of the Nation of Islam had never requested similar dietary restrictions to that of the MTI; he stated "They eat meat. They eat everything, except pork." *Id.* at 29.

This court finds that Deputy Stachelek's initial denial of a meat free meal for members of MTI served a legitimate penological interest since this decision was made on the heels of the State of Emergency at Graterford, and there were 3,500 inmates to be served, compared to only three plaintiffs who allegedly made a request for a change in the food policy. Furthermore, plaintiffs had alternative means of practicing their religion, i.e., opportunities to supplement their diets with other foods which were not counter to their religious beliefs, opportunities for individual prayer, etc. Moreover, according to defendants, plaintiffs' request conflicted with the requests of other Muslim inmates who asked that their meat meal be served during dinner. This court finds that given Deputy Stachelek's extensive experience handling Ramadan feasts at Graterford, the conflicting requests for food from various inmate groups, and the alternatives available to plaintiffs to comply with their religious beliefs, the initial decision to deny plaintiffs' request was reasonable, and therefore, not violative of their First Amendment rights. Lastly, this court also notes that approximately mid-December, defendants subsequently made reasonable attempts to accommodate plaintiffs' religious needs by providing cheese on the food line as a meat substitute. [FN32] Accordingly, this court holds that defendants' original denial of plaintiffs' request for a meatless Ramadan meal did not violate their First Amendment rights.

FN32. Plaintiffs also complain that on one occasion, after the cheese was placed on the food line, Captain Guysen removed the cheese from the line. However, Captain Guysen stated that he had no knowledge that a meat substitute was approved on a daily basis. When it was discovered that he ordered the cheese substitute removed, he was reprimanded; thereafter, he did not order the cheese removed from the line. This court finds that Captain Guysen's action does not amount to a restriction on plaintiffs' free exercise of religion, since plaintiffs had other methods of complying with their dietary requirements, and also acknowledged that they did not break their fast as a result of Captain Guysen's mistake.

B. *Substantive Due Process*

*11 The substantive component of the due process clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that shocks the conscience. *Fagan v. City of Vineland,* 22 F.3d 1296, 1303 (3d Cir.1994)(en banc); *Smith v. Borough of Pottstown,* 1997 WL 597909 * 5 (E.D.Pa.1997); *Jubilee v. Horn,* 975 F. Supp 761,764 (E.D.Pa.1997). But see, *Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996) (limiting the shocks the conscience test to police chases).

In Count II of their Amended Complaint, plaintiffs allege that defendants violated their substantive due process rights. [FN33] The Supreme Court has held that "[a]s a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity. *Albright v. Oliver,* 510 U.S. 266, 271-72, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion)(quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Court further explained, "[w]here a particular amendment ' provides an explicit textual source of constitutional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 15
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

protection' against a particular sort of government behavior,' that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.' " *Id.* at 273 (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *see also Fagan v. City of Vineland,* 22 F.3d 1296, 1306-08 n. 6 (3d Cir.1994) (en banc) ("We cannot ignore the Supreme Court's repeated warnings against an overly generous interpretation of the substantive component of the Due Process Clause.").

> FN33. Plaintiffs contend that the " guidelines instituted at Graterford suspended all religious activity for an extended period of time. Further, said guidelines and activities prohibit outside visitors from coming in and observing religious holidays and observances; regulations and guidelines prohibit congregations of God fearing Muslim practitioners from having prayer meetings at regularly scheduled intervals." (Pls.' Am. Compl., Count II, ¶ 39.)

In the case at bar, an enumerated provision of the Bill of Rights, namely the First Amendment, encompasses plaintiffs' claims in Count II of their Amended Complaint. The court finds that plaintiffs' claims in Count II of their Amended Complaint are of the nature of First Amendment allegations, and are properly addressed thereunder. [FN34]

> FN34. In the event that plaintiffs had stated a substantive due process claim, the standard under which such a violation is addressed is the "shocks the conscience" standard. In *Fagan v. City of Vineland,* our Court of Appeals stated that "the substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.' " 22 F.3d 1296, 1303 (3d Cir.1994) (en banc). The facts alleged in the present case do not shock the conscience of the court. It cannot

be fairly said that the conduct alleged by plaintiffs as violative of their substantive due process rights amounts to an arbitrary use of governmental power. For this additional reason, this court finds that defendants' motion for summary judgment on plaintiffs' substantive due process claim is granted.

