1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


VURNIS GILLIS                      : Civil Action No.
            Plaintiff             : 04-921
                                   :
      -v-                          :
                                   :
STAN TAYLOR, et al                 :
            Defendants             :




            Deposition of JOHN OLDIGS, taken before
Elaine Gallagher Parrish, RPR, CRR, at The Nemours
Building, 1007 North Orange Street, Wilmington,
Delaware, on May 22, 2007, commencing approximately at
10:00 a.m.


APPEARANCES:

        ZHUN LU, ESQ.
        ERIC JAMES EVAIN, Ph.D., ESQ.
        GRANT D. CUNNINGHAM, ESQ.
        Connolly Bove Lodge & Hutz, LLP
             The Nemours Building
             1007 North Orange Street, P.O. Box 2207
             Wilmington, Delaware 19899
             for the Plaintiff,

        ERIKA Y. TROSS, ESQ.
        Deputy Attorney General
             State of Delaware Department of Justice
             820 North French Street
             Wilmington, Delaware 19801
             for the Defendants.




            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
             (302)655-0477
             www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters





JOHN OLDIGS

2

1          JOHN OLDIGS,

2    having been first duly sworn according to law, was

3    examined and testified as follows:

4                    - - -

5    BY MR. LU:

6        Q.    Good morning.

7        A.    Good morning.

8        Q.    Thanks for coming, especially taking the time

9    coming from Dover.  Before we start I just want to give

10   you a little bit of direction.  So the oath you just

11   took, and that placed an obligation on you that if you

12   answer to my questions truthfully, but at the same time

13   you are entitled to understand the questions I give you.

14   So if anywhere that my question is not clear to you, if

15   you don't understand, please let me know.

16       A.    All right.

17       Q.    Also, you have a right to complete your answers

18   to the question.  So if somewhere that you stop, you

19   pause, thinking about how to continue, and if I think

20   that you're done and instead of asking the next one, if

21   that happens, let me know and that I didn't let you

22   finish.

23       A.    Understood.

24       Q.    If you need to take a break, just let us know so

JOHN OLDIGS

3

1   we can do that.

2      A.   All right.

3      Q.   Because the deposition is recorded, so for the

4   benefit of the Court Reporter here give your answer

5   verbally so that both of us can hear, just shaking the

6   head is not good enough.

7      A.   Right.   Okay.

8      Q.   For the record, please state your name and

9   official title, please.

10     A.   John Oldigs, senior fiscal administrative

11  officer, Department of Correction.

12     Q.   So Department of Correction, is Department of

13  Correction your current employer?

14     A.   Yes, they are.

15     Q.   Have you testified before?

16     A.   Never.

17     Q.   This is the first time.   Okay.   Since when you

18  worked for your current employer?

19     A.   I began 1988.

20     Q.   Okay.   At the same position?

21     A.   No.   I started out as an account tech and have

22  worked my way up, held various positions.

23     Q.   Okay.   So how long have you been at your current

24  position?

JOHN OLDIGS

4

1    A.   My position that I'm in now was just recently

2  upgraded to my title that I have now.  I have been in my

3  position, though, under a different classification for

4  six years.  I was support services administrator but

5  then my title got changed to what it is now.

6    Q.   Okay.  Could you describe your job

7  responsibilities at your current position, even though

8  the position I understand is newly created but you have

9  been doing the same -- been responsible for the same job

10 over last six years or so, right?

11   A.   Right.  Basically I'm in charge of the finances

12 for the medical and substance abuse units within the

13 Department of Corrections.  I do the analysis, payments

14 to all vendors, other related duties that fall within

15 the medical field of overseeing the contractor which

16 includes archiving of medical files, day-to-day liaison

17 between our medical vendor and the department when I'm

18 in constant contact with them on their needs, where I

19 purchase all equipment, maintenance contracts, whatever,

20 and basically just do a lot of reports concerning our

21 medical contractor.

22   Q.   Okay.  So are you familiar with Delaware State

23 policy rules and regulations with respect to medical

24 recordkeeping for prisoners?

JOHN OLDIGS

5

1    A.    Yes.

2    Q.    So you are able to testify on that aspect?

3    A.    Yes.

4    Q.    And you're willing to do so?

5    A.    Yes.

6    Q.    Thank you.  Let me ask this.  Who is the legal

7   owner of the medical records for the prisoners?

