## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

VURNIS GILLIS,                    )
                                  )  C.A. No. 04-921
                  Plaintiff,  )
                                  )
  -vs-                            )
                                  )
STAN TAYLOR, et al.,              )
                                  )
                  Defendant.  )

      Deposition of LATISHA JOHNSON taken
pursuant to notice at the law offices of CONNOLLY BOVE
LODGE & HUTZ, 1007 North Orange Street, Suite 900,
Wilmington, Delaware, beginning at 10:00 a.m. on August
20, 2007, before Julianne LaBadia, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        ZHUN LU, ESQ.
        GRANT D. CUNNINGHAM, ESQ.
        THATCHER RAHMEIER, ESQ.
        CONNOLLY BOVE LODGE & HUTZ
          1007 North Orange Street, Suite 900
          Wilmington, Delaware  19899
          For the Plaintiff

        ERIKA Y. TROSS, ESQ.
        Deputy Attorney General
          820 North French Street
          Wilmington, Delaware  19801
          For the Defendant
        DEPOSITION OF LATISHA JOHNSON

- APPEARANCES CONTINUED -

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



LORI WOLHAR, ESQ.
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
 1220 Market Street - 5th Floor
 Wilmington, Delaware  19801
 For CMS

\* \* \* \* \* \* \* \*

LATISHA JOHNSON

The deponent herein, having first been

duly sworn on oath, was examined and

testified as follows:

DIRECT EXAMINATION

BY MR. LU:

     Q.   Okay.  Ms. Johnson, my name is Zhun Lu.  I will

ask you some questions today, and you have been placed

under a legal obligation to tell the truth to answer my

questions.  But at the same time, you have the right to

understand my questions, so if there is anything that you

are not clear or don't understand the question, please

let me know so that I can make it clear and you

understand.

     A.   Okay.

     Q.   And also, you are entitled to hear out the

complete questions.  And so, if I give you a question



3

1   that you are thinking about how to give an answer, if I

2   thought that you have completed your answer, I may start

3   asking the next question.  If that's the case, let me

4   know, so I can hold the new question and let you finish

5   your answer to the previous question.  Okay?

6       A.   Okay.

7       Q.   If you need to take a break, please let me know

8   so that we can finish the question at hand and then you

9   can take a break at any time.

10      A.   Okay.

11      Q.   And also, because the deposition is recorded by

12  the court reporter here.  So, for her benefit, please

13  give your answer verbally.  Just shaking your head and

14  nodding your head is not sufficient.  Okay?

15      A.   Yes.

16      Q.   And also for the benefit of the court reporter,

17  let's try not to talk over each other, meaning that when

18  you talk, I'll stop, and when I talk, you stop.  Okay?

19      A.   Yes.

20      Q.   Good.  For the record, please state the name of

21  your current employer, please.

22      A.   Correctional Medical Services.

23      Q.   Please, also for the record, please state your

24  name and your official title of your job.

Latisha Johnson

4.

```
 1        A.    Letitia Johnson, medical records clerk.

 2        Q.    Okay.  How long have you been working for

 3   Correctional Medical Services?

 4        A.    A year and four months.

 5        Q.    Okay.  Did you hold any other position before

 6   your current one?

 7        A.    Positions where?

 8        Q.    In your current employment.

 9        A.    No, sir.

10        Q.    That's the only position that you've held?

11        A.    Yes.

12        Q.    Okay.  Did you work for CMS previously,

13   specifically the year of 2000 to 2002?

14        A.    Never.

15        Q.    Did you work for CMS during the year between

16   1985 to 1996?

17        A.    No, sir.

18        Q.    Okay.  Have you ever testified in a deposition

19   for your current employer?

20        A.    No, sir.

21        Q.    Have you done that for your previous employers?

22        A.    No, sir.

23        Q.    This is the first time?

24        A.    Yes, sir.
```

Latisha Johnson

5

1      Q.    All right.  Did you speak with your attorney in

2   preparation for this deposition?

3      A.    Excuse me?

4      Q.    Did you speak to your attorney in preparing for

5   this deposition?

6      A.    Yes, sir.

7      Q.    How much time did you spend preparing for this

8   deposition?

9      A.    Not long.

10      Q.    An estimate.  An hour?  Two hours?

11      A.    Maybe an hour.

12      Q.    An hour?  Did you review any documents or

13   records in preparing for this deposition?

14      A.    No, sir.

15      Q.    So you only talked to your attorney?

16      A.    Yes.

17      Q.    Did you talk to anybody else in your

18   organization before this deposition?

19      A.    My supervisor.

20      Q.    Okay.  Could you tell us what your supervisor's

21   name is?

22      A.    Jan McLaran.

23      Q.    And what is her title at the organization?

24      A.    He.

Latisha Johnson

6

1    Q.    He, I'm sorry.

2    A.    He's an HSA.

3    Q.    Say that again.

4    A.    He is an HSA.

5    Q.    What does that mean?

6    A.    He is our health services administrator.

7    Q.    Okay.  Could you tell us, what are your job

8    responsibilities?  Yours.

9    A.    Me?

10   Q.    Yes.

11   A.    We hold all the medical files, medical files of

12   all the inmates and --

13   Q.    All the inmates --

14   A.    All the medical files of the inmates.

15   Q.    Okay.

16   A.    And we -- pretty much we maintain them, we keep

17   them up and we file paperwork inside of the charts.

18   Q.    Okay.

19   A.    And that's really --

20   Q.    So that's all you do?

21   A.    Yeah.  Pretty much.

22   Q.    Okay.  Are you the only person at your

23   organization who is responsible for the medical records?

24   A.    No, sir.

Latisha Johnson

7

1      Q.    How many other people who are also your

2  coworkers who do the same job?

3      A.    Two.

4      Q.    Two?

5      A.    Yes.

6      Q.    What are their names?

7      A.    Lianne Dunn and Patrice Herrera.

8      Q.    So there are three of you that are responsible

9  for the medical records at the organization; is that

10  correct?

11             MS. WOLHAR:    Objection to form.

12  BY MR. LU:

13      Q.    Is that -- okay.    So --

14             MS. WOLHAR:    You can answer if you

15  can.

16      Q.    So there are only three people who are

17  responsible at your organization?

18      A.    Three people -- the main side?

19      Q.    At your current site.

20             MS. WOLHAR:    Objection to form.

21  BY MR. LU:

22      Q.    Can you tell me the number of people who are

23  responsible at your place, responsible for medical

24  records?

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

Latisha Johnson

8

```
 1              MS. WOLHAR:   Objection to form.

 2       A.   Are you talking about on my side or on the --

 3   on -- at the whole prison?

 4       Q.   At your current site.  How many sites are

 5   there?

 6       A.   There's three sides.

 7       Q.   There's three sites?

 8       A.   Yes, sir.

 9       Q.   So you are at which site?

10       A.   I am on the main side.

11       Q.   And the other two people, which sites are they

12   at?

13       A.   They're on the main side, also.

14       Q.   So do you have other sites for the medical

15   records?

16       A.   Yes.

17       Q.   Can you tell me what are the other site?

18       A.   There is the SHU, which is the secure housing

19   unit, and there is the MHU, which is the maximum housing

20   unit.

21       Q.   Okay.  So there is a SHU and a MHU?

22       A.   Yes.

23       Q.   And where is SHU?

24       A.   It's all on the same grounds, but we're here,
```

Latisha Johnson

9

1    the SHU is over there.  It's like on different sides of

2    the prison.  So each part has their own medical records

3    for their particular side.

4         Q.    Okay.  But they are all at Correctional Center;

5    is that right?

6         A.    Correctional Medical Services?

7         Q.    Right.

8         A.    Yes.

9         Q.    So they are located at where?

10        A.    They're located at the prison.

11        Q.    Yeah, which is at?  Smyrna?

12        A.    Delaware Correctional Center?

13        Q.    Yes.

14        A.    Yes.

15        Q.    And the other two coworkers, are their titles

16   the same as yours?

17        A.    Yes.

18        Q.    So they have the same responsibilities as you

19   do?

20        A.    Yes.

21        Q.    Did you ever work for a company called First

22   Correctional Medical?

23        A.    No, sir.

24        Q.    Did you ever work for a company called Prison

Latisha Johnson

10

1    Health Services?

2        A.    No, sir.

3        Q.    All right.  I am going to ask you about the

4    trainings that you have for your current job.  So, what

5    kind of trainings do you have to receive, in order to do

6    your work?

7        A.    I don't understand what you mean.

8        Q.    Well, do you have to get trained, in terms of

9    procedures of how to maintain keeping the medical records

10   and receiving medical records, or retrieving medical

11   records?  Do you need to have specific training at your

12   job?

13              MS. WOLHAR:   Objection; form.

14       A.    No.

15       Q.    So you don't have any training in order to get

16   your job?

17       A.    I don't understand what you mean.

18       Q.    Okay.  Well, let me explain.  So, when you

19   apply for a job, right, you got your job, and does your

20   employer provide any trainings for you, in order for you

21   to do a job?

22       A.    Depends on your job.

23       Q.    Right.  So, I am talking about your current

24   job.  In order to do your current job, have you received

Latisha Johnson

11

1    any particular trainings from your employer?

2        A.    You go to training for different things, yes.

3        Q.    For what?

4        A.    You go to training for different things that

5    you're going to be doing.

6        Q.    So what are the things that you're doing?  You

7    just told me --

8        A.    You don't go to training to pull the record off

9    the shelf.

10       Q.    You don't?

11       A.    You don't.

12       Q.    Okay.  So how do you follow, are there any

13   procedures that you follow to retrieve records?

14       A.    Look them up by the last name.

15       Q.    Okay.  Do you look at the last name on the

16   computer?

17       A.    Yes.

18       Q.    And tell me, what do you do next?

19       A.    To go look for a file?

20       Q.    Just tell me, if you receive a request.

21       A.    Okay.

22       Q.    Tell me what you do next.

23       A.    First when we receive a request, we need to

24   know the inmate's name, date of birth, and SBI number.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Latisha Johnson

12

1    All three, if possible.

2        Q.    Okay.

3        A.    Not, if you have the name, first and last name,

4    look them up by their first and last name.  You always

5    ask for a date of birth, to verify that that's the

6    correct individual.

7        Q.    Right.

8        A.    And look it up inside of our computer system.

9    Calls DACS.

10       Q.    Called what?

11       A.    DACS.

12       Q.    D-E-X?

13       A.    D-A-C-S.

14       Q.    Okay.

15       A.    And from DACS, we can tell where the inmate is

16   at, whether he is at our facility or somewhere else.  And

17   that's how we go about even starting the possibility of

18   even getting a record.

19       Q.    So what does DACS stand for?

20       A.    I'm not too sure.

21       Q.    Okay.  But it's a system that you can retrieve

22   information?

23       A.    Correct.

24       Q.    Upon receiving a request?



Latisha Johnson

13

1  A. Right.

2  Q. After you retrieve that information from the

3 DACS system --

4  A. Right.

5  Q. -- what's next?

6  A. If the inmate is housed there with us, then we

7 go to our shelves, which are in alphabetical order by the

8 last names.

9  Q. Okay.

10  A. And we pull the chart off the shelf.  And if it

11 needs to be copied, then it will be copied and we mail it

12 out to whoever had asked for it.

13  Q. Okay.  So, you only retrieve the records off

14 the shelf at your location?  Do you go anywhere else?

15  A. Say that again.

16  Q. Well, after you have the information --

17  A. Right.

18  Q. -- you look up in the DACS, and then you go to

19 the shelf?

