# RESPONSE TO INMATE HEALTH CARE ARTICLES

Presented to The News Journal on Friday, September 30, 2005

By: Stan Taylor

Recently, the News Journal published a series of articles on inmate medical care in Delaware correctional facilities. We are concerned for the welfare of those in our care and have been working for some time to improve the delivery of health care services. We also recognize that serious illness and death are painful experiences for families and loved ones, made more difficult by their loved one's incarceration.

In April 2005, The News Journal first contacted the DOC about its intent to report on this issue. It is important to clarify several misrepresentations and inaccuracies, and to present a chronological analysis of the actions taken by the DOC to address medical care issues over the last year.

INMATE MEDICAL SERVICES

The Delaware Department of Correction has over a 25-year history of contracting with private medical service providers to deliver health care service to the inmate population. Many states went in this direction beginning in the 1970's in an effort to improve the delivery of health care services to offenders. In 2000, 34 states contracted for some medical services and 24 states' corrections systems were run completely by private contractors.

The DOC contract stipulates that the medical health care provider deliver services in compliance with the National Commission on Correctional Health Care (NCCHC) Standards. The NCCHC is the nationally recognized accrediting body for health care service providers. In fact, all of the institutions in the Delaware Department of Correction have been accredited by the NCCHC since 1986. The DOC reported this information to the News Journal on multiple occasions during their investigation. This information never appeared in any of the articles.

Over the years these contracted services have expanded to address the changing medical needs of a growing offender population. The current annual contract exceeds $25 million, doubling in just the last five years. Many offenders arrive at our facilities with serious medical problems. Others develop medical problems as they age while serving lengthy prison sentences. Because of behavioral problems, these are frequently difficult patients to treat.

Medical treatment of offender populations is a demanding and complicated job. Today, our average daily count of the incarcerated inmate population is 6,800. Every year, the

DOC admits and releases more than 20,000 offenders. Each admission results in a medical screening.

Last year the medical care vendor provided:
- 20,631 intake screenings
- 23,312 sick calls
- 169,215 prescriptions (prescriptions alone totaled $5.8 million).
- 8,135 dental visits
- 5,579 vision related services.

The DOC provides comprehensive medical services to the inmate population including labs tests, radiology, pregnancy and pre-natal care, dialysis, x-rays, wound and injury care, general care, testing (HIV, TB, STD), eye exams, physicals and check-ups, prescriptions; dental exams, x-rays fillings, extractions and denture repair; and mental health screenings, psychiatric/psychological visits and crisis intervention.

Along with care provided inside the correctional facilities, offenders who need services that can't be delivered in the institutions are transported to outside medical facilities. Once the medical provider identifies a need for outside care, the DOC transports the inmate.

Last year, the DOC transported over 2,100 offenders for outside medical services. These include hospital admissions, emergency room visits and appointments with various medical specialties, including orthopedics, ophthalmology, cardiology, dermatology, oral surgery, gastroenterology, oncology, ear-nose-throat, general surgery, radiology/imaging, audiology, hematology, and physical therapy.

CONTRACT PROCEDURES

In addition to clarification on the data presented in The News Journal articles, we believe it is important to offer further insight into the recent change of medical provider.

First Correctional Medical-Delaware (FCMD) was awarded the contract with the Delaware DOC in June 2002.

In 2004, the Department's Medical Review Committee (MRC) began to identify problems with FCMD's performance. The MRC is a standing committee of the Department of Correction charged with oversight of health care services. It is comprised of representatives from the DOC and Public Health.

In December 2004 and January 2005 the DOC notified FCMD of performance deficiencies. As a result of these non-compliance issues, the DOC requested NCCHC to conduct an audit to monitor FCMD's performance under the health services contract.

The NCCHC audit report indicated several problems with medical administration and clinical practice, including record keeping, utilization management, medical history, and sick call follow-up.

In March 2005, the DOC notified FCMD that it intended to terminate the contract unless FCMD corrected the deficiencies noted in the audit report within a reasonable time period. FCMD implemented a 90-day plan monitored by the NCCHC to comply with NCCHC Standards for Health Services. The NCCHC determined on May 10, 2005 that the FCMD plan could not reliably be evaluated until August 2005. At that point, FCMD offered to terminate the health services contract by mutual agreement effective June 30, 2005; and the Department accepted.

Given the short time frame to secure a new provider, the Department did not have the 180 days normally required to follow state bid procedures on a contract of this magnitude and complexity. Accordingly, the Department was permitted to waive bid procedures to select another vendor.

After careful consideration of the options, the DOC selected Correctional Medical Services (CMS) to assume the existing contract at the current level of funding. Both parties agreed that a review of services, expenditures and compensation would occur after six months with the Department reserving the option to issue a public bid upon 180 days notice.

STATISTICAL INFORMATION

The recent News Journal articles make reference to Bureau of Justice Statistics (BJS) reports comparing Delaware to national rates in various categories but fail to fully explain what the numbers represent.

Unlike most correctional systems, Delaware operates a unified (jail & prison) system, and reports combined data to BJS. The News Journal articles referencing national comparisons reflect prison-only statistics. Omitting the jail data from other states' reporting dramatically inflates Delaware's ranking against national averages.

However, BJS gathers jail and prison data separately. BJS reports jail data as detentioners and sentences of less than one year. BJS reports prison data as sentences over one year.

In small correctional systems like Delaware, use of computed rates instead of actual history can significantly distort the picture, as was done in these articles.

For example, The News Journal quotes the August 2005 BJS report titled "Suicide and Homicide in State Prisons and Local Jails". The study computes the national rates per 100,000 inmates. It indicates a national prison suicide rate of 14 and a local jail rate of 48.