C. *Equal Protection*

Plaintiffs also allege that defendants' actions deprived plaintiffs of their rights to equal protection of the laws in that they did not subject other religious groups to the "same restrictive guidelines that were imposed on Muhammed's Temple of Islam." [FN35] (Pls.' Am. Compl., Ct. III, ¶ 44.) Defendants aver, however, that they are entitled to summary judgment on these matters because plaintiffs cannot show that they were similarly situated to any other prisoners who were treated differently, and that even if they could make such a showing, there exists a rational basis for the alleged differential treatment.

> FN35. Plaintiffs allege that other " 'mainstream' religious organizations were allowed to meet on a regular basis, to have outside ministers and visitors celebrate religious holidays, and generally have not been subjected to the type of harassment as those members of the Muslims faith and specifically the Muhammed's Temple of Islam." (Pls.' Am. Compl. Ct. III, at ¶ 44.)

*12 The Supreme Court mandated in *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), that "all persons similarly situated should be treated alike." *See also Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Artway v. Attorney General of the State of New Jersey,* 81 F.3d 1235, 1267 (3d Cir.1996). A prison regulation does not violate the Equal Protection Clause so long as the classifications established by the regulation serve a legitimate government interest and are reasonably related to that end. *Lewis v. Casey,* 518 U.S. 343 (1996). To establish a violation under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                 Page 16
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

equal protection clause in the absence of a suspect classification, a plaintiff must show that there could be no rational basis for being treated differently from other similarly situated individuals. *Brandon v. District of Columbia Board of Parole,* 734 F.2d 56, 60 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1127, 105 S.Ct. 811, 83 L.Ed.2d 804 (1985); *Jubilee v. Horn,* 959 F.Supp. 276, (E.D.Pa.1997). The plaintiff bears the burden of proving that the prison regulation or policy at issue is not rationally related to the stated purpose.

Plaintiffs' first equal protection claim, that defendants imposed more restrictive measures upon them than those imposed upon other groups, is unpersuasive. Plaintiffs have not presented any evidence, either by affidavit or other competent proof, that other, similarly situated inmates were treated differently from plaintiffs with respect to the policies implemented at Graterford regarding the cessation of volunteer activities. The one-week cessation of religious services, and the suspension of study sessions applied to all religious groups at Graterford. Plaintiffs merely allege that other religious groups were not subject to the same policies that members of MTI were subject to, and these allegations are not substantiated in fact. Plaintiffs have, therefore, failed to present evidence of an equal protection violation regarding their contention that administration of the policies was applied in a manner which violated the Equal Protection Clause. Under the standard for evaluating summary judgment motion, plaintiffs may not rely upon conclusory allegations in pleadings or in memoranda and briefs to establish a genuine issue of material fact. Defendants have met their initial burden by establishing, that there was no such issue, since the suspension of "volunteer activities," both religious and otherwise, applied to all volunteer groups. Because defendants have sustained their burden, plaintiffs must then make a showing sufficient to establish the existence of every element essential to their case. *See Harter,* 967 F.2d at 852. Plaintiffs, however, have merely relied upon conclusory allegations in their amended complaint and response to defendants' supplemental motion for summary judgment. This they may not do. *See Lujan,* 497 U.S. at 888. Accordingly, plaintiffs have failed to meet their burden under the summary judgment standard.

*13 Plaintiffs also allege that "members of a (sic) Christian and Jewish faiths are allowed greater dietary access and freedom in accordance with their religious observances than the Muslim faith generally and specifically Muhammed's Temple of Islam." (Plts.' Am. Compl., Count VI, ¶ 73.) Plaintiffs cite to no evidence to support this contention. Defendants counter that "unlike the food allowances made for non-Orthodox Muslims, the prison does not make special food arrangements for the Catholics during the Lenten season." (Defs.' Resp., at 6.) Once again, plaintiffs have not sustained their burden under the summary judgment standard. Accordingly, plaintiffs' equal protection claim fails.

### D. *Retaliation and Harassment*

It is well settled that prison officials cannot retaliate against a prisoner who exercises his First Amendment rights. *See Crawford-EL v. Britton,* ---U.S. ---- at ----, 118 S.Ct. 1584, --- L.Ed.2d ---- at ----, 1998 WL 213193 at *11 (U.S. May 4, 1998). *Brooks v. Andolina,* 826 F.2d 1266, 1268-69 (3d Cir.1987); *Millhouse v. Carlson,* 652 F.2d 371, 373-74 (3d Cir.1981). "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." *White v. Napoleon,* 897 F.2d 103, 111-12 (3d Cir.1990). To prevail on a retaliation claim, a plaintiff must prove that: (1) he engaged in protected activity; (2) he was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Anderson v. Davila,* 125 F.3d 148, 160 (3d Cir.1997)(citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