8    A.    The Department of Correction.

9    Q.    So you are, clearly, because of your position

10  you are clearly familiar with the rules and regulations,

11  how to keep medical records for prisoners, correct?

12   A.    Yes.

13   Q.    Okay.  So are you also familiar on the same

14  respective, the rules and regulations about

15  recordkeeping for prisoners from 1986 to 1995?

16   A.    Yes.

17   Q.    All right.  When did you become aware of this

18  deposition?

19   A.    I guess probably about a month ago.

20   Q.    Okay.  So how did you first find out this

21  deposition?  Did somebody contact you?

22   A.    Erika contacted me.

23   Q.    How did you prepare for this deposition?

24   A.    I didn't prepare.

JOHN OLDIGS

6

1    Q.   Did you not do anything at all?

2    A.   I pretty much know what there is to know about

3    dealing with this subject where I did not have to go

4    back and review anything.

5    Q.   So you did not talk to anybody about this

6    deposition?

7    A.   No.

8    Q.   Did you review any documents?

9    A.   No.

10    Q.   All right.  So you didn't spend any time to

11    prepare for this deposition?  Based on your knowledge,

12    based on your knowledge from your job responsibility,

13    you did not prepare?

14    A.   Can I?

15          MS. TROSS:  I can't talk to you.  Answer

16    the question.

17          THE WITNESS:  Erika did come down last week

18    and sat with me briefly just going over, you know, what

19    to expect, but I pretty much had already known

20    everything that she had mentioned to me.

21    BY MR. LU:

22    Q.   All right.  So how long did you meet with her

23    last week?

24    A.   20, 30 minutes.



JOHN OLDIGS

7

1    Q.    Have you seen any document entitled notice for

2    deposition?  Did Erika show you the document when you

3    met with her?

4    A.    I did see the document from I think that was a

5    subpoena to Erika.  I never did see a document that had

6    my name on it.

7    Q.    Let me just show you this.  Plaintiff, if I

8    submit, Exhibit 1000.  Take a look at this document.

9              (Oldigs Deposition Exhibit No. P-1000 was

10   marked for identification.)

11   BY MR. LU:

12   Q.    So do you need a few minutes to -- this is the

13   first time --

14   A.    I have seen this.

15   Q.    -- you have seen that?

16   A.    I have seen this.

17   Q.    Okay.  Great.  So just look at the questions

18   listed there.

19   A.    Okay.

20   Q.    Okay.  You have been at this position for about

21   six years.  Who was the person before you at this

22   position?

23   A.    Larry Sussman.

24   Q.    Is he still with the State?

JOHN OLDIGS

8

1    A.    Yes.

2    Q.    So do you have his contact information?

3    A.    He works in the same building that I do in

4    Dover.    I just have to contact that building, 245 McKee

5    Road.

6    Q.    So how long was he at this position, do you

7    know?

8    A.    If I said I would be guessing.    I would say

9    roughly six, seven years also.

10    Q.    Okay.    So do you know the person before him?

11    A.    No, I do not.

12    Q.    All right.    At your position do you have any

13    other people who report to you?

14    A.    No, not currently.

15    Q.    Okay.    So you are the only person who oversees

16    the medical records --

17    A.    Yes.

18    Q.    -- for the State?

19    A.    Yes.

20    Q.    Okay.    Who are the current medical providers for

21    the State, taking care of the prisoners at this time?

22    A.    Correctional Medical Services.

23    Q.    That's the only one you have?

24    A.    Yes.

JOHN OLDIGS

9

1    Q.    Since when has the provider been working for the

2    State?

3    A.    Since July 1st, 2005, I believe.

4    Q.    Okay.  Do you know the provider before that?

5    A.    Yes.

6    Q.    Could you state the name of the provider?

7    A.    First Correctional Medical.

8    Q.    How long was this provider --

9    A.    They had the contract for two fiscal years, so

10   it would be July 1st, 2004.

11   Q.    Do you know the provider before that?

12   A.    Yes.  Correctional Medical Services.

13   Q.    It's the same?

14   A.    Right.

15   Q.    And the one before that?

16   A.    Prison Health Services.

17   Q.    For how long?

18   A.    Prior to First Correctional Medical when CMS had

19   the contract was from fiscal year '00 to '04, Prison

20   Health had it from '96, fiscal year '96 to fiscal year

21   2000.