20  A. Right.

21  Q. And you pull out the records?

22  A. Right.

23  Q. So that's the only place you go to get the

24 physical records?  Do you go anywhere else?

Latisha Johnson

14

1    A.   Anything that we have on site, then we pull it.

2 Because -- because there's a difference between an inmate

3 that is active and not active.  If it's not active, then

4 he is next door inside the other room, that we go pull

5 off the shelf.  The same thing.

6    Q.   All right.  You just mentioned active.  How do

7 you decide who is active or not active?

8    A.   By DACS.

9    Q.   The DACS will tell you who is or is not active?

10    A.   Yes.

11    Q.   So, if it's not active, you go to a different

12 room?

13    A.   Right.

14    Q.   But that's still, that room is still at Smyrna;

15 is that correct?

16    A.   Correct.

17    Q.   So, are those the only two places that you look

18 for physical records?  Would they be anywhere else?

19    A.   Anybody housed on the main side, yes.  But if

20 they're housed somewhere else, no.  The SHU and the MHU

21 has their own.

22    Q.   Does the system, the DACS system, tell you that

23 the medical records that you are trying to receive -- I

24 mean retrieve, from an inmate, does the system tell you

Latisha Johnson

15

1    where other sites the inmate has been held before?

2        A.    Yes.

3        Q.    So, if you do see that, do you go get records

4    from other sites?

5        A.    From the SHU and the MHU?

6        Q.    Right.  If the records say -- if the DACS

7    system tells you that --

8        A.    Yes.

9        Q.    -- the inmate has been to other places before,

10   and you retrieve the records from other places, as well?

11       A.    If the inmate was held in the SHU or housed in

12   the MHU, there is somebody over there already, a clerk in

13   the SHU, and you call them and say, we got this.  This

14   inmate needs whatever.  And they get it over there.

15       Q.    Okay.  The information you have on DACS, I

16   assume that's available at your company at its

17   headquarters; is that correct?

18              MS. WOLHAR:  Objection to form and

19   foundation.

20              MR. LU:  Well, let me just introduce

21   an exhibit.

22              (Johnson Exhibit 1 marked)

23   BY MR. LU:

24       Q.    Take a few minutes and read that.  Are you

Latisha Johnson

16

1    done?

2        A.    Yes.

3        Q.    Could you read the last sentence of the first

4    paragraph.

5        A.    CMS is not in possession of the medical records

6    pertaining to Mr. Gillis for any time prior to 2001.

7        Q.    Okay.  Can you tell me where this letter is

8    coming from?

9        A.    No, I cannot.

10        Q.    You cannot?

11        A.    No, sir.

12        Q.    Is it from CMS?  The letterhead?

13        A.    The letterhead, yes, sir.

14        Q.    All right.  And also, the lower portion, the

15    address?

16        A.    I don't know that address.

17        Q.    Can you read the address?

18        A.    12647 Olive Boulevard, PO Box 419052, St.

19    Louis, Missouri 63141-9052.

20        Q.    Can you look at the next page?  So, can you

21    tell what that is?

22        A.    Uh-huh.

23        Q.    So, can you tell where this letter is coming

24    from?



Latisha Johnson

17

```
 1        A.    Can I tell where it's coming from?

 2        Q.    Yes.

 3        A.    It came from CMS.  Uh-huh.

 4        Q.    All right.  The letter from CMS headquarters is

 5   telling us that CMS has no medical records pertaining to

 6   Mr. Gillis for any time prior to 2001.  Is that correct?

 7        A.    Yes.  That's what it says.

 8        Q.    Okay.  Let me introduce another exhibit.

 9              (Johnson Exhibit 2 marked)

10   BY MR. LU:

11        Q.    Just take a few minutes to notice the dates and

12   the name on the records, please.  Okay.  Could you tell

13   me, what is the name on the record?

14        A.    Vurnis Gillis.

15        Q.    Okay.  And the exhibit also notes, at the lower

16   right corner is a series of numbers on each page.  Okay.

17   The first one is 371, and the last one is 391.  These are

18   the Bates numbers on the medical records produced to us

19   by the State.

20        A.    Okay.

21        Q.    Okay?  So, can you tell me what the dates on

22   those records are?

23        A.    The first page?

24        Q.    Yes.
```

Latisha Johnson

18

1    A.    It's February, '96.

2    Q.    Okay.  And the next page?

3    A.    November of '95.

4    Q.    And the next one?

5    A.    March of 2000.

6    Q.    And two pages down?

7    A.    December, '99.

8    Q.    Good.  The next one?

9    A.    August, '99.

10   Q.    And the next one?

11   A.    April, '99.

12   Q.    And also look at the date in the middle.

13   A.    December, '98.

14         MS. TROSS:  I would just like to note

15   for the record that she is not reading each and

16   every date on these documents.

17         MR. LU:  I understand.

18   BY MR. LU:

19   Q.    So, would you agree that the dates on these

20   records are in the period of '95, '96, '99, '98, and so

21   on?

22   A.    And so on?  Like -- I see '96, and I've seen --

23   Q.    Right.  '95?

24   A.    '95.  Yes.

Latisha Johnson

19

1    Q.    Do you see 2000?

2    A.    Okay.

3    Q.    And '99?  Do you see '98?  And if you look at

4    the last page, it's '96; is that correct?

5              MS. WOLHAR:  Objection to form and

6    foundation.

7    BY MR. LU:

8    Q.    Is the date on the last page dated '96?

9    A.    Yes.

10    Q.    Okay.  So, how do you explain the discrepancies

11    on the letter from CMS --

12    A.    I didn't write the letter from CMS.

13    Q.    Say that again?

14    A.    I didn't write the letter from CMS.

15    Q.    I understand.  You didn't write that.  Okay.

16    So, how do you think that CMS has the information about

17    records saying that CMS does not have records for

18    Mr. Gillis for any time before 2001?

19              MS. WOLHAR:  Objection to form and

20    foundation.

21    A.    I don't know.

22    Q.    Don't know?  But you agree there is a

23    discrepancy in terms of dates from the letter of CMS and

24    the dates on the record I just showed you?

Latisha Johnson

20

1              MS. WOLHAR:  Objection; form.

2        A.   I don't know how you got that.

3        Q.   Got what?  The records?

4        A.   I'm saying, I don't understand -- I can say

5    what I see.  I know this is 1996, okay?

6        Q.   Right.  Yes.

7        A.   Right.

8        Q.   And do you recognize the Bates number on this

9    page?

10       A.   No, sir.

11       Q.   Those were produced by the State.

12       A.   I don't know that.

13       Q.   Okay.  Let me introduce another exhibit.

14              (Johnson Exhibit 3 marked)

15   BY MR. LU:

16       Q.   Okay.  You just told me that you cannot

17   explain -- you didn't write that CMS letter?

18       A.   Correct.

19       Q.   And you can't explain why there is a difference

20   between the dates on the CMS letter and the records that

21   I showed you?

22       A.   Right.

23              MS. WOLHAR:  Objection.

24       Q.   Is that correct?

Latisha Johnson

21

1      A.   I don't know what this is.  I didn't write this

2   letter.  I didn't write this to you.

3      Q.   Okay.  So, who do you think at CMS can help me

4   to understand the discrepancies?

5      A.   I can't tell you that.  I don't know.

6      Q.   Do you think your supervisor can help us on

7   that?

8      A.   I don't know.

9      Q.   Okay.  All right.  Let's look at the new

10  exhibit, number 3.  Do you recognize that document?

11     A.   Yes, sir.

12     Q.   Could you look at the item number 6 on the

13  second page?

14     A.   Yes.

15     Q.   Could you read that, please.

16     A.   As requested, I reviewed the file the second

17  time and found no records dated from 1986 to the

18  mid-1990s.

19     Q.   Do you think 1995 and 1996 would be considered

20  as mid-1990s.

21          MS. WOLHAR:  Objection to form.

22     A.   Excuse me?

23     Q.   Would 1995 be considered as mid-1990s?

24     A.   No.



Latisha Johnson

22

```
1              MS. WOLHAR:   Objection.

2        Q.    It would not?

3        A.    No.

4        Q.    So, what's your definition of mid-1990s?

5        A.    Mid-1990s, about '97, '98, '99.

6        Q.    So, '95 is not?

7        A.    It's the 1990s, but also, you can also look

8   inside of the affidavit, also it states that everything

9   that we had on file for him was copied, and sent.  So,

10  meaning that everything that you have, and if something

11  in the record was dated from '95, whatever, you had it.

12       Q.    All right.  Let's go back to that a little

13  later, but since you said that you copied everything you

14  had at the time --

15       A.    Excuse me?  I didn't say at the time.  That's

16  not what I said.

17       Q.    Well --

18       A.    Everything that we had available is what I

19  said.

20       Q.    Right.  Everything you had available at the

21  time, you copied everything?  Okay.

22                   (Johnson Exhibit 4 marked)

23  BY MR. LU:

24       Q.    Please note the Bates number on the page,
```

Latisha Johnson

23

1  starting from number 1.

2      A.   Uh-huh.

3      Q.   Please go through them.

4      A.   Uh-huh.

5      Q.   So these are the first ten pages of the medical

6  records provided to us by the State last year, around the

7  same time that this affidavit was dated.

8      A.   Okay.

9      Q.   Another exhibit.

10          MS. WOLHAR:   Is there a question

11 pending?

12          MR. LU:   Yes.

13          (Johnson Exhibit 5 marked)

14 BY MR. LU:

15     Q.   Please note the Bates number on those pages,

16 too, please.

17     A.   Uh-huh.

18     Q.   The last page is numbered 620.

19     A.   Yes.

20     Q.   Okay.   Those are ten last pages from the

21 medical records provided to us last year, again, around

22 the same time.

23          MS. TROSS:   Excuse me, I have to

24 object.   These are not medical records.   I gave you

Latisha Johnson

24

1  medical records and other documents.

2          MR. LU:  Part of them are medical

3  records.  Altogether, it's all in here.

4          MS. TROSS:  Right.  I gave you a lot

5  of different documents, including medical records.

6          MR. LU:  Right.  I understand.

7          MS. TROSS:  These are sentencing

8  records, not medical.

9          MR. LU:  I understand.

10          MS. TROSS:  I just wanted to clarify

11  for the record that she wasn't looking at medical

12  records.

13          MR. LU:  But that's part of the

14  records that were provided to us around the same

15  time.

16          MS. TROSS:  Right.  I gave you several

17  documents.

18          MR. LU:  I understand.  I understand.

19  Let me just ask the next question.

20  BY MR. LU:

21      Q.   So, the medical records, the records that we

22  received last year, the total numbered pages are 620

23  pages.  Okay?

24          MS. WOLHAR:  Is there a question?

1        MR. LU:  Yes.

2        MS. WOLHAR:  You're asking her if she

3    knows how many medical records you were given?

4        Q.    Right.  I'm asking, do you remember, when you

5    did a search back in August or July, 2006, do you have

6    any recollection of how many pages did you retrieve at

7    that time?

8        A.    No, sir.

9        Q.    Okay.  Did you make any records of the medical

10   records that you produced upon request from the Attorney

11   General's office?

12       A.    Say that again.

13       Q.    When you produced medical records, do you make

14   up any records, do you keep track of how many records

15   that you provided upon request from the Attorney

16   General's Office?

17       A.    Are you asking me how many records or how many

18   pages.