Delaware submitted its unified or combined jail and prison data, which translated into a rate of 28 per 100,000 inmates, falling in the middle of the statistical range by any reasonable standard. What did the News Journal do? The article repeatedly compared Delaware's unified rate of 28 with the national prison rate of 14. This incorrect comparison was explained several times to the reporter, to no avail.

The News Journal quotes the "Wicomico County Prison" (actually a county jail), as a national model, having less that one death per year. Under the BJS methodology of deaths per 100,000 inmates even this experience of 0.5 deaths per year, results in a death rate of 92.

In other words, a doubling of actual experience (from 0.5 to 1) can result in a huge movement in the BJS rate.

Delaware actual incidents of HIV related deaths and suicides for calendar years 2000-2004:

| Year | HIV | Suicide |
|------|-----|---------|
| 2000 | 1 | 0 |
| 2001 | 7 | 3 |
| 2002 | 3 | 2 |
| 2003 | 5 | 1 |
| 2004 | 0 | 1 |

FACTUAL INACCURACIES

From April 2005, until the publishing of the articles, the News Journal made multiple requests for information. The DOC provided all legally permitted information. In addition, the reporters requested two interviews with me and both were granted. The reporters requested access to two correctional facilities and that request was granted. Reporters requested to interview six current inmates. While all requested interviews were granted, none were included in the series. Instead, the News Journal profiled 16 other inmates but did not offer the DOC the opportunity to comment on 13. As a result of this egregious failure in balanced reporting, the DOC has documented more than 50 additional inaccuracies or misrepresentations.

The DOC has found numerous misstatements, exaggerations and outright falsehoods in the News Journal's attempt to recount care received by particular inmates. While we would welcome the opportunity to refute each and every misstatement in the series, the DOC cannot do so in most cases, because refuting the articles' assertions would require DOC to rely upon and disclose information from inmates' medical files, which are required to be kept confidential under federal law. If the News Journal can secure a waiver of health information confidentiality from any of the sources for its articles, the DOC can provide a complete response to the allegations reported.

One particular case that highlights the inaccuracy of the series, without disclosing protected health information, is the case of Jermaine Wilson.

In its Wednesday, September 28 report titled 'Accountability', the News Journal reported that, sometime in 2005, the DOC was housing two inmates named Jermaine Wilson at Gander Hill prison. The report indicated that the DOC transferred the wrong Jermaine Wilson to the more restrictive maximum security unit at Delaware Correctional Center. The article reported that, days later, the wrongly transferred Jermaine Wilson killed himself. <u>The entire premise of this article is false, misleading the public on the true nature of this case because neither Jermaine Wilsons were ever at Gander Hill at the same time.</u>

Jermaine LeMar Wilson, DOB 1-15-85, was being properly housed at Gander Hill prison. He was serving a two-year sentence at Level 5 (prison) for 1st degree robbery beginning on 6-20-03. With good time credit applied, Jermaine LeMar Wilson's prison time ended on 9-9-04. J.L. Wilson had a Level 4 (work release) sentence to follow the prison time. That portion of the sentence began on 9-9-04. Wilson was transitioned through Level 4 on his way to work release; with stays at the Webb Correctional Facility and Central Violation of Probation Center. While at CVOP, Wilson exhibited defiant behavior, refused to participate in mandatory community service projects and blatantly failed to comply with orders from security staff. As a result of this violation, he was sent to Delaware Correctional Center. Based on his CVOP behavior, he was placed in maximum security.

Jermaine M. Wilson, DOB 8-8-83 – a different inmate -- was not incarcerated at either Level 5 (prison) or Level 4 (work release) during the time Jermaine LeMar Wilson was incarcerated at Gander Hill. Jermaine M. Wilson was on probation at the time, living full time in the community. His period of probation went from 4-16-03 to 5-10-05. On 5-11-05, Jermaine M. Wilson was incarcerated at Sussex Violation of Probation Center. He was released on bail the next day, 5-12-05, to complete his period of probation.

On 7-7-05, Jermaine M. Wilson was incarcerated at Sussex Correctional Institution on trafficking charges. He currently resides at Sussex Boot Camp.

It is unjustifiable that such sloppy reporting can be the basis for an article that is entirely wrong. It is clear the reporters made significant errors in the research, or worse undertook no research at all, of this case that resulted in a baseless article negative to the Department of Correction.

This article misled the public and distorted the public record. The DOC believes serious similar errors are present in nearly every article but as noted above federal law prohibits comment on specific medical cases.

The Department of Correction is currently developing its Fiscal Year 2007 budget request. This budget request includes funding for professional medical expertise to assist with oversight of inmate medical health care contractors.

Furthermore, the DOC has entered into discussions with our colleagues at the Division of Public Health to develop protocols for testing offenders for infectious diseases. The objective of this collaboration is to maximize the opportunity to identify individuals as they enter Level 5 and Level 4 facilities. Disease identification will enable more focused treatment and counseling efforts. This logic is supported by the Centers for Disease Control and Prevention. Every identified, infected offender receiving treatment, lowers the risk of spreading the infection both inside DOC facilities as well as in the community upon release. We believe that the burden of additional testing costs is far outweighed by the potential benefits to our collective public health.

The DOC puts great emphasis on ensuring the offender population receives the most competent and thorough medical care available. The Department regrets any adverse outcomes that our offenders might experience. We will continue to strive to provide quality and compassionate care to each and every offender.

As I have stated on prior occasions, providing medical services to an inmate population is a demanding and complicated task but Delaware has done a responsible and thorough job serving a very difficult population. The News Journal owes it to the citizens of our State to report the facts in an accurate, balanced, and truthful way.