In Count V of the Amended Complaint, plaintiff Malik Allah appears to allege facts which imply that a certain corrections officer acted in a retaliatory manner toward him. However, such allegations do not make out a claim of retaliation, since this court is unable to discern from plaintiffs' submissions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                             Page 17
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

which protected activity plaintiff was engaged in, or that the adverse action [FN36] alleged was substantially motivated by the plaintiff's participation in protected activity. Malik Allah maintains that early one morning in December 1995, he was disturbed by Corrections Officer Deshields and told to pass out the morning milk. Plaintiff Malik Allah contends that he was in the middle of his prayers when the request was made, and he asked the officer to close the cell door. According to Malik Allah, Officer Deshields denied this request. Malik Allah claims that as a result of this incident, he was "unjustly accused of threatening a corrections officer despite having witnesses to discredit the corrections officer." (Pls.' Am. Compl., Count V, ¶¶ 61-66.) Plaintiff Malik Allah contends that he was placed in "lock down" for twenty-one days, missed the Feast of Eid on January 7, 1996, and "forced to miss out on all religious functions for a period of 21 days," and he was "not exonerated from these misconduct charges until January 26, 1996." *Id.*

> FN36. Presumably, the adverse action alleged by the plaintiff is the fact that he was placed in "lock down" for a period of time.

*14 Plaintiff Malik Allah has not demonstrated that Officer DeShields acted in retaliation against him for engaging in a protected activity. Even assuming, *arguendo,* that plaintiff Malik Allah is alleging that the protected activity he engaged in was "prayer", he has failed to show that the act of praying, as opposed to his failure to obey orders, was a substantial motivating factor for the decision to place him in "lock down." Accordingly, this court finds that plaintiff Malik Allah's retaliation claim fails as a matter of law.

Plaintiff Davis alleges that he was verbally threatened by corrections officers when he was preparing for the Feast of Eid celebration. Davis assert that the officers verbally threatened him, but did not physically touch him. (Defs.' Ex. IV, at 160-61.) The officers deny Davis' claim, stating that Davis was not on the list of inmates permitted to set up for the Ramadan feast, and they permitted him access to the field house only upon orders from Lieutenant Mash. (Defs.' Mot. Summ. J., at 35; Defs.' Exs. XI, XII.) Even assuming that Davis' version of the events were true, this court finds that the acts of which plaintiff Davis complains do not violate his constitutional rights. *See Wilson v. Horn,* 971 F.Supp. 943, 947-48 (E.D.Pa.1997)("The verbal abuse and harassment of which ... [the inmate plaintiffs] complain, although not commendable, does not rise to the level of a constitutional violation."). Even plaintiff Davis stated that the officers "didn't put me out. That's why I said it was just a threat." (emphasis added)(Defs.' Ex. II, at 160-61.) Thus, this court finds that plaintiff Davis' harassment claims against defendants Marburger, Orzehowski and Riegel fail.

Plaintiff Evans sues Lieutenant Judge alleging that Judge "was just all out nasty." Evans contends that Judge attempted to coerce him into "breaking the rule, the religion doctrine rule", by encouraging Evans to eat his evening meal before sunset. (Defs.' Ex. IV, at 244, 245). Evans concedes that he never did break his fast during daylight hours. (Defs.' Ex. IV, p. 245.) This court interprets plaintiff Evans' claim as a harassment claim. As stated above, verbal harassment, alone, does not amount to a constitutional violation. Accordingly, this court finds that plaintiff Evans' harassment claim against Lieutenant Judge fails.

### V. *CONCLUSION*

For all the above reasons, the court holds that the defendants' motion for summary judgment must be GRANTED and that judgment be entered in favor of defendants and against plaintiffs on all claims in plaintiffs' Amended Complaint. An appropriate order follows.

### ORDER

AND NOW, this day of May, 1998, upon consideration of Defendants' Supplemental Motion for Summary Judgment (Doc. No. 47), plaintiff's response thereto (Doc. No. 49), and defendants' supplemental filing, (Doc. No. 50), it is hereby

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 18
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

ORDERED

that defendants' motion is GRANTED. For the reasons set forth in this court's Memorandum of Decision filed this day, judgment is hereby entered in favor of defendants on all of plaintiffs' claims.

E.D.Pa.,1998.
Allah v. Stachelek
Not Reported in F.Supp., 1998 WL 281930 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:96cv00502 (Docket) (Jan. 24, 1996)
• 2:96cv00466 (Docket) (Jan. 23, 1996)
• 2:95cv07922 (Docket) (Dec. 22, 1995)
• 2:95cv07700 (Docket) (Dec. 12, 1995)
• 2:95cv07593 (Docket) (Dec. 06, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.