22   Q.    So can you remember all the medical providers if

23   I'm going to ask you to cover the period between 1986 to

24   1995?

JOHN OLDIGS

10

1    A.    I would feel a lot better if I had that listing

2    in front of me.

3    Q.    Right.

4    A.    But, yes, I would be able to say who held the

5    contract.

6    Q.    Okay.  So can you start from 1986?

7    A.    1986?

8    Q.    That's correct.

9    A.    '86, I would need that list going back that far.

10   Q.    Well, could you look at the page two question

11   that we have to prepare, especially asking about the

12   medical records, location custody for the plaintiff in

13   the period that we're asking is from 1986 to 1995.  So I

14   do need the information from you since you don't -- I

15   don't know, unless you can tell me from your, you know,

16   just on top of your head?

17   A.    I would feel more -- I was told not to bring

18   anything.

19   Q.    Okay.

20   A.    I would feel more confident having that in front

21   of me than just saying out loud what I think it was.

22   Q.    Okay.  I understand.  But you do have a list --

23   A.    Yes, I do.

24   Q.    -- in your office?  So we will request that list

JOHN OLDIGS

11

1    at some later time.

2        A.    Yes.

3        Q.    All right.  Let's talk about the recordkeeping.

4    Do you have a central location for the medical records?

5              MS. TROSS:    Excuse me, Zhun, I am going to

6    interject at this point and object to all questions

7    regarding policies and procedures of the Department of

8    Correction and its facilities.  Those policies and

9    procedures are protected from disclosure by Delaware

10   law, specifically Section 4322.D of Chapter 43 of Title

11   XI of the Delaware Code.  We didn't bother to paper

12   anything at this point in bringing it to the Judge's

13   attention.  We did want to allow the deposition to

14   proceed.  So I am going to instruct Mr. Oldigs to

15   respond, but we are not waiving our privilege with

16   respect to questions and answers dealing with DOC's

17   policies and procedures.  We are reserving that

18   privilege.  But I am going to direct him to respond to

19   your question.

20              MR. LU:   I understand that.  Thank you.

21              THE WITNESS:   Can you repeat the question,

22   please?

23   BY MR. LU:

24       Q.    The question is do you have a central location

JOHN OLDIGS

12

1    for your medical records?

2    A.    No, we do not.

3    Q.    Okay.  Then can you explain how do you keep your

4    medical records?

5    A.    Upon release they're kept at the prison facility

6    for three years.

7    Q.    Released, can you explain what that released

8    means?

9    A.    Once an inmate is released from our system --

10    Q.    Okay.

11    A.    -- his medical file is kept at that releasing

12    facility for three years.

13    Q.    Okay.  And after that?

14    A.    Then they are archived, that entire year of

15    medical files is archived where it goes to another State

16    agency, archives.

17    Q.    Okay.  How long do you keep the medical records

18    in that archives?

19    A.    57 years.

20    Q.    57 years.

21    A.    Right.  It's total retention of 60 years.

22    Q.    Okay.  In that case if the -- that procedure has

23    been followed then the person -- the prisoner's record

24    should be either in your custody or in the archive if

JOHN OLDIGS

13

1  the prisoner is still in the prison, has not been

2  released, is that correct?

3      A.    It would still be within our system.

4      Q.    Then how do you go about to retrieve that

5  medical record?

6      A.    Once I receive a request, whether it be from a

7  law firm or disability office, I go into DELJIS, find

8  the location of that inmate, and send it to the medical

9  records person at that institution.

10     Q.    I want to show you a document.  This is a

11  affidavit by Latisha Johnson.  I would like to mark this

12  as an Exhibit 1001.

13            (Oldigs Deposition Exhibit No. P-1001 was

14  marked for identification.)

15  BY MR. LU:

16     Q.    Have you seen this document before?

17     A.    No, I have not.

18     Q.    All right.  Take a few minutes and just read it.

19     A.    All right.

20     Q.    So do you know Miss Johnson?

21     A.    The name is not familiar.  If I was to see her

22  face I would probably recognize her.