19       Q.    Say that again.

20       A.    How many records or how many pages.

21       Q.    Right.

22       A.    Which one?

23       Q.    How many pages?

24       A.    No.



Latisha Johnson

26

```
1        Q.    You don't?

2        A.    No, sir.

3        Q.    So you copy everything and then you hand it

4    over; is that correct?

5        A.    Copy everything and hand it over?

6        Q.    Well, let's just -- let's just be specific.

7    When Ms. Tross asked you to provide medical records for

8    Mr. Gillis last year --

9        A.    Right.

10       Q.    -- you copied everything you had, and you

11   handed it over to Ms. Tross or mailed it over to

12   Ms. Tross?

13       A.    It was mailed.

14       Q.    Mailed, right.  So, do you know how many pages

15   of medical records you handed over to the Attorney

16   General's office?

17       A.    I don't remember.  I don't remember.

18       Q.    Did you keep any records in your practice, in

19   terms of handing over records like that?

20       A.    We don't write down numbers.

21       Q.    You don't?

22       A.    No.  We write down the inmate's name and the

23   date, and who it went to.

24       Q.    Okay.  So, you didn't know how many pages that
```

1    you handed over?

2        A.    At that time?

3        Q.    At that time.

4        A.    They probably did, but I don't remember now.    I

5    can't tell you right now.

6        Q.    Okay.  Procedurally, if you are the person to

7    retrieve the records for the same inmate, if your

8    coworker were to do the same, if you both would follow

9    the same procedure, the number of medical records that

10   you produced would be the same; is that correct?

11            MS. WOLHAR:    Objection to form.

12       Q.    So, when you retrieve medical records, let's

13   say you produce 600 pages --

14       A.    Okay.

15       Q.    -- today.  And if you do the same thing, say

16   last week, you would produce the same number of pages of

17   medical records; is that right?

18       A.    I don't understand.

19       Q.    All right.  If Erika Tross asked you to produce

20   medical records for Mr. Gillis last month --

21       A.    Okay.

22       Q.    -- you go through the procedure, and you would

23   identify a certain number of pages of medical records,

24   right?



WILCOX & FETZER LTD.
Registered Professional Reporters

Latisha Johnson

28

1       A.    Okay.  Yeah.

2       Q.    Now, if she is going to ask you today to do the

3  same thing, would you retrieve the same number of pages

4  of medical records for the same inmate today?

5       A.    Depends if the inmate is active or not active.

6       Q.    So, can you tell me what is active or not

7  active?

8       A.    An inmate is active is an inmate that is

9  still -- he is still in prison, still at DCC.  That means

10  he may get seen between next month and today.  So he will

11  have more stuff.

12       Q.    Okay.  So, if the inmate is not under the care

13  of the Correctional Center, would that person be

14  considered as inactive?

15       A.    It depends on where they're at.

16       Q.    Okay.  If the person is at Delaware Psychiatric

17  Center.

18       A.    Right.

19       Q.    Is that active or not active?

20       A.    He is not active.

21       Q.    He is not?

22       A.    Right.

23       Q.    All right.  That's exactly the situation.

24  Mr. Gillis has been under the care of Delaware

1    Psychiatric Center for about a year now.

2         A.    Uh-huh.

3         Q.    So, if you are asked to retrieve Mr. Gillis'

4    records, say a month before today --

5         A.    Okay.

6         Q.    You would have come up with a certain number of

7    medical records, correct?

8         A.    Right.

9         Q.    And if you were doing the same thing today,

10   would you produce the same number of medical records for

11   Mr. Gillis today?

12        A.    Yes.

13        Q.    Okay.  Good.

14             MS. TROSS:  Zhun, if I may clarify

15   something, the second set of documents that I gave

16   to you did not come from DCC.  They came from SCI.

17   If that's where you're going with this.  That's why

18   the second set is different, they came from SCI.

19             MR. LU:  What is SCI?

20             MS. TROSS:  Sussex Correctional

21   Institute.  That's where Mr. Gillis was prior to

22   coming to DCC.  After the last deposition, you asked

23   us to check again.  We checked again, and Sussex

24   produced to us the set of documents which is the

Latisha Johnson

30

1   second set of documents that were given to you.

2               MR. LU:  So the second records were

3   not retrieved from DCC?

4               MS. TROSS:  No.  They were not.

5               MR. LU:  Okay.

6   BY MR. LU:

7       Q.    Let's go back to the DACS system.  When you

8   look at the DACS system, again, looking up Mr. Gillis,

9   does that give you any information about CSI medical

10  records?

11              MS. WOLHAR:  Objection to form.

12      Q.    So, when you --

13              MS. WOLHAR:  SCI, are you --

14      Q.    SCI.  I'm sorry.

15      A.    Will it give us anything about what?

16      Q.    About Mr. Gillis' records at SCI?

17      A.    No, sir.

18      Q.    So, your records only -- the records in your

19  department only pertains to the records kept at DCC, not

20  anywhere else; is that correct?

21      A.    Our records at DCC --

22      Q.    Right.

23      A.    -- are the records that that inmate has.  And

24  if an inmate is transferred to us from a different site,

Latisha Johnson

31

1  then whatever records that he brings with him to us is

2  all we have.  We don't have anything else.

3      Q.   So, if the person was transferred from SCI to

4  DCC, would his medical records come with him to DCC?

5      A.   They should.

6      Q.   It didn't happen this time, did it?

7      A.   I don't know that.

8          MS. WOLHAR:   Objection.

9      Q.   When you go to the shelf, or the storage room

10  for the medical records, again, using Mr. Gillis as an

11  example, if you look at his records, are the records

12  arranged in particular order?  For example, are they

13  arranged in chronological order?

14          MS. WOLHAR:   Objection to form.

15      A.   Yeah.

16      Q.   Yes?

17      A.   All records are housed by last names.

18      Q.   Their last names?

19      A.   Yes.

20      Q.   No.  But I am talking about the records for a

21  particular inmate --

22      A.   Uh-huh.

23      Q.   Are the records for that particular inmate, are

24  they arranged in any particular order, say by dates?

Latisha Johnson

32

1    A.    Now?

2    Q.    Yes.

3    A.    Right now, yes.

4    Q.    They are?

5    A.    Yes.   Now.

6    Q.    Okay.  So, if you look at, then, either request

7  for Mr. Gillis' records for, say, 1998 --

8    A.    Uh-huh.

9    Q.    For the year of 1998, so it would be very easy

10 for you to retrieve that year for the records that you

11 have; is that correct?

12         MS. WOLHAR:   Objection; foundation.

13   A.    I don't know.  I don't understand.  I'm not

14 understanding.

15   Q.    If the records were arranged by year and year,

16 in a chronological order, so it would be easier for you

17 to retrieve any particular year of the records from a

18 particular inmate.  Do you agree with that?

19   A.    Any particular inmate, for any particular year?

20 No.  I don't agree with that.

21   Q.    So they are not arranged by chronological

22 order, are they?

23   A.    They are arranged in order.

24   Q.    They are?

Latisha Johnson

33

1    A.    Yes, they are.

2    Q.    In what kind of order?

3    A.    They are arranged in order by dates inside of

4    their medical records.  But I don't understand what

5    you're talking about.  If something from 1998 -- I don't

6    understand.  What do you mean?

7    Q.    Okay.  Let's say a set of records covering the

8    years from 2000 to 2005.  If they are arranged by dates,

9    if I am asking you to retrieve the record in that set of

10   records of May 1 of 2006, you can find it easily, because

11   they're arranged by dates; is that right?

12              MS. WOLHAR:   Objection.

13   A.    From May?

14   Q.    Yes.

15   A.    2006?

16   Q.    Yes.

17   A.    It depends on where a person is at, though.

18   You're not -- you don't understand.  It's not that you

19   can just go pick up a chart and say here.  It depends --

20   it depends on the inmate.  It depends on the inmate.

21   Q.    Okay.  Well, assuming all the records that

22   we're talking about are in your possession.  It's all --

23   A.    But you're assuming something.

24   Q.    Yes.  Right.  So let's just assume that the

Latisha Johnson

34

1   records you have at your site, they are arranged by

2   dates, as you just told us; is that correct?

3       A.   I am telling you as of right now, as of this

4   moment --

5       Q.   Okay.

6       A.   -- and as long as I've been there, records are

7   kept in a binder.  If a person is seen, the new one goes

8   on top, assuming that they'll be in order.  Anything

9   before I was there, I don't know how they kept the

10  records.

11      Q.   Okay.

12      A.   But now, that's how they're kept.  That is what

13  I am telling you.

14      Q.   So how long --

15      A.   So if you ask me something from 2004 --

16      Q.   I understand.

17      A.   '98, '96, '95, 1986, I would not know.

18      Q.   I understand.  So, as long as you know, the

19  practice has been there, since you've been working there?

20      A.   As long as I've been there, that's how we have

21  done it.  But prior to me being there, I do not know.

22      Q.   I understand.  Okay.  So, if they are arranged

23  in that order, so, when I ask you to produce the

24  records -- well, I'll withdraw that question.

1          All right.  Let's talk about the inactive.

2    If a file becomes inactive, what do you do with the

3    records?

4               MS. WOLHAR:  Generally speaking?

5               MR. LU:  Yes.

6      A.    Well, if a record becomes inactive, we take it

7    and we break it down, you know, and take it out of the

8    blue charts that they normally are in.  It would be

9    inside of a different color chart, that they are

10   inactive, and it gets stored next door inside the other

11   room, inside of -- in order by their last names.

12     Q.    Okay.

13     A.    And then they are kept there for three years.

14     Q.    For three years?

15     A.    For three years.

16     Q.    But they are still at the same site?  Still at

17   the DCC, right?

18     A.    Yes.

19     Q.    So, when you were searching for Mr. Gillis'

20   records back last year, did you check the inactive files,

21   too?

22     A.    Yes, we did.

23     Q.    Did you find anything there?

24     A.    No.



Latisha Johnson

36

1    Q.    So, all his files are in the active section, if
2    you will; is that right?
3    A.    No.  All his files are housed over in the SHU.
4    Q.    Over in the SHU?  So, what does SHU stand for,
5    do you know?
6    A.    The SHU is the higher-security housing unit of
7    the inmates.
8    Q.    Okay.  So, all his records were found there?
9    A.    Yes.
10    Q.    Did you do another search for Mr. Gillis'
11    medical records this year?
12    A.    This year?
13    Q.    Yes.
14    A.    Not as far as I remember.
15    Q.    Do you keep track of the requests for inmates'
16    medical records?
17    A.    The requests for --
18    Q.    For medical records?
19    A.    By who?
20    Q.    By anybody.
21    A.    Yes.
22    Q.    Okay.  So, if you look at your track records,
23    you would be able to see whether anybody in your
24    department has made a search --

37

1    A.    Has made a search, or --

2    Q.    -- for Mr. Gillis' records since the last year

3    that you did your search?

4    A.    We don't keep track of the searches.  We keep a

5    track of -- of pretty much, you know, who wanted the

6    record, and whether or not the record was copied, and if

7    it was copied for somebody, then we would know that.

8    Q.    Okay.

9    A.    We would know that it was copied on this date

10   for this person.  But as far as who goes looking for

11   charts, that could be anybody.

12   Q.    Right.  So it can be you or your coworkers?

13   A.    Could be anybody.  It can be anybody working in

14   the -- inside of our facility.

15   Q.    Wait a minute.  I thought previously, you

16   mentioned that there were three --

17   A.    There are three medical records clerks.

18   Q.    All right.

19   A.    But you're asking me about somebody looking for

20   a record.  There's also nurses and inmates -- anybody can

21   be looking for a record.  You're not making it clear.

22   You're not saying -- what you said to me was anybody else

23   looking for a record.  Anybody can be looking for a

24   record.  But if you're talking about as far as a record

Latisha Johnson

38

1   of it being copied and sent off to somebody else, that is

2   solely upon us.