23     Q.    Okay.  So do you understand that from the

24  affidavit that she's testifying that the medical records

14

1   that she retrieved only go back to about date of 1996,

2   1995?

3       A.    I understand.

4       Q.    Does that sound normal to you?  You understand

5   that Mr. Gillis is still under the custody of the State

6   and he's been incarcerated since 1986, but his medical

7   records from that affidavit which states that the

8   records only goes back to '95 or '96, so what's your

9   answer to that?

10      A.    I know when this was happening back in '06 that

11  I had contacted his previous places of incarceration,

12  asked them to search for his records.  I'm in a central

13  location to where I'm assuming that CMS, Correctional

14  Medical Services is doing all they can to fulfill the

15  request of the entire incarceration period.

16      Q.    Okay.  So did you get any answer from them?

17      A.    I believe that we did find some from Sussex.

18      Q.    When was this?

19      A.    And had forwarded them up last year, around this

20  time period.

21      Q.    Okay.

22      A.    I would also like to add that I received two or

23  three requests a day for a medical file.

24      Q.    I understand.



JOHN OLDIGS

15

A.    To where, you know, it's hundreds a year are looked for.

Q.    So when you receive those requests how do you go about to get them, and then I guess, more importantly, what's the outcome from your action responding to his request?

A.    Our medical unit is rather small.  We're just now recently growing with all that's happening.  My position really was just given this, just because there was no other person in the medical unit to where, you know, I do my part, the department wants a central point of contact, and which they chose me to receive all requests for files, and basically my point is just to receive the copy of the request, find out that releasing institution or where the individual is still institutionalized at, and send it to the medical records person.

Q.    So can you state a name of the medical records person that you send your requests to?

A.    There is up and down the State nine different prison facilities.

Q.    But you do have contact information --

A.    Yes.

Q.    -- for those?



JOHN OLDIGS

16

1    A.    Yes.

2    Q.    Okay.  You mentioned earlier that the medical

3  records were being kept for 57 years from the date that

4  the prisoner is released.  I would assume that's also if

5  the prisoner is dead, deceased, that also counts as a

6  starting point for 57 years, correct?

7    A.    I believe those go to the Medical Examiner's

8  Office up here in Wilmington.

9    Q.    So they have the medical records?

10   A.    Right.

11   Q.    If somebody, if a prisoner is dead?

12   A.    Right.

13   Q.    Let's talk about the regulations and rules.  You

14  mentioned 57 years.  How long has that regulation been

15  in place?

16   A.    As long as I have been doing this position.

17   Q.    For last six years?

18   A.    Right.

19   Q.    What about before that, before the six years?

20   A.    I have always known it to be that long, a

21  60-year retention.

22   Q.    60-year retention?

23   A.    Three years at the releasing and then 57 in

24  archives, I have also known it to be that.

JOHN OLDIGS

17

1   Q.   Okay.  So would it be fair to say that

2   regulation was in place since 1986?

3   A.   I would say yes.

4   Q.   When you say that the nine different facilities

5   that you send your requests to, would that include

6   Delaware Psychiatric Center?

7   A.   They are not a part of the Department of

8   Correction, no.

9   Q.   They're not?

10   A.   No.

11   Q.   So do you have any access to the medical records

12   to the Delaware Psychiatric Center?

13   A.   No, I do not.

14   Q.   I want to show you another document.  I'd like

15   to make this as an Exhibit 1002.

16          (Oldigs Deposition Exhibit No. P-1002 was

17   marked for identification.)

18   BY MR. LU:

19   Q.   Okay.  So do you recognize the name on the

20   document, patient?

21   A.   Mr. Gillis' name.

22   Q.   Right.

23   A.   Yes.

24   Q.   And could you also look at the date on that

JOHN OLDIGS

18

1    document?

2        A.    Okay.

3        Q.    So the date is January 11th of '96, is that

4    correct?

5        A.    I show just January, '96.

6        Q.    Oh.

7        A.    Up top here, 1-11-96, yes.

8        Q.    Okay.  So this is a part of the medical records

9    that we received from the State so far, and which

10   indicates that Mr. Gillis was medicated starting at

11   least January 11th of 1996.  However, we don't see

12   anything before that date stating why Mr. Gillis was

13   medicated, because the records that we have were missing

14   from that point forward, meaning the date before that,

15   January 11th of '96, so we don't have any indication

16   that why Mr. Gillis was medicated.  So my question to

17   you is had we had records before this date we would be

18   able to tell why Mr. Gillis was medicated, is that

19   correct?