3        Q.   Okay.  All right.

4        A.   So what you're saying is somebody looking for a

5   record --

6        Q.   Let me make the question a little more

7   specific.  So, if anybody requested you copy the complete

8   records for Mr. Gillis --

9        A.   Okay.

10       Q.   -- say since the last time you did it --

11       A.   Okay.

12       Q.   -- you would have a record, a track record for

13  that?

14       A.   Yes.

15       Q.   Will you be able to find that for us?

16       A.   To find what?

17       Q.   To look at the records, of whether any other

18  requests for copying --

19       A.   The records --

20       Q.   -- Mr. Gillis' records since last year?

21       A.   Yes.

22       Q.   So, what do you have to do to find that

23  information?

24       A.   Go through the book and look in the book.

Latisha Johnson

39

1      Q.    So there is a record book you -- a log-in book

2    that you put down the request and the copies made?

3      A.    Yes.

4      Q.    All right.  So if you go through that book, you

5    will find out -- you can find out whether any other

6    additional requests for copying, again, complete medical

7    records, were made since last July?

8      A.    If it was written down, yes.

9      Q.    Procedurally, is it required to keep the

10   records?

11     A.    Procedurally --

12           MS. WOLHAR:  Objection to form.

13     A.    Excuse me?

14     Q.    You just said that it's written down.  So you

15   are assuming that it may not be written down?

16     A.    I'm not assuming anything.  I'm just letting

17   you know.  You asked the question.

18     Q.    So it can be written down.  Also, it can be not

19   written down?

20           MS. WOLHAR:  Objection to form.

21     A.    That's with anything.

22     Q.    Well, let me ask it this way:  If such request

23   was made, and the copies were made, and it was sent out,

24   are you, or is any of your coworkers supposed to write

Latisha Johnson

40

1    that down?

2        A.    Yes.

3        Q.    Okay.  How many requests of copying medical

4    records do you handle regularly, say per month?

5        A.    It -- it always depends.

6        Q.    Give us a rough idea.

7        A.    Oh, at least -- I would say at least about six

8    a month, at least.

9        Q.    Six a month?

10       A.    Uh-huh.

11       Q.    To copy the medical records for a particular

12    inmate?

13       A.    Yes.

14       Q.    Is it unusual for a request for medical records

15    for any particular time period?  Like what we're asking.

16    We're asking for medical records from 1986 to 1995.  Is

17    that unusual, or is that normal practice?

18       A.    I don't know.

19            MS. WOLHAR:  Objection to form.

20       Q.    Okay.  You said about six requests that you get

21    every month.

22       A.    Right.

23       Q.    Are they usually just say, you know, copy

24    everything for us?

Latisha Johnson

41

```
 1        A.    They will say copy the medical record, just --
 2   yeah.
 3        Q.    Everything?  Usually they don't say only a
 4   portion of it?
 5        A.    Mostly, most of the time, no, sir.
 6        Q.    Let's go back to the last year search that you
 7   did.  How much time does it take for you to get that
 8   record, when you received that request from Erika?
 9              MS. WOLHAR:  Objection.
10        A.    How much time did it take us?
11        Q.    Yes.
12              MS. WOLHAR:  Same.
13        Q.    An hour?  Half an hour?
14              MS. WOLHAR:  Objection.
15        Q.    Five minutes?
16        A.    It doesn't -- you look it up and find out where
17   an inmate is housed, and you go from there.  It's not --
18   there's never a certain time period for anything.
19        Q.    Usually, how long does it take?
20        A.    It all depends.
21        Q.    Okay.
22        A.    It depends on where the inmate is housed at.
23        Q.    All right.  Do you remember, specifically, do
24   you remember how much time you spent on searching for Mr.
```

Latisha Johnson

42

1    Gillis' record last year?

2             MS. WOLHAR:   The first time or the

3    second time?

4        Q.   The first time.

5        A.   Mr. Gillis' records are housed in the SHU.

6    They've always been housed in the SHU.

7        Q.   Okay.

8        A.   So when the phone call came across for his

9    medical records, we knew they were in the SHU.  So we

10   made the phone call to the SHU and asked for his medical

11   records.

12       Q.   Okay.

13       A.   That was the first time.

14       Q.   And then they handed over the records to you

15   for making copies?

16       A.   To copy them, yes.

17       Q.   You don't remember how many pages that you

18   produced the first time?

19       A.   No.

20       Q.   So, was there a second time, too?

21       A.   Second time for?

22       Q.   For searching for Mr. Gillis' records.

23       A.   Yes, there was.

24       Q.   When was that?

Latisha Johnson

43

```
 1        A.    I'm not really quite sure when it was, but

 2   after the first set was mailed off, Erika had called and

 3   she had asked me to search again, just to make sure that

 4   we didn't have anything else on him.

 5        Q.    Okay.

 6        A.    And that we looked --

 7        Q.    So what did you do?

 8        A.    We looked.  We looked all through the medical

 9   records department on the main side, and we also looked

10   inside of the files that are no longer active.  We looked

11   all through them, just to make sure that we didn't miss

12   anything, and there was nothing.  I also called to the

13   SHU, on the other side, and I called to the MHU, on the

14   other side, to have them to go through all of them, also,

15   to look to make sure nobody missed anything.

16        Q.    Right.

17        A.    And after everybody looked and everybody

18   searched, we took -- after we could not find anything, I

19   called her back and let her know, no, we don't have any

20   other records.  Everything we have is everything that we

21   gave to you when you asked the first time.

22        Q.    So, the first time you looked, all the records

23   were kept at the SHU?

24        A.    Yes.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Latisha Johnson

44

1    Q.    So, the second time you look at the MHU?

2    A.    We looked -- we looked at the MHU, just for the

3    same, just so we can say that we looked everywhere.  So

4    that way it couldn't be no -- anything.  We can say we

5    looked, everywhere in the prison there is to look, we

6    looked.  But it turned out, as I said, there is no more.

7    There is nothing else.

8    Q.    So, there's nothing else at the MHU, nothing?

9    A.    Nothing at the SHU.

10    Q.    Wait a minute.  How can you --

11    A.    The SHU, the MHU.

12    Q.    The first time you looked at the SHU?

13    A.    No.  The first time we went to the SHU because

14    we knew the records were in the SHU already.

15    Q.    And you copied everything there?

16    A.    Copied it.

17    Q.    But you don't know how many pages the first

18    time you copied?

19    A.    I don't know how many it is at all.  I don't

20    know how many pages it is now.

21    Q.    But there's no record whatsoever of how many

22    pages you actually copied?

23    A.    Excuse me?

24    Q.    You just said you copied everything.

Latisha Johnson

45

1    A.    We copied everything he has --

2    Q.    At the SHU the first time.

3    A.    Everything we had, we copied.

4    Q.    But you have no idea of how many pages you

5    actually copied and sent out, because there is no record?

6    A.    When?

7    Q.    The first time.

8    A.    How many pages?

9    Q.    Yes.

10   A.    No.  I don't know how many pages it is now.

11   Q.    So you have no idea how many pages you actually

12   copied the first time, do you?

13              MS. WOLHAR:   Objection to form.

14   A.    How many pages?

15   Q.    Yes.

16   A.    How many pages?

17   Q.    Yes.  The first time.

18   A.    Every time a chart is copied, pages are

19   counted.

20   Q.    They're counted?

21   A.    Yes, they are.  But -- but pages are -- how

22   many pages are never written down.  They are counted, to

23   give to our secretary with the chart.  So therefore, when

24   the chart leaves, that's that.  But it has nothing to do

1    about how many pages that we copy.  Charts -- they are

2    kept in charts.  Not just pages sitting, like pages like

3    this (indicates).  They're in charts.  So you're asking

4    how many pages does the record have?  I don't know.

5         Q.    So how do you keep track -- they're sitting in

6    charts, but you have to copy them physically, right?

7         A.    Okay.

8         Q.    The charts.

9         A.    Right.

10        Q.    And how many pages of charts that you actually

11   copied?  You don't really know how many that you did the

12   first time?

13        A.    I told you that already.

14        Q.    Right.

15        A.    I told you we don't know that.  I don't know

16   how many pages.  Sitting right here today, I can't tell

17   you I copied 625 pages.  I can't say that.

18        Q.    I understand.  So you didn't know how many

19   pages you actually copied.  Now, the second time --

20        A.    No.  See, you keep -- you keep telling me that

21   I didn't know, or I don't know?

22        Q.    Did you know then?

23        A.    Right now, I cannot tell you.

24        Q.    All right.



Latisha Johnson

47

1    A.    How many pages were copied.  Every time a chart

2  is copied, what -- what I am telling you is, whether or

3  not that person that is getting the chart is being -- is

4  being billed for it, is going to be getting a bill for us

5  copying the chart, then the pages are counted, a little

6  note on a sticky thing, and we give it to our secretary.

7    Q.    So where can I find that bill, if I would like

8  to --

9    A.    It depends on whether or not that -- whoever

10  requested the chart was actually being billed for it.  We

11  don't -- well, I don't know personally who gets billed

12  and who does not get a bill.  Some people that get

13  charts, maybe they don't get billed for them.  Depending

14  upon who -- depending upon who they are.

15    Q.    So who would know that the request for

16  Mr. Gillis' records last July, August, around that time

17  frame, was billed or not?

18    A.    Those -- the secretary at the time.  I don't

19  know who she was.  I don't remember.

20    Q.    You don't remember her name?

21    A.    I don't remember who -- we have three of them

22  since -- before.

23    Q.    Okay.  So, do you think we can find out from

24  somebody at CMS who that secretary is at the time?

Latisha Johnson

48

1      A.   I'm quite sure you could, yes.

2           MS. TROSS:  Zhun, I'll tell you I

3  didn't get a bill.  If that helps, I did not get a

4  bill.

5      A.   Well, then --

6           MR. LU:  So, then, there's no record

7  of how many pages were actually copied?

8           MS. TROSS:  I told you, we gave you

9  the entire medical file.

10          MR. LU:  I understand.

11          MS. TROSS:  And we have offered to let

12 you come look at the file.  We've given you

13 everything.

14          MR. LU:  I --

15          MS. TROSS:  The exact number of pages,

16 the Bates numbers --

17          MR. LU:  I understand.  I am not

18 saying that you did not.  I'm just trying to find

19 out what happened to the records which should have

20 been there, if the policies were --

21          MS. TROSS:  I can see if you are

22 trying to build a spoliation argument.  There is no

23 grounds here for spoliation.  There is no intent to

24 destroy anything.

Latisha Johnson

49

```
 1                    MR. LU:  We are not asking for that.
 2   I am just trying to find out -- well, if the State
 3   is willing to make a record that those records were,
 4   indeed, missing --
 5                    MS. TROSS:  I'm not going to make any
 6   kind of record.
 7                    MR. LU:  That's fine.
 8                    MS. TROSS:  I am telling you we have
 9   made available to you everything we have.  Nothing
10   has been withheld from you.
11                    MR. LU:  I understand.  But what we're
12   saying is it doesn't matter that you made everything
13   available to us.  The fact is, a huge chunk of
14   medical records are missing.  And we're trying to
15   find out what happened to them.
16                    MS. TROSS:  And go where with it?
17                    MR. LU:  All right.  If you --
18                    MS. TROSS:  We have given to you
19   everything.  You have everything.  I haven't
20   withheld anything from you.
21                    MR. LU:  I did not say --
22                    MS. TROSS:  And if you want, you are
23   free to come down to DCC and look at the medical
24   records.
```

Latisha Johnson

50

1          MR. LU:  We can make arrangements for

2    a suitable time for that at some time point, but

3    right now, we're just trying to find out as much

4    information as possible, what happened to his

5    records.  Okay?  Maybe we can take a short recess.

6    It's been an hour now.  Take a break?

7          MS. WOLHAR:  Do you want to take a

8    break?

9          THE WITNESS:  No.

10          MS. WOLHAR:  Do you need a break?

11          MR. LU:  Yes, I do.

12          MS. WOLHAR:  Okay.

13          (Short recess held)

14   BY MR. LU:

15       Q.   Are you ready to start again?

16       A.   Yes.

17       Q.   All right.  What did you do before you worked

18   for CMS?  Is this your first job?

19       A.   No, sir.

20       Q.   What did you do before that?

21       A.   I worked at Client Logic.

22       Q.   What is this?

23       A.   It's a company worked for --

24       Q.   Okay.  Go on.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Latisha Johnson

51

```
 1        A.    Oh.  We worked for the cigarette company

 2   Marlboro, pretty much.

 3        Q.    Okay.  It had nothing to do with the Correction

 4   Center?

 5        A.    No.

 6        Q.    We did talk a little bit before, but I just

 7   wanted to get more details in terms of CMS record

 8   keeping.  How long did you say that the records are

 9   supposed to be kept at your site?