20       A.    I would assume that is correct.

21       Q.    Okay.  So now the question, next question is

22   that because we don't have any medical records before

23   that date, and we really do need to have the records

24   before that, how do you go about to find those records

JOHN OLDIGS

19

1    for us?

2       A.    I contact all the prison facilities where

3    Mr. Gillis was incarcerated going back prior to his

4    whole history.

5       Q.    All right.

6       A.    And have asked them to search for his record.

7       Q.    And the answer, did you get from that, you got

8    from them --

9       A.    I contacted -- I contact -- this goes back to

10   the '06, I remember doing this, I believe there was four

11   different, he was transferred back and forth and all

12   four did search, sent me what they had on him, and I

13   assumed that that was the entire package on Mr. Gillis.

14      Q.    So the records that we received you believe were

15   from those four facilities upon your request and send

16   the record to you?

17      A.    Right.  When I receive a record I am taking it

18   that they are sending me his complete entire file.

19      Q.    Okay.  But the ones that we have, they're not

20   complete, the earliest the one that I have just showed

21   you is among the earliest ones showing that he was

22   medicated for this particular medication.

23      A.    Right.

24      Q.    And we don't have any other records prior to

JOHN OLDIGS

20

1   this date showing the reason that why Mr. Gillis was

2   medicated.  And does that surprise you that there is

3   such a huge amount of medical records missing, although

4   you assume that those records provided to you were his

5   complete medical -- complete medical records?

6       A.   I don't have an answer for that.  I'm assuming

7   what they send me is complete.  And I do everything I

8   can to make sure that it is complete.

9       Q.   Okay.  So is there any way to find out that the

10  facilities that you requested medical records that they,

11  indeed, provided you the complete records they have?

12      A.   I'm not a medical expert.  I'll say, again, I'm

13  assuming what they send me is complete.

14      Q.   Well, but the thing is the records that we have

15  they're not complete.  There is a huge chunk of records

16  are missing.  And he was, again, he was incarcerated

17  since 1986 but the earliest medical records that we have

18  received so far only goes back to 1996.

19      A.   Right.  If I receive a request, send it out,

20  fulfill it, get the copy back, and then I forward it to

21  where it needs to go, if that person finds that there is

22  missing period of time within that record contacts me

23  back and lets me know that I'll do everything I can to

24  try to locate that missing portion by going in to

JOHN OLDIGS

21

1    DELJIS, finding exactly where he was at, calling them up

2    again and asking them look, you have to look again in

3    your inactive, active, wherever.

4    Q.    So if we're going to send request again, would

5    you be able to do that?

6    A.    Yes.

7    Q.    To contact the facilities and ask them to check

8    whether any records -- you know, actually we know that

9    the part that was missing was between 1986 to 1996.

10    That's the period that medical records are missing.

11    A.    I would be able to contact again.

12    Q.    Okay.

13              MR. LU:  Can we take a short recess?

14              MS. TROSS:  Sure.

15              (Recess taken.)

16    BY MR. LU:

17    Q.    Are we ready again?  All right.  I want to ask

18    you a couple more questions going back to the previous

19    ones just to clarify.  I mentioned Delaware Psychiatric

20    Center.  You said that's not a part of the State but if

21    the prisoner is kept there do you send your medical

22    records to them or do they give records to you?

23              MS. TROSS:  Excuse me.

24              THE WITNESS:  First I'd like to correct --

JOHN OLDIGS

22

1          MS. TROSS:  I just want to correct that

2    that was mischaracterizing his testimony.  He said it

3    wasn't part of the Department of Correction.

4    BY MR. LU:

5        Q.    Oh, it is not part of the Department of

6    Correction.

7        A.    Right.

8        Q.    It is part of the State?

9        A.    Yes.  They're part of Health and Social

10   Services, fall under Health and Social Services.

11       Q.    I understand that.  Sorry.

12       A.    And to follow up with your question, I know that

13   if an inmate is sent to DPC Center just the pertinent

14   information follows him there.  The psychiatric notes,

15   his medication history, the MARs.