10        A.    When?

11              MS. WOLHAR:  Objection to form.

12        Q.    How long?

13        A.    When?

14        Q.    How long do you keep the records?

15              MS. WOLHAR:  Objection to form.

16        A.    When?  Keep the records when?

17        Q.    How long do you keep them, before you either

18   send them out or -- I mean you don't dispose of them.

19   You keep them.  For how long?

20              MS. WOLHAR:  Objection to form.

21        A.    When, though?  I'm saying when?

22              MS. WOLHAR:  What time period are you

23   talking about?

24        Q.    Isn't there a policy in terms of how long do
```

Latisha Johnson

52

1  you keep the records?

2          MS. WOLHAR:   Objection to form.

3      A.   When?  Keep the records for?

4      Q.   For how long?

5          MS. WOLHAR:   Objection.

6      A.   I'm asking you when?

7      Q.   The records you have.

8      A.   You're asking me how long you keep records?

9      Q.   Right.

10     A.   What kind of records?  When?  Like are you

11  talking about an inmate is at the prison now?

12     Q.   Yes.

13     A.   An inmate that is with us right now?

14     Q.   Yes.

15     A.   We have his records.  Yes.  We keep them.

16     Q.   For how long?

17     A.   It depends on how long the inmate's been there.

18     Q.   Okay.  If the prisoner has been there, say from

19  1986 --

20     A.   I don't know what they did back in '86.  I

21  wasn't working there then.

22     Q.   Well, let me ask this, then:  Have you ever

23  seen any records that dated before 1995?  It doesn't

24  matter, anybody.

Latisha Johnson

53

1      A.    On any inmate?

2      Q.    Yes.

3      A.    Yes.

4      Q.    How far back were those records dated, do you

5   remember?

6      A.    No.

7      Q.    Have you seen medical records dated in the

8   1980s?

9      A.    I don't know.

10      Q.    Okay.  Have you seen any situation like this

11   before, meaning that certain records were not -- you

12   cannot find them?

13              MS. WOLHAR:    Objection to form;

14   foundation.

15      A.    Who can't find them?

16      Q.    Well, for Mr. Gillis, you could not find any

17   records, from your affidavit, between the period of 1986

18   to the mid-1990s.

19              MS. WOLHAR:    Objection to form and

20   foundation.

21      Q.    Is that your statement in your affidavit?

22      A.    Yes.  It is.

23      Q.    So, you've done many retrievings for requests

24   of medical records, right?

Latisha Johnson

54

1    A.   To be copied?

2    Q.   Yes.

3    A.   Yes.

4    Q.   Has it happened to you before that somebody

5    comes back to you asking for additional records?  Or is

6    this the first time that you encountered since you've

7    been working with CMS?

8    A.   Meaning --

9         MS. WOLHAR:  Objection to form.

10   A.   -- a person asking me for --

11   Q.   Asking you to go back and search again.

12   A.   No.  This has never happened before.

13   Q.   So this is the first time?

14   A.   Uh-huh.

15   Q.   Okay.  Your other two coworkers, what are their

16   names again?

17   A.   Are you asking?

18   Q.   Yeah.  The coworkers.

19   A.   Leeane and Patrice.

20   Q.   How long has Leeane been working for CMS?

21   A.   I don't know.

22   Q.   How long has Patrice been working for CMS?

23   A.   She's new.

24   Q.   She's newer than you?

Latisha Johnson

55

1      A.    Uh-huh.

2      Q.    But Leeane is not?

3            MS. WOLHAR:   Answer yes or no.

4      A.    I'm sorry.  Yes.

5      Q.    Leeane, has she been working for CMS longer

6  than you have?

7      A.    Yes.

8      Q.    How much longer?

9      A.    I don't know.

10     Q.    Do you know any other instances that people

11  come back to ask searching medical records again for the

12  same inmate?

13     A.    No.

14     Q.    Does CMS have a written procedure in terms of

15  retrieving medical records?

16     A.    Excuse me?

17     Q.    Does CMS have a written procedure in terms of

18  how to retrieve medical records?

19     A.    You mean is it written down how to go about

20  doing it?

21     Q.    Yes.

22     A.    No.  Not to my knowledge.

23     Q.    Then when you first start working for CMS --

24     A.    Uh-huh.

Latisha Johnson

56

```
1        Q.    -- how did you know what to do, in terms of

2   retrieving medical records?  Did somebody teach you to do

3   that?

4        A.    You train, yes.

5        Q.    You train?

6        A.    Yeah.  By the person who's there.

7        Q.    Tell me more about the training.

8        A.    You're trained by the person that was there

9   before you.

10       Q.    Okay.  Who was that person?

11       A.    Oshenka and Leeane.

12       Q.    And is she still a CMS?

13       A.    Oshenka and Leeane are both there.  They moved

14  to a different department.

15       Q.    So they both trained you?

16       A.    Yeah.

17       Q.    So the training is just a verbal basis?  There

18  was nothing in writing; is that correct?