16       Q.    I'm sorry, what did you call that?

17       A.    MARs, this is a MAR document.

18       Q.    Could you spell that?

19       A.    M-A-R.  It's an acronym for medical

20   administrative record I think.

21       Q.    Okay.  So there are certain exchanges between

22   the Department of Correction --

23       A.    His entire file is not sent, medical file, but

24   just key points that the medical, our medical, CMS,

JOHN OLDIGS

23

1   feels like the DPC Center is going to need.

2       Q.   Do they also, by that I mean DPC, does DPC also

3   send records back to the Department of Correction?

4       A.   I don't really know.  If he -- you're referring

5   to if he becomes well enough to come back into our

6   system --

7       Q.   No, no.

8       A.   -- from DPC?

9       Q.   No.  My question is does DPC also send their

10  medical records to Department of Correction?

11      A.   No.  Well, we don't receive inmates back from

12  them.  They're usually released out into society.

13      Q.   Oh.  What if --

14      A.   If an individual is categorized as being

15  mentally sane and still has years of his sentence left

16  and does need to come back and serve it.

17      Q.   Right.

18      A.   I would assume, I -- I would assume that yes,

19  that they do send key notes back to our medical to keep

20  a continuity of care going.

21      Q.   Right.  So and under certain circumstances

22  there, certain exchange between Department of Correction

23  and the DPC in terms of medical records?

24      A.   Right.  And that primarily falls upon our

JOHN OLDIGS

24

1   medical contractor to just correspond with their medical

2   unit.

3     Q.   Okay.  You mentioned that there is an archive

4   for medical records, correct?

5     A.   Right.

6     Q.   When you received requests for medical records

7   do you check the archives as well?

8     A.   If the individual has been out of our system

9   longer than three years or it's an older request that

10  goes back, and I keep a list of the last year each

11  facility has sent their inactive files to archives, so I

12  know that if I receive a request on an individual, say,

13  released in 1999 that his file is going to be in

14  archives, I'll just go to my content list of those

15  records to find out which box his file is in and request

16  it from archives.

17    Q.   So if a person is still under the custody of the

18  State, is still a prisoner, then his record would not be

19  in the archives, is that right?

20    A.   Correct.

21    Q.   Okay.  Early on you mentioned the medical

22  providers, they either changed between from year to

23  year?

24    A.   Yes.

JOHN OLDIGS

25

1    Q.    Or sometimes the contract maybe renewed and they

2    continued.    Let's just say if you have a change of

3    medical provider, let's just say five years ago, and

4    then from the provider A to provider B how do they pass

5    the medical records, what other regulations procedures

6    on that?

7    A.    The transition period?

8    Q.    Yes.

9    A.    Normally I have always seen happen to where the

10    people that work at the prison facilities are hired on

11    by the new company that the only thing that changes is

12    the upper management.    New company comes in, they just

13    hire all the existing staff to where really there is no

14    change at the prison facilities.    It's just the home

15    office changes to a new company.

16    Q.    All right.    So the records would --

17    A.    They still remain in the same place.

18    Q.    Okay.

19    A.    They're not moved.

20    Q.    So would that be true since, let's say from 1986

21    to 1995, or 1996 --

22    A.    Yes.

23    Q.    -- period?    All right.    I think I'm pretty much

24    done with my questions.    Just to summarize what we

JOHN OLDIGS

26

1    talked about.  So there should be medical records for

2    Mr. Gillis in your system, is that correct?

3        A.    Yes.

4        Q.    Okay.  And his records, since he's still a

5    prisoner, so his records would not be in the archives,

6    is that right?

7        A.    Correct.  Although I would like to say that

8    Mr. Gillis is not a prisoner right now at the DPC

9    Center.  If he remains at DPC Center his records with

10   the Corrections will eventually be archived.

11       Q.    How long of a period are you referring to?

12       A.    Three years.

13       Q.    If he's been in the DPC for three years then his

14   medical records in the Department of Correction could be

15   sent to archives?

16       A.    Correct.

17       Q.    So if we are able to collect his complete

18   records then we would be able to tell then why he was

19   medicated during the period of 1986 to '95 or '96

20   period, do you agree with that statement?

21       A.    I'm not a medical expert, but yes, I would agree

22   with that.