19       A.    Training is hands on.

20       Q.    Okay.  They show you what to do?  Correct?

21       A.    Right.

22       Q.    And you just follow whatever they showed you?

23       A.    Why -- yes.

24       Q.    But there's nothing in writing?
```

Latisha Johnson

57

1              MS. WOLHAR:  Objection; asked and

2    answered.

3         A.   Not to my knowledge.

4         Q.   Right?  Okay.  Does CMS have any written

5    policy, in terms of record keeping, medical records

6    keeping?

7         A.   What?  I'm sorry.  Say that again.

8         Q.   Does CMS have any written policy in terms of

9    record keeping?

10             MS. WOLHAR:  Objection to form;

11   foundation.

12        A.   Not sure.

13        Q.   Not sure?

14        A.   I don't -- I'm not CMS headquarters.

15        Q.   But you have never seen such written documents

16   from CMS, have you?

17             MS. WOLHAR:  Objection to form and

18   foundation.

19        A.   Maybe I have.  Maybe when I first started,

20   maybe something was written.  But not something that you

21   have --

22        Q.   Okay.  So, the training you received came about

23   when you first started working for CMS, correct?

24        A.   Yes.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Latisha Johnson

58

1     Q.   And all the procedures have been the same since

2   you started with CMS, correct?

3     A.   Procedures, as in?

4     Q.   Retrieving the medical records.

5     A.   Yes.

6     Q.   Have there been any updates or modifications or

7   changes in terms of the retrieving procedures?

8           MS. WOLHAR:  Objection to form.

9     A.   As of when?

10     Q.   Since you started working for CMS, have there

11  been any modifications in the medical retrieving

12  procedures?

13     A.   The way you go about getting a file, you mean?

14     Q.   Yes.

15     A.   It's always been the same.

16     Q.   Okay.  Has there been any additional trainings

17  since you started working for CMS?

18     A.   What kind of trainings are you talking about?

19     Q.   Retrieving medical records.

20     A.   You mean training to go pick a file up off a

21  shelf?

22     Q.   Right.

23     A.   I'm lost.  I'm sorry.  You --

24     Q.   So the only training that --

Latisha Johnson

59

1        A.    You're asking the same question over and over

2    again.

3        Q.    The only training that you had, the only

4    training that you had was when you first started, right?

5        A.    You learn new things every day.  You work

6    there, so you do the same thing every single day.  It's

7    repetitive thing that you do every single day.  I'm

8    not -- you're asking me the same question over and over

9    and over again.

10        Q.    Okay.  So that's the only training that you had

11    when you first started; is that correct?

12        A.    The only --

13        Q.    Training, in terms of retrieving medical

14    records.

15        A.    You do it every single day, so if there's

16    something that you don't understand along the way of you

17    doing it, then you ask questions about it.

18                (Ms. Tross left the deposition)

19        Q.    I'm only asking --

20        A.    But you're asking the same thing.

21        Q.    I'm only asking, was that the only training

22    that you've ever had, in terms of retrieving medical

23    records at the CMS?

24                MS. WOLHAR:   Objection to form.

1    Q.    When you first started.

2    A.    What I am telling you is that when you first

3  start there, okay, yes, somebody comes -- whoever is

4  working with you in that department, you guys get

5  together and they show you what you supposed to be doing,

6  how you do it.  Okay.  You do it.

7              And then, along the way, if there is

8  something that you do not understand between the year and

9  a half or now, or whenever, you always ask questions.

10  So, you can't say that that is the only training that you

11  ever had.  You can't even say that.

12    Q.    So, how often do you have to ask questions from

13  the person who gave you training when you first started?

14    A.    I don't.

15    Q.    You don't?

16    A.    I don't.

17    Q.    Never?

18    A.    Not unless it's something that I completely do

19  not understand.  But as far as -- but what you're asking

20  is about going to go retrieve the records, going to go

21  get a record.  It's not hard.

22    Q.    Okay.

23    A.    That's what I'm telling you.  You're asking

24  me -- how much training do you need for you to go to a

Latisha Johnson

61

1   shelf and look at the last name and pull the record off

2   the shelf.  You don't need to be trained on the ABCs.

3   That's what I am trying to tell you.

4       Q.   Okay.  Let's talk about ABCs.  So all the

5   records were arranged by the names, alphabetical order,

6   right?

7       A.   Excuse me?  Right --

8           MS. WOLHAR:  Hold on.  If you need the

9   question repeated, have the court reporter repeat

10  it.

11      Q.   All the medical records are arranged by the

12  names in alphabetical order, correct?

13      A.   Right.

14      Q.   Do you only retrieve, physically, medical

15  records by the names of the inmate?

16      A.   Only?

17      Q.   Yes.

18      A.   No.

19      Q.   Okay.  Do you use some other means?

20      A.   Yes.

21      Q.   For example?

22      A.   The SBI numbers, the date of birth.

23      Q.   Did you use SBI number for retrieving

24  Mr. Gillis' medical records?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Latisha Johnson

62

1       A.   Yes, I did.

2       Q.   Okay.  And the name that you used, did you only

3   use one form of the name?

4       A.   Excuse me?

5       Q.   Did you try any other variations of his names?

6       A.   We look them up by the SBI number, you don't

7   need any other form of his name.  The names come up.

8       Q.   So if you have the SBI number, it doesn't

9   matter what other names that the inmate may go by?

10      A.   Right.

11           MS. WOLHAR:   Objection.

12      Q.   Thank you.  In terms of physically retrieving

13  the records, how many people can do that, other than you

14  and the other two coworkers?

15      A.   Retrieving the record for?

16      Q.   Making copies.

17      A.   It's just us.

18      Q.   Only the three of you?  Correct?

19      A.   Besides our bosses, but -- that's it.

20      Q.   Okay.  So, any other people can have access,

21  physically, to the medical records?

22      A.   On who?

23      Q.   On Mr. Gillis, for example.

24      A.   Not on him.  It would be just the head people

Latisha Johnson

63

1   of the company, and our -- on site, like me, like our

2   boss, and people like that.  Because there would be no

3   need for his records.

4       Q.   So, within CMS, you and your two coworkers are

5   able to physically access Mr. Gillis' medical records,

6   correct?

7            MS. WOLHAR:   Objection to form.

8       A.   Who?  Me, uh-huh.  And -- say that again.

9       Q.   And your two coworkers?

10      A.   His charts are held over in the SHU.  But yes.

11  We can access them.  But the clerk over in the SHU has

12  them.

13      Q.   How do you spell SHU, by the way?

14      A.   S-H-U.

15      Q.   Okay.  And the clerks at SHU, they are able to

16  have access to Mr. Gillis' records; is that correct?

17      A.   Right.

18      Q.   So, who are the clerks at the SHU?

19      A.   There's only one.  Her name is Maddie.

20      Q.   Okay.  Was she the person there that you

21  contacted the first time last year about Mr. Gillis'

22  records?

23      A.   Yes.

24      Q.   And was she also the person that you contacted

1    the second time last year for Mr. Gillis' medical

2    records?

3        A.    The second time meaning when we went to go look

4    to make sure we didn't miss anything?

5        Q.    Yes.

6        A.    Yes.

7        Q.    So, you did not go there yourself?

8        A.    No.    That's her department.

9        Q.    And is there a policy of CMS that does not

10   permit you to go to the SHU?

11       A.    Are you asking me am I allowed to go to the

12   SHU?

13       Q.    Yes.

14       A.    Yes.    I'm allowed to go to the SHU.

15       Q.    But you didn't go last year, either the first

16   time or the second time?

17       A.    The first time?   I went to go get them.

18       Q.    You did, the first time?

19       A.    Yes.   I called her, she told me, okay, I have

20   them.   And she sent me -- because she was busy and she

21   couldn't copy them her own self.   I told her I would copy

22   them.   That's how I got them.

23       Q.    Okay.   So, did you copy those files personally,

24   the first time?



Latisha Johnson

65

1    A.    Me and Leeane.   Yes.

2    Q.    And the second time, you only made the call to

3  Maddie, right?

4    A.    Ms. Maddie in the SHU and Ms. Marian in the

5  MHU.

6    Q.    But you did not go to the SHU or the MHU the

7  second time, correct?

8    A.    I told you I called them.

9    Q.    But you didn't go there?

10    A.    Right.

11    Q.    So, when you used the copy machine to make the

12  copies of Mr. Gillis' records, does the copy machine

13  require an entry, so that the numbers of the documents

14  that were copied will be available later on?

15    A.    Huh?   I'm sorry, excuse me?

16    Q.    When you used the copy machine --

17    A.    Uh-huh.

18    Q.    -- do you need to register any numbers, so that

19  the copies that were made would be recorded for later

20  purposes?

21    A.    No.

22    Q.    But then how do you know the number of pages of

23  copies that you make when you submit the bill later on?

24    A.    Well, when we use the copy machine, the copy

Latisha Johnson

66

1   machine has a counter on it.  So, every page that a copy

2   machine copies, it tells you.

3       Q.   Well, that was my last question.  So --

4       A.   No.  No --

5       Q.   So there was a counter on the copy machine?

6       A.   You asked me, the last question was, do I have

7   to enter in anything.  I don't have to enter in anything.

8       Q.   But there is a counting device on the copy

9   machine that would tell you how many pages that you

10  actually copied?

11      A.   Not -- no.  Not at the end.  Not at the end.

12  Are you talking about altogether?  No.  You have to --

13  every time you put some papers in there -- let's say I'm

14  copying ten right now.  Hit print.  Ten of them come out.

15  On the thing of it, it will say ten.  And let you know

16  you copied ten of them.  If I copied ten here and 25 over

17  here, it won't tell me that I copied 35 pages.

18           You have -- you have to actually keep

19  track, also, as you are done with the ten, there's --

20  well, the way I do it, after I copy something, it tells

21  me how many pages I copied, I write that number down.  So

22  when I get down to the end, I know how many pages I have

23  copied.  I don't know how they do it, but that's how I do

24  it.  But there is no device inside of the machine.

Latisha Johnson

67

1    Q.    Okay.  So it's a compilation of the device and

2  with your own notes?

3    A.    Right.

4    Q.    To tell you how many pages you actually copied?

5    A.    Exactly.

6    Q.    Okay.  Thank you.  Do you remember that you did

7  that when you copied Mr. Gillis' records?

8    A.    Remember that I did what?  Did I count the

9  pages?

10    Q.    Using the device and your own notes to keep

11  track of the pages?

12    A.    I'm pretty sure I did, because I do that with

13  all -- everything I copy, I do that with.

14    Q.    Okay.  So what happened to that note that you

15  took?

16    A.    Trash.

17    Q.    You trashed it?

18    A.    I would have trashed it, because we don't keep

19  them.  I told you that earlier.

20    Q.    I am trying to make it clear, so if I missed

21  that, I'm sorry, but I just wanted to, you know, make

22  sure that I understand.

23    A.    I told you, after we copy a chart and the pages

24  are counted, they go on a little sticky, whatever, for a

Latisha Johnson

68

1   secretary.

2        Q.   Okay.

3        A.   And for her only.  After she does whatever she

4   does with it, because that's her job, not mine, the paper

5   probably goes in the trash.  Depending on whether or not

6   the person gets billed.  Just as Erika stated that she

7   didn't get billed, so there probably is nothing stating

8   how many pages that was copied.

9        Q.   How often do you actually have a bill for the

10  copies that you make?

11       A.   I don't bill them.

12       Q.   You don't know?  The secretary would know?

13       A.   She would know.

14       Q.   So, we actually don't know exactly, at this

15  time point, how many pages of Mr. Gillis' records were

16  copied when Erika Tross made the request last year?

17       A.   Right.

18       Q.   Thank you.  Have you ever been asked by anyone

19  in CMS to withhold medical records?

20       A.   No.

21            MS. WOLHAR:   Objection; form and

22  foundation.

23       Q.   Have you ever been asked to destroy any medical

24  records, by anybody in CMS?

Latisha Johnson

69

1    A.    No.

2              MS. WOLHAR:   Objection to form and

3    foundation.

4    Q.    How many records do you keep at the DCC,

5    approximately?

6              MS. WOLHAR:   Objection to form.

7    A.    Excuse me?

8    Q.    How many records do you have on hand at the

9    SHU, for example?

10              MS. WOLHAR:   Objection to the form.

11    A.    I don't work in the SHU.

12    Q.    You don't know?

13    A.    I don't work in the SHU.

14    Q.    What about the MHU?

15    A.    I don't work in the MHU.

16    Q.    What about the central facility where you are

17    at?

18    A.    I don't know.   We have over 2,000 inmates at

19    DCC.

20    Q.    So, there must be lots of records?

21              MS. WOLHAR:   Objection to form.

22    Q.    Correct?