23       Q.    So the medical records because of the policy

24   that they have to be kept at least for 60 years from

JOHN OLDIGS

27

1   what you just told us before, so there must be his

2   record, I mean complete record that if we try we should

3   be able to find them somewhere in your system?

4      A.    Correct.

5      Q.    So we're going to send additional requests and

6   we'd ask you to follow up to the facilities that you

7   mentioned earlier and check on the records and make sure

8   that they have, particularly from the period of 1986 to

9   1996 period of Mr. Gillis' medical records.

10     A.    I understand.

11            MR. LU:  All right.  I think that's all I

12  have.  Thank you so much for coming.

13            THE WITNESS:  You're welcome.

14            MR. LU:  And thank you, counsel.

15            MS. TROSS:  You're welcome.

16            THE REPORTER:  Would you like the witness

17  to read and sign?

18            MS. TROSS:  Yes, please.

19            (Whereupon the Deposition concluded at

20  approximately 11:50 a.m.)

21

22

23

24

JOHN OLDIGS

28

1                        I N D E X

2    DEPONENT:  JOHN OLDIGS                        PAGE

3       Examination by Mr. Lu                        2

4                  E X H I B I T S

5    JOHN OLDIGS DEPOSITION EXHIBITS              MARKED

6    1000 Notice of deposition                      7
     1001 Affidavit of Latisha Johnson             13
7    1002 Medical records dated 1/11/96            17

8
     ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 29
9
     CERTIFICATE OF REPORTER                PAGE 30
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JOHN OLDIGS

29

1

2              REPLACE THIS PAGE
         WITH THE ERRATA SHEET
3           AFTER IT HAS BEEN
         COMPLETED AND SIGNED
4            BY THE DEPONENT.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

JOHN OLDIGS

30

1   State of Delaware)
                    )
2   New Castle County)

3            CERTIFICATE OF REPORTER

4            I, Elaine G. Parrish, Registered
    Professional Reporter and Notary Public, do hereby
5   certify that there came before me on the 22nd day of
    May, 2007, the deponent herein, JOHN OLDIGS, who was
6   duly sworn by me and thereafter examined by counsel for
    the respective parties; that the questions asked of said
7   deponent and the answers given were taken down by me in
    stenotype notes and thereafter transcribed into
8   typewriting under my direction.

9            I further certify that the foregoing is a
    true and correct transcript of the testimony given at
10  said examination of said witness.

11           I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
12  interested in the event of this suit.

13

14                      Elaine G. Parrish

15                      Certification No. 170-RPR

16                      (Expires January 31, 2009)

17

    DATED:    May 25, 2007
18

19                              COPY

20

21

22

23

24

1000

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Vurnis Gillis, | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-921-*** |
| | ) | |
| Stan Taylor, et al., | ) | |
| | ) | |
|       Defendants. | ) | |

### PLAINTIFF, GILLIS'S, NOTICE TO TAKE THE DEPOSITION OF DEFENDANTS PURSUANT TO FED. R. CIV. P. 30(b)(6)

PLEASE TAKE NOTICE that Vurnis Gillis ("Plaintiff"), by his attorney, will take the deposition upon oral examination of the person or persons designated by Stan Taylor, et al ("Defendants") pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. The deposition will take place at the offices of Connolly Bove Lodge & Hutz, LLP, The Nemours Building, 1007 North Orange Street, Wilmington, DE 19801 on March 19, 2007 at 2:00 p.m., or at such other time and location as mutually agreed upon, and will continue from day to day at the time and place until completed.

The deposition will be taken before a Notary Public or some other officer authorized to administer an oath. Testimony will be recorded by stenographic means and may also be recorded by videotape (audio-and-visual).

In accordance with Fed. R. Civ. P. 30(b)(6), defendants shall designate one or more officers, directors, managing agents, employees or other persons to testify on its behalf as to matters known or reasonably available to them concerning the following subject matter:

1.      Defendants' record retention policies, rules, regulations, procedures, and practices in obtaining, maintaining, up-keeping, housing, tracking, transferring, or otherwise disposing of medical and/or psychiatric records for prisoners incarcerated in the Delaware Correctional Center and/or psychiatric facilities.

525544-1



DEPOSITION
EXHIBIT
P-1000

2.    The existence, location, filing, maintenance, storage, filing or other
      custodial activity relating to Plaintiff's medical and/or psychiatric
      records for the years 1986 to date.