23    A.    There's 2,000 inmates at DCC.

24    Q.    Right.

Latisha Johnson

70

1      A.    What more do you want to know?

2      Q.    So, how big is your warehouse to keep the

3   records?

4            MS. WOLHAR:   Objection to form.

5      A.    Records on who?  I mean records on --

6      Q.    Everybody.

7      A.    We have different rooms.  That's what I'm

8   telling you.

9      Q.    You have three different rooms, am I right?

10  One at the SHU, one in the MHU.

11     A.    Those are for SHU inmates.

12     Q.    What?

13     A.    There's a room over in the SHU for all of their

14  inmates, and all of their files.  There's a room in the

15  MHU for all of their inmates and all of their files.

16     Q.    How big is the room for storing records at the

17  SHU?

18     A.    I don't know.  It's -- standard size, I guess.

19     Q.    Okay.

20     A.    I never measured it.

21     Q.    Okay.  Standard size.  What do you mean by

22  standard size?

23     A.    It's just a regular sized room.  I never took a

24  measure and -- tape measure and measured the room.

Latisha Johnson

71

1    Q.   But it was only one room?

2         MS. WOLHAR:  Objection to form.

3    A.   Excuse me?

4    Q.   It's only one room?

5    A.   One room?

6    Q.   At the SHU?

7    A.   In the SHU?  For?

8    Q.   To keep the records.

9    A.   Yes.

10   Q.   And there's only one room at the MHU for

11   keeping the records, correct?

12   A.   As far as I know, yes.

13   Q.   And there's only one room for where you're at?

14   A.   For --

15        MS. WOLHAR:  Objection to form.

16   A.   For which one?  For keeping --

17   Q.   For keeping records.

18   A.   What kind of records?

19   Q.   Medical records.

20   A.   I told you earlier, you didn't listen to me

21   earlier.  I told you there's a room for inmates that are

22   no longer at our facility, meaning the inmates that have

23   been released, the inmates that are gone.  It's a

24   separate room.  So, I can't say that there's just one

Latisha Johnson

72

1    room over there on our side where we keep charts.

2        Q.    So, how many rooms, total?  Totally?  I'm

3    losing track of it.  So you're saying --

4        A.    I told you earlier that there is a room for

5    charts that are inactive.

6        Q.    Where is that?

7        A.    Over on the main.

8        Q.    That's where you are at?

9        A.    Where I work at.

10        Q.    So there is one room at the main -- okay.  Go

11    on.

12                MS. WOLHAR:  Objection to form.

13        A.    For charts that are inactive.  And then there's

14    the room that I work in, which is we house all the active

15    records.

16        Q.    So, there are two rooms at the main, one is

17    active, the other one is inactive?

18        A.    Yes.

19        Q.    Correct?

20        A.    Yes.

21        Q.    Okay.  And there's one room at the MHU, one in

22    SHU, so there are four rooms altogether, correct?

23        A.    Right.

24        Q.    Let's talk about the room that holds the

Latisha Johnson

73

1    inactive records.   How long do the inactive records stay

2    in that room?

3         A.    Three years.

4         Q.    What happens after three years?

5         A.    They get archived.

6         Q.    To where?

7         A.    To Dover.

8         Q.    What's the procedure to do that?

9         A.    You go in the room, you pull all the charts

10   from the -- for whatever time period that it's time to

11   archive, that whole three-year span, whatever, whatever

12   year it is.  You pull it, they go in boxes.  After we box

13   them up, we call down to the regional office in Dover,

14   and they come pick them up.  And after that, they're gone

15   from us.

16        Q.    When you hand them over to the archives --

17        A.    Uh-huh.

18        Q.    -- do you keep track of the records you handed

19   over?

20        A.    No.

21        Q.    How often does that happen when you hand over

22   the records to Dover for archiving?

23        A.    Every three years --

24              MS. WOLHAR:  Objection to form.

Latisha Johnson

74

1    Q.    Every --

2    A.    You -- we keep charts on hand for three years,

3    and then we archive them.

4    Q.    But what alerts you about the three years is

5    up?

6    A.    What do you mean?  When it's time to archive?

7    Q.    Yes.

8    A.    They let us know.

9    Q.    Who?

10    A.    Our department up in regional, up in Dover.

11    Q.    So, they direct you which records should be

12    archived?

13    A.    Whatever time period it is, then all of them

14    go.  It's not just you go get this record and that record

15    and I want them to be archived.  You archive by the year.

16    Q.    So, you only do it once a year?

17    A.    Excuse me?

18    Q.    You only do that once a year?

19    A.    Archive once a year?  Yes.

20    Q.    Okay.  And how do you decide which ones should

21    be archived?

22    A.    The time period.  The time frame.  There's

23    always -- we keep charts on site only for three years.

24    Q.    Right.



Latisha Johnson

75

1    A.    So if it's over three years that the chart has

2    been -- like is there, every -- they -- every three

3    years, the charts -- they move it out.    They only keep

4    them only for three years.    That's it.

5    Q.    So, do you make that decision in terms of the

6    three-year deadline?

7    A.    I don't archive.

8    Q.    Okay.

9    A.    I help Leeane, is the one that always archives.

10    I help just put them in boxes.

11    Q.    Okay.    So, the person who decides the deadline

12    for the three-year period is someone at the regional, at

13    Dover, correct?

14           MS. WOLHAR:    Objection to form and

15    foundation.

16    A.    We archive, based upon whenever it's time for

17    us to archive.    That's the only thing that I can tell

18    you, and the only thing that I know about us doing our

19    archive last year, when we did archives last year, we was

20    told that it was time for us to archive.    Prior to that,

21    I don't know.

22    Q.    So you are not the person to decide the timing

23    for --

24    A.    I don't decide anything.    I just work there.

Latisha Johnson

76

1      Q.   But who gave you the order, saying now it's

2  time to archive?

3      A.   We got the order from regional, from the

4  regional office.

5      Q.   And do you have a name from them?

6      A.   John Oldigs is the man up in regional.

7      Q.   John Oldigs works for CMS?

8      A.   No.  He works for DOC.  The charts are not

9  CMS's charts.  That's what I'm trying -- they belong to

10  DOC.  We just maintain them for them.

11      Q.   Can you spell the last name of John Oldigs?

12      A.   O-l-d-i-g-s.

13      Q.   So he decides when to archive?

14          MS. WOLHAR:  Objection to form and

15  foundation.

16      A.   I don't know if he decides it or not.  All I am

17  telling you is after we archive charts, they go to him,

18  period.  That's the only thing I can tell you about the

19  whole archiving situation, at all.

20      Q.   Okay.  Do you have any access to medical

21  records in the archive?

22      A.   Do I?  No.

23      Q.   Does CMS have access to the medical records in

24  archive?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Latisha Johnson

77

1     A.    No.   You have to go to John Oldigs.

2     Q.    I think I'm about to finish up now.   But I just

3  want to summarize briefly what we talked about so far.

4              MS. WOLHAR:   I'm going to object to

5  form and foundation.   Is there going to be a

6  question pending?

7              MR. LU:   Yes.   I was thinking about

8  the question.

9     Q.    So, you did two searches for Mr. Gillis'

10  medical records last year; is that correct?

11     A.    For?

12     Q.    For Mr. Gillis.

13     A.    For Erika?

14     Q.    Yes.

15     A.    Yes.

16     Q.    Did you do searches for Mr. Gillis' records

17  upon somebody else's request?

18     A.    When?

19     Q.    Last year.

20     A.    I can't tell you.   I don't remember.

21     Q.    So the records that you provided to Erika the

22  first time was everything that you could find at the

23  time, correct?

24     A.    Everything that we have on site, yes.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      Q.   Okay.  But you didn't know how many pages of

2   the records that you copied at the time, correct?

3                MS. WOLHAR:   Objection to form.

4      A.   We don't keep -- we don't keep pages, how many

5   pages that you copy.

6      Q.   So you don't know?

7      A.   No, I don't know.

8      Q.   Okay.  So, when you have the second request

9   from Ms. Tross, you did not go look for the records

10  personally; isn't that correct?

11     A.   That's incorrect.  I did not go where and look

12  for the records?  I did look for the records.  On the

13  main side, yes, I did.  Personally, I did.

14     Q.   Okay.

15     A.   And my other coworkers did, also.

16     Q.   Who were the other coworkers who looked for the

17  records at the time?

18     A.   Leeane Dunn and Oshenka Gordon.

19     Q.   But you only personally searched records at the

20  main, correct?

21     A.   Right.

22     Q.   You did not go to the MHU personally to search;

23  isn't that correct?

24     A.   The MHU and the SHU have their own clerk over

1    there.   Correct.   I did not go.

2        Q.    But you did go the first time, didn't you?

3        A.    To the SHU.  Yes.  To pick up the records.

4        Q.    But you did not go to the SHU the second time,

5    right?

6        A.    Correct.

7        Q.    And you did not go to the MHU the second time,

8    correct?

9        A.    Right.

10        Q.    When you looked at the records, either the

11    first time or the second time, did you look at the dates

12    on those records?

13        A.    The dates for what?

14        Q.    The dates written on the records.

15        A.    What's the purpose of me looking at the dates?

16        Q.    What about the second time?

17                MS. WOLHAR:  Objection to form.

18        Q.    Did you look at the dates on the records the

19    second time?

20                MS. WOLHAR:  Objection to form and

21    foundation.

22        A.    There was no copy the second time.  The chart

23    was copied the first time she asked me to copy the chart.

24        Q.    So you did not look at the dates the second

Latisha Johnson

80

1  time?

2      A.    No.  I didn't copy the chart again.  After I

3  copied the chart the first time, she asked me to go back

4  and look through the chart to make sure I didn't see

5  anything that dated back in from 1980 -- whatever it was.

6  And I told her okay, I would.  And then I looked through

7  his medical file, make sure I didn't see anything from

8  1985, 6, 7, whenever it was.  And she asked me did I see

9  anything in there from back in those dates, and I told

10  her no.

11      Q.    So you did review the dates the second time?

12      A.    Right.  To make sure I didn't see anything from

13  1980 or -- no.  She said I guess they were missing --

14  whatever.  I told her we didn't have anything.  That's

15  how we found out that we didn't have anything back from

16  1980 whatever.

17      Q.    You can look at the affidavit that you signed.

18      A.    I got it.

19      Q.    And the statement you made there that you did

20  review --

21      A.    Yes.

22      Q.    -- the file the second time.

23      A.    To make sure we didn't have nothing in it

24  dating from the years she gave me.  It was like 1985, I

Latisha Johnson

81

1    think it was that far back, to '90 whatever it was.  I

2    don't remember the exact years it was.  I looked in his

3    files for them years.  I told her that everything that we

4    have, I sent to her.  So, everything that I had given her

5    is what we had.

6        Q.    But the statement that you made her, and I

7    quote --

8        A.    Jesus.

9        Q.    -- "As requested, I reviewed the files a second

10   time, and found no records dating from 1986 to the

11   mid-1990s."  Correct?

12       A.    Correct.  And also, keep on reading down some

13   more.  It says, "Everything that we have available, you

14   have."  So, and you're showing the 19 -- whatever you

15   said that you had, meaning that it was given to you.  It

16   must have been inside of a file that he had.

17       Q.    You keep saying that you gave us --

18       A.    Jesus.

19       Q.    -- everything you had, but you had no idea how

20   many you had at the time; isn't that correct?

21       A.    Everything that we -- everything we had there

22   at DCC was given to you.

23       Q.    But did you know how many pages?  No.  You

24   don't.

Latisha Johnson

82

1              MS. WOLHAR:  Objection to form; that's

2    argumentative.

3        Q.    I withdraw that question.  Did you know how

4    many pages you copied?  Did you?

5        A.    I'm telling you, we don't do anything by pages

6    at the prison.  Everything is kept in charts.

7        Q.    My question is --

8              MS. WOLHAR:  Okay.

9        Q.    My question is, did you know how many pages you

10   made at the time?

11             MS. WOLHAR:  At the time they were

12   copied?

13             MR. LU:  Let her answer the question,

14   please.

15       A.    I told you that.  You've asked me that five

16   times.  I told you five times already.  I keep telling

17   you the same exact thing, about how many pages that were

18   copied.  Our records are kept in records, not paper just

19   laying around saying we got ten pieces of paper right

20   here.  They're kept in charts.

21             I told you, after the first time they were

22   copied, and the sticky note was written on, he had this

23   many pages were copied, was given to our secretary, from

24   there, I don't know.  How many pages was it?  I don't

Latisha Johnson

83