3.    The current location and custody of Plaintiff's medical and/or
      psychiatric records for the years 1986 to 1995.

Dated: March 7, 2007

_____
Zhun Lu, Esquire (#4427)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: (302) 884-6262
Fax: (302) 658-5614
Email: zlu@cblh.com

*Attorney for Plaintiff*

525544-1

CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2007, a true and correct copy of the foregoing

PLAINTIFF, GILLIS'S, NOTICE TO TAKE THE DEPOSITION OF DEFENDANTS

PURSUANT TO FED. R. CIV. P. 30(b)(6) was caused to be served on the following by

hand delivery on:

Erica Y. Tross, Esquire
State of Delaware
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, Delaware 19801

/s/ Zhun Lu
Zhun Lu, Esquire (#4427)
zlu@cblh.com

525544-1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Vurnis Gillis, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-921-*** |
| | ) | |
| Stan Taylor, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF, GILLIS'S, NOTICE TO TAKE THE
DEPOSITION OF DEFENDANTS PURSUANT TO
FED. R. CIV. P. 30(b)(6)

The undersigned counsel for Plaintiffs hereby certifies that a copy of PLAINTIFF,

GILLIS'S, NOTICE TO TAKE THE DEPOSITION OF DEFENDANTS PURSUANT

TO FED. R. CIV. P. 30(b)(6) was caused to be served on March 7, 2006 via Hand

Delivery upon the following counsel of record:

Erica Y. Tross, Esquire
State of Delaware
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, Delaware 19801

Dated: March 7, 2007

/s/ Zhun Lu
Zhun Lu, Esquire (#4427)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: (302) 884-6262
Fax: (302) 658-5614
Email: zlu@cblh.com

*Attorney for Plaintiff*

525544-1

CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2007, a true and correct copy of the foregoing

PLAINTIFF, GILLIS'S, NOTICE TO TAKE THE DEPOSITION OF DEFENDANTS

PURSUANT TO FED. R. CIV. P. 30(b)(6) was caused to be served on the following via

CM/ECF filing on:

Erica Y. Tross, Esquire
State of Delaware
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, Delaware 19801

/s/ Zhun Lu
Zhun Lu, Esquire (#4427)
zlu@cblh.com

525544-1

1001

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VURNIS L. GILLIS,                    )
                                     )
            Plaintiff,               )
                                     )
                                     )        Civil Action No. 04-921-KAJ
      v.                             )
                                     )
                                     )
STAN TAYLOR, et al.,                 )
                                     )
            Defendants.              )

## AFFIDAVIT OF LATISHA JOHNSON

I, Latisha Johnson, having been duly sworn by law, do hereby depose and state as follows:

1.    I am employed by Correctional Medical Services ("CMS") in the Medical Records Department located at the Delaware Correctional Center.

2.    In late July, early August 2006 I was asked to make a copy of the entire medical file of Inmate Vurnis Gillis, SBI #00180180.

3.    As requested, I made a copy of all of Gillis's available medical files and sent the copied files for mailing.

4.    On or about August 4, 2006 I spoke with Deputy Attorney General Erika Y. Tross regarding the Gillis medical files. I conveyed to DAG Tross that I had copied all of Gillis's available medical files and that there were no additional documents or files for Gillis.



5    DAG Tross requested that I review the files again to see if there were medical records dating from 1986 to the mid 1990s.

6    As requested, I reviewed the files a second time and found no records dating from 1986 to the mid 1990s.

7.    In addition I called the medical departments at the Secured Housing Unit and the Maximum Housing Unit. I was told that the medical files I had contained all of the available records for Gillis and that there were no other available records.

8.    After reviewing the files I contacted DAG Tross and told her that I had sent her a copy of all of Gillis's available medical files and that there were no records in Gillis's medical file dating from 1986 to the mid 1990s.

9.    Accordingly, I certify that all available medical records indexed to Gillis have been provided to DAG Tross.

Latisha Johnson
Latisha Johnson

SWORN AND SUBSCRIBED before me this 28th day of September, 2006.

Notary

-2-

1002



DEPOSITION
EXHIBIT
P-1002
PENGAD 800-631-6989

D00322