```
 1    know.  That was over -- it was over a year ago.

 2        Q.   So that is the question, is you don't know how

 3    many pages you copied.

 4        A.   Do you know how many pages you got over a year

 5    ago?  Do you know?  No.

 6              MS. WOLHAR:  Okay.  Hold on a second.

 7    Is it okay if we take a little bit of a break?

 8              MR. LU:  Sure.

 9              MS. WOLHAR:  Okay.  Come on.  Take a

10    walk.

11              THE WITNESS:  God.

12              (Brief recess held)

13    BY MR. LU:

14        Q.   Let's go back to the affidavit again.

15              MS. WOLHAR:  For the record, that's

16    Number 3 of your exhibits?

17              THE COURT REPORTER:  Yes, it is.

18        Q.   And let's focus on this time period stated in

19    your affidavit again.  When you reviewed the files a

20    second time, you did not find any records dating from

21    1986 to the mid-1990s, correct?

22        A.   Correct.

23        Q.   And I want to direct your attention to Exhibit

24    2.
```

Latisha Johnson

84

1        A.    Did you have the paperwork that came with that?

2    The ones that came previous to -- no.  I see that.  What

3    I am talking about is inside of his chart that was copied

4    with these pages, there also is stuff that is more recent

5    on top.  These right here are the ones that went inside

6    the same chart.  That's what I am telling you.

7              You pulled out the ones from '96 to

8    whatever.  What I am telling you is these, and some more,

9    like '98, 2000, all that, are all in the same chart.

10   It's all one volume.  So, what I am telling you now, you

11   are asking for things also previous to that.  Those are

12   whole different volumes.

13             And so, the whole thing that you're not

14   getting, obviously, is that everything that you have,

15   period, is everything that we have.  And as you were

16   talking about right here in Number 6, and as also, Erika

17   also knows this, because I spoke with her over the phone,

18   is I told her that everything that we have given you is

19   everything we have.

20             And now, also looking through it, and she

21   also knows about these dates, the '96, the -- whatever,

22   is stuff that was inside of the charts.  That we have.

23   That's all that we have.  That's the reason why behind

24   you have a couple of things from -- whatever to whatever.

85

1   But if you -- but if you brought out this man's whole

2   chart that came with this, you would have seen in there

3   from 2000, that came also with this, because that's all

4   that we have.

5        Q.    I haven't asked a question yet.

6        A.    I know, but I'm telling you, because you asked

7   the question already.  The same question that you asked

8   me an hour and a half ago.

9        Q.    No.  I say it's a different question.

10       A.    It's not.  But go for it.

11       Q.    So, when you say you reviewed the files, the

12  dates about 1986 to the mid 1990s, you are actually only

13  reviewing the dates on the charts, on the cover of the

14  charts?

15       A.    Okay.  What --

16            MS. WOLHAR:  Objection to the form and

17  the foundation.

18            MR. LU:  I am trying to find out what

19  the dates cited, stated by Ms. Johnson in her

20  affidavit, I want to find out what basis that she

21  used to come up with dates.  That's the foundation.

22       A.    You asked me for --

23       Q.    So, the question is, how did you come up with

24  these dates, 1986 to mid-1990s?  Did you --

Latisha Johnson

86

1    A.    Erika asked me.

2    Q.    Can I finish the question, please?

3          MS. WOLHAR:   Let him finish the

4    question.   Then you can answer.

5    Q.    So you only look at the dates of the charts.

6    You kept referring to charts --

7    A.    There's no --

8          MS. WOLHAR:   Is that --

9    Q.    Is that correct?

10         MS. WOLHAR:   Objection to form.   You

11   can answer, if you can.

12   A.    I did not say the dates were on the charts.   I

13   said we keep all of -- all of the inmate's work, or

14   medical history, whatever you want to call it, is inside

15   of the charts.

16   Q.    Okay.

17   A.    They're not listed on the charts.   They are

18   listed on the actual physical thing.   Paper, whatever.

19   Q.    So you did go through the charts to look at

20   dates?

21   A.    We went through the charts, as a matter of

22   fact, because when -- because when she called, when Erika

23   called me back, she was solely looking for things from

24   1980 to like 1995, '80 something, to like '95, something

1    like that.   Those were the dates she was looking for.

2    Because she asked me, are you sure they go back -- again,

3    and make sure you don't have anything from 19 -- I think

4    it was like '80 -- '80 whatever, to like 1995, was the

5    margin that she gave me to look for, to go search for.

6    And that's what we did.

7        Q.    Did you see anything dated 1995?

8        A.    Not to my knowledge, no.   I mean I can't say

9    there wasn't any in there, but as far as looking to make

10   sure that we didn't have anything.

11       Q.    So you didn't see anything of 1995?

12       A.    It's over a year ago.   I don't know what I seen

13   over a year ago.

14       Q.    I understand.   I understand.   Okay.   The second

15   page, it's Bates number 372.

16       A.    Okay.

17       Q.    Could you look at the dates on that page?

18       A.    Okay.   So, the dates are --

19           MS. WOLHAR:   Hold on a second.

20       A.    -- there, so you actually have them.

21           MS. WOLHAR:   Hold on a second.   I'm

22   going to object to form and foundation.   Ms. Tross,

23   who has already left the deposition, has indicated

24   she gave you additional records from SCI.

Latisha Johnson

88

1          MR. LU:  That wasn't --

2          MS. WOLHAR:  So I don't know exactly

3  what records or what you are seeking from this

4  witness about the records she provided to you, okay?

5  Just so we're clear.

6          MR. LU:  Also for the record, the

7  second set of medical records provided by Ms. Tross,

8  there were about 800 pages, most of which are

9  repetitive to the records produced the first time

10  with the help of Ms. Johnson.  However, the earliest

11  dates in the second production do not go any date

12  beyond late 1995.  So, now I'll come back to the

13  question.

14  BY MR. LU:

15      Q.   Is the date of 1995 on the second page, Bates

16  number 372?

17      A.   Is there a 1995 date on there?

18      Q.   Do you see a date of 1995?

19      A.   From when he was housed at SCI?  Yes.

20      Q.   That record was produced the first time.

21      A.   Exactly.  Meaning it came from -- where?  SCI.

22      Q.   But you had --

23      A.   It was copied --

24      Q.   -- the record --



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Latisha Johnson

89

```
1              MS. WOLHAR:  Okay.  One at a time,

2    please.

3        Q.   But you had the record, correct?

4        A.   Yes.

5        Q.   But your statement -- and you just said you

6    didn't see anything of 1995.

7        A.   Nothing that I have, no.

8              MS. WOLHAR:  Objection to form and

9    foundation.

10       Q.   So you did not see anything of 1995?

11       A.   Nothing that I have, no.

12       Q.   But the record showing that Bates number 372

13   was actually dated in 1995, correct?

14             MS. WOLHAR:  Objection to form and

15   foundation.  Asked and answered.  Go ahead, if you

16   can.

17       Q.   Let's go back again.  In your affidavit, you

18   stated you reviewed the files the second time --

19       A.   Uh-huh.

20       Q.   -- and that you found no records dated from

21   1986 till mid-1990s.  Is that correct?

22       A.   That's what it says, yes.

23       Q.   You also stated earlier that you don't recall

24   seeing anything dated in 1995; isn't that correct?
```

Latisha Johnson

90

1       A.   Over a year ago, I do not know what was in that

2   record, sitting here right now.  I cannot tell you that.

3       Q.   Well, you just stated that.

4       A.   Well, I can tell you, because I am reading it

5   right here, and I do know that I signed this.  Obviously,

6   if I signed it, that must mean that at the time when I

7   signed it, over a year ago, that that's exactly what I

8   was saying, over a year ago.

9            But right now you're asking me do I

10  remember seeing his records from 1995.  Right now, I do

11  not remember any records from 1995.  I don't remember

12  anything in this man's record, at all.

13      Q.   Now, look at the Exhibit 2, which is a part of

14  the medical records provided to us by Erika Tross last

15  year, with Bates number 371 to 391, for the record.  If

16  you look at the page with Bates number 372, do you see a

17  date of November 6, 1995?

18      A.   Yes.  The inmate was housed at SCI.  So

19  that's --

20      Q.   My question is --

21      A.   We had it, yes.

22      Q.   The question is, do you see a date on that

23  page, Bates number 372, the date is November 6, 1995?

24      A.   Yes, I do.

Latisha Johnson

91

```
 1        Q.    Okay.  And that record, as a part of the first
 2   set, was produced to us last year.
 3        A.    Okay.
 4        Q.    How do you explain the discrepancies between
 5   your statement on the affidavit --
 6        A.    She asked --
 7             MS. WOLHAR:   Let him finish the
 8   question, please.
 9        Q.    -- and the date on page having Bates number
10   372?
11             MS. WOLHAR:   Objection to form and
12   foundation.  Go ahead and answer it.
13        A.    She asked me to go back through the records and
14   make sure that there's nothing else in his records from
15   1986 to 1990.  That's what I did.  Everything that we
16   had, she already had.  Meaning, your Bates number 372,
17   she already had.  So, meaning that there is nothing else
18   in the chart from the years that she was looking for,
19   that she does not already have.
20        Q.    Okay.
21        A.    She has it already.  So, why would I go back
22   and recopy something she already has?  Okay.
23        Q.    So, in other words, based on what you checked
24   at the time, you don't have any medical records from
```

Latisha Johnson

92

1  Mr. Gillis for the years of 1986, 1987; isn't that

2  correct?

3       A.   Say that again.

4       Q.   Based on what you checked at the time, meaning

5  last year --

6       A.   Uh-huh.

7       Q.   -- you don't have any medical records for Mr.

8  Gillis for the years of 1986 and 1987; is that correct?

9            MS. WOLHAR:   Objection to form and

10  foundation.

11       A.   Right.   No.   We don't have any.

12       Q.   Okay.   Do you have any medical records for

13  Mr. Gillis for the year of 1988?

14       A.   No.

15       Q.   Do you have any medical records for Mr. Gillis

16  for the year of 1999?

17            MS. WOLHAR:   Objection to form.   You

18  mean in addition to what has already been provided?

19  Is that the question?   Or is it just generally do

20  you have a medical record for Mr. Gillis for the

21  year -- or during the year of 1988?

22            MR. LU:   In general.

23            MS. WOLHAR:   Okay.   Objection to form.

24       Q.   Do you?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Latisha Johnson

93

1      A.    Do I have what?

2      Q.    The medical records for Mr. Gillis for the year

3  of 1999?

4      A.    I don't remember.  I can't say if we have any

5  record for '99.  I know for sure we had nothing from '86

6  and '87, and '88.  I do not.  I do know that.  But I'm

7  not sure about -- about the '99.

8      Q.    Is there any way that you can find out?

9      A.    Any way that I could find out?

10     Q.    Yes.

11     A.    Going through his medical record.

12     Q.    Okay.  Anybody else can do that in your

13  organization?

14          MS. WOLHAR:  Objection to form and

15  foundation.

16          MR. LU:  I withdraw that question.

17  For the record, Ms. Johnson cannot recall certain

18  information that plaintiff is trying to obtain.

19  Therefore, I want to make a record that the

20  deposition remains open for a suitable time in the

21  near future.  I also would like to make a record

22  that CMS is to produce a 30B6 witness regarding CMS

23  medical record keeping policies, procedures, and the

24  related matters.

Latisha Johnson

94

1          That's all I have.  Thank you so much

2   for coming here.  Thank you, Counsel.

3          MS. WOLHAR:  I would like to, for the

4   record, object to this deposition being kept open,

5   and the basis cited by the plaintiff's attorney.  I

6   further would like to object to a notice of 30B6

7   evidence given by deposition.  If Mr. Lu wants to

8   take a 30B6 deposition, then he knows how to go

9   about doing it.  And my name is Lori Wolhar.

10  Thanks.

11         THE COURT REPORTER:  Do you want her

12  to read and sign?

13         MS. WOLHAR:  Yes.

14         (Deposition concluded at 12:25 p.m.)

15

16

17

18

19

20

21

22

23

24

Latisha Johnson

95

1              I N D E X

2   DEPONENT:  LATISHA JOHNSON              PAGE

3   Examination by Mr. Ly                    2

4              E X H I B I T S

5   PLAINTIFF'S DEPOSITION EXHIBITS         MARKED

6   1.  7/31/07 letter, Mawhinney to Lu     15

7   2.  Medical records                     17

8   3.  Affidavit                           20

9   4.  Mental Health Evaluation            22

10  5.  Court documents                     23

11  ERRATA SHEET/DEPONENT'S SIGNATURE       96

12  CERTIFICATE OF REPORTER                 97

13

14

15

16

17

18

19

20

21

22

23

24

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

ATTACH TO DEPOSITION OF: Latisha Johnson

DATE TAKEN: 08-20-07

IN THE MATTER OF: Goldstein Estate Litigation

### ERRATA SHEET

<u>INSTRUCTIONS</u>: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|---------------------------------|
| 4 | 1 | Letitia should be Latisha - to correct the record |
| 4 | 4 | Should be a year and eight months. to correct record |
| 5 | 22 | McLaren should be McLaren - to correct record |
| 7 | 7 | Lianne should be LeeAnn & Herrera should be Harrell |
| 37 | 20 | Should be "nurses looking for charts on inmates" instead of nurses and inmates - to correct the record |
| 54 | 19 | Leeane should be LeeAnn - to correct the record |
| 54 | 20 | Leeane should be LeeAnn - to correct the record |
| 63 | 19 | Maddie should be Mattie - to correct the record |
| 65 | 1 | Leeane should be LeeAnn - to correct the record |
| 65 | 4 | Maddie should be Mattie and Marien should be Mary. - to correct the record |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _9/11/07_        _____
(Signature of Deponent)

RETURN TO:  WILCOX & FETZER, LTD.
            1330 King Street
            Wilmington, DE  19801

Latisha Johnson

97

1  State of Delaware    )
                       )
2  New Castle County    )

3

4              CERTIFICATE OF REPORTER

5      I, Julianne LaBadia, Registered Diplomate
   Reporter and Notary Public, do hereby certify that
6  there came before me on August 20, 2007, the
   deponent herein, LATISHA JOHNSON who was duly sworn
7  by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
8  deponent and the answers given were taken down by me
   in Stenotype notes and thereafter transcribed by use
9  of computer-aided transcription and computer printer
   under my direction.

10

11     I further certify that the foregoing is a true
   and correct transcript of the testimony given at
   said examination of said witness.

12

13     I further certify that reading and signing of
   the deposition was required by the deponent and
   counsel.

14

15     I further certify that I am not counsel,
   attorney, or relative of either party, or other wise
   interested in the event of this suit.

16

17

18                    _Julianne LaBadia_____

19            Julianne LaBadia, RDR, CRR

20            Certification No. 267-RPR

21            License Expires:  1/31/08

22

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

