IK1074

# STANDARDS FOR HEALTH SERVICES IN PRISONS

January 1987

NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE

2105 N. SOUTHPORT • SUITE 200 • CHICAGO, IL 60614

NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE



RETURN TO
NATIONAL LIBRARY OF MEDICINE
BEFORE LAST DATE SHOWN

OCT 19 1993

JUL 2 8 1994

STANDARDS FOR HEALTH SERVICES IN PRISONS

JANUARY 1987

National Commission on Correctional Health Care
2105 N. Southport, Suite 200
Chicago, Illinois 60614

(312) 528-0818

Copyright 1986

LTD

F 21637   920730   BW   BP 36840

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Acknowledgments | iv |
| Preface | vi |

## Section A. ADMINISTRATION

| | Page |
|---|---|
| P-01. Responsible Health Authority (essential) | 2 |
| P-02. Medical Autonomy (essential) | 2 |
| P-03. Administrative Meetings and Reports (essential) | 2 |
| P-04. Policies and Procedures (essential) | 3 |
| P-05. Internal Quality Assurance (essential) | 4 |
| P-06. Peer Review (important) | 4 |
| P-07. Sharing of Information (important) | 5 |
| P-08. Consultation on Special Needs Patients (important) | 5 |
| P-09. Notification of Next of Kin (important) | 6 |
| P-10. Notification of Local Authorities (important) | 6 |
| P-11. Forensic Information (important) | 6 |
| P-12. Disaster Plan (essential) | 7 |
| P-13. Environmental Inspections (important) | 7 |
| P-14. Kitchen (important) | 8 |

## Section B. PERSONNEL

| | Page |
|---|---|
| P-15. Licensure (essential) | 10 |
| P-16. Job Descriptions (important) | 10 |
| P-17. Staffing Levels (important) | 10 |
| P-18. Training for Health Care Providers (essential) | 10 |
| P-19. Training for Correctional Officers (essential) | 11 |
| P-20. CPR Training (essential) | 12 |
| P-21. Medication Administration Training (important) | 12 |
| P-22. Food Service Workers (important) | 12 |
| P-23. Inmate Workers (essential) | 13 |

## Section C. SUPPORT SERVICES

| | Page |
|---|---|
| P-24. First-aid Kits (important) | 16 |
| P-25. Equipment, Supplies, and Publications (important) | 16 |
| P-26. Clinic Space (important) | 17 |
| P-27. Laboratory and Diagnostic Services (important) | 17 |
| P-28. Hospital Care (important) | 18 |
| P-29. Pharmaceuticals (essential) | 18 |

i

Section D. CARE AND TREATMENT

Part One. REGULAR SERVICES

P-30.  Receiving Screening (essential)                                    22
P-31.  Access to Treatment (essential)                                    23
P-32.  Health Assessment (essential)                                      23
P-33.  Mental Health Evaluation (essential)                               25
P-34.  Daily Handling of Non-emergency Medical Requests (essential)       25
P-35.  Sick Call (essential)                                              25
P-36.  Treatment Philosophy (important)                                   26
P-37.  Grievance Mechanism (important)                                    26
P-38.  Medical Orders (essential)                                         27
P-39.  Standing Orders and Treatment Protocols (important)                27
P-40.  Infection Control Program (important)                              28
P-41.  Health Promotion and Disease Prevention (important)                28
P-42.  Continuity of Care (important)                                     29
P-43.  Emergency Services (essential)                                     29
P-44.  Dental Care (essential)                                            29
P-45.  Ectoparasite Control (important)                                   30
P-46.  Diet (important)                                                   30
P-47.  Exercise (important)                                               31
P-48.  Smoking (important)                                                31
P-49.  Personal Hygiene (important)                                       32

Part Two. SPECIAL SERVICES

P-50.  Health Evaluation of Inmates
       in Solitary Confinement (essential)                                34
P-51.  Health Evaluation of Inmates in Segregation (important)            34
P-52.  Intoxication and Withdrawal (essential)                            34
P-53.  Chemically Dependent Inmates (important)                           35
P-54.  Communicable Disease and Isolation (important)                     35
P-55.  Skilled Nursing and Infirmary Care (essential)                     35
P-56.  Care of the Physically Disabled, Mentally Ill,
       or Developmentally Disabled Inmate (important)                     36
P-57.  Special Needs Treatment Planning (essential)                       37
P-58.  Suicide Prevention (essential)                                     37
P-59.  Sexual Assault (important)                                         38
P-60.  Use of Restraints (important)                                      39
P-61.  Pregnant Inmates (important)                                       39
P-62.  Prenatal Care (essential)                                          40
P-63.  Prostheses (important)                                             41

Section E. MEDICAL RECORDS

P-64.  Medical Record Format (essential)                                  44
P-65.  Confidentiality of Medical Records (essential)                     44
P-66.  Transfer of Medical Records (important)                            45
P-67.  Retention of Medical Records (important)                           45

Section F. MEDICAL-LEGAL ISSUES

P-68.  Informed Consent (important)                                       48
P-69.  Right to Refuse Treatment (important)                              48
P-70.  Forced Psychotropic Medication (essential)                         49
P-71.  Medical Research (important)                                       49

Appendices
SAMPLE INSTRUCTIONS AND FORMS

    I.  Policies and Procedures                                           53
   II.  Medication Administration Training                                61
  III.  Standing Orders and Treatment Protocols                           65
   IV.  Receiving Screening Forms                                         67
    V.  Discharge Summary                                                 71

Glossary                                                                  73

Index                                                                     79

# ACKNOWLEDGMENTS

The revision of Standards for Health Services in Prisons by the National Commission on Correctional Health Care (NCCHC) was accomplished with the advice and cooperation of a number of individuals and organizations. Foremost among these was the ad hoc task force consisting of the following individuals:

B. Jaye Anno, Ph.D., Chairperson
Secretary-Treasurer of NCCHC and
former Assistant Director of Health Services,
Texas Department of Corrections

Carl Bell, M.D.
Chairperson of NCCHC's Accreditation Committee
Member, NCCHC's Board of Directors
representing the National Medical Association

Michael Mahoney
Member of NCCHC's Accreditation Committee
Representative to NCCHC's Board and
Executive Director of the John Howard Association

Rena M. Murtha R.N., M.A.
Past Chairperson of NCCHC's Board of Directors
and Bonnie C. Norman, R.N., M.P.A.
representing the American Nurses' Association

Dale Peterson
Warden of Lincoln Correctional Center,
Illinois Department of Corrections

Curtis Prout, M.D.
Member, NCCHC's Board of Directors
representing the American College of Physicians

John Raba, M.D.
Medical Director of Cermak Health Services,
Cook County Illinois Department of Corrections

Anthony Schaab Ph.D.
Chief of Mental Health
Illinois Department of Corrections

Staff coordinator: Jodie Manes, A.M.,
NCCHC Director of Marketing and Research

Typist, copyeditor, and indexer: Sarah Shaftman, M.A.,
NCCHC Director of Computer Services

In addition to the task force, individuals in health care specialty areas were asked to review the standards related to their professions: Robert Hilton, R.Ph. (named to the Commission's Board of Directors by the American Pharmaceutical Association) on the pharmaceutical standard; Barbara Hladki, M.S., R.D., and her colleagues from the American Dietetic Association on the standards governing food services; Joan Banach, R.R.A., and her colleagues from the American Medical Record Association, on the medical record standards. The dental standard was developed by the Council on Dental Health and Health Planning of the American Dental Association. Further, copies of the draft of the revised standards were sent to all members of NCCHC's Board of Directors and to their supporting organizations, as well as to numerous individuals working in correctional health care, including medical society representatives, Commission surveyors, and practitioners. The critiques received were invaluable in shaping the final standards.

Finally, special thanks are due to the Medical Trust, one of The Pew Charitable Trusts, and the Culpeper Foundation, for grants supporting the standards revision project. The time, effort, and contributions of all of these individuals and organizations are gratefully acknowledged.

Grant V. Rodkey, M.D.
President, National Commission
on Correctional Health Care

Bernard P. Harrison, J.D.,
Chairman, NCCHC
Board of Directors

PREFACE

The standards contained in this document are a revision of the July 1979 Standards for Health Services in Prisons of the American Medical Association. The revision was supported primarily through a grant from the Culpeper Foundation, one of The Pew Charitable Trusts, with additional funding from the Medical Trust. The revised standards, Standards for Health Services in Prisons, are a publication of the National Commission on Correctional Health Care. The National Commission is a not-for-profit, tax-exempt (501)(c)(3) corporation, whose Board of Directors is composed of individuals named by the following professional associations:

American Academy of Child Psychiatry
American Academy of Family Physicians
American Academy of Pediatrics
American Academy of Physician Assistants
American Academy of Psychiatry & the Law
American Association of Public Health Physicians
American Bar Association
American College of Emergency Physicians
American College of Physicians
American Correctional Health Services Association
American Dental Association
American Diabetes Association
American Dietetic Association
American Medical Association
American Medical Record Association
American Nurses' Association
American Osteopathic Association
American Pharmaceutical Association
American Psychiatric Association
American Psychological Association
American Public Health Association
American Society of Internal Medicine
John Howard Association of America
National Association of Counties
National Medical Association
National Sheriffs' Association

The Commission's primary purpose is the improvement of health care delivery in the nation's jails, prisons, and juvenile confinement facilities by continuing the accreditation program initiated by the American Medical Association, supplying technical assistance, holding training programs and educational conferences, and developing and disseminating publications on correctional health care.

These standards reflect the viewpoint of the National Commission regarding adequate medical care and health services in jails. They are minimal. The basis of the standards is the belief that the health care provided in institutions should be equivalent to that available in the community and subject to the same regulations. Prisons are expected to observe local, state, and federal laws on the delivery of health care in their jurisdictions.

vi

The standards were written to guide institutions in providing adequate health care and ensuring continuity of care. They are most applicable to long-term adult correctional facilities. Any size or type of facility housing convicted felons for a year or longer may evaluate its health care program using these standards. The standards also are meant to apply equally to institutions housing women and men. Facilities with both men and women do not comply with the standards if the required services are available to one sex but not to the other.

Implementation of these standards assumes a multidisciplinary model of health care delivery. All levels of the medical, dental, and mental health professional staffs need to be involved in working toward compliance. Where the health services are not organized under a single authority, regular communication among medical, mental health, and dental staff members is even more crucial. The standards also place responsibility on the health care staff to consult with non-medical colleagues in the management of inmates with special health problems. Thus, the health services must function as part of the overall prison program, which requires close cooperation between health professionals and the facility's staff and administration.

Standards are acknowledged criteria for qualitative and/or quantitative measurement of health care delivery systems. The Commission's standards form the basis of its program to accredit health care systems in prisons. Accreditation means professional recognition of good performance, and, through the implementation of standards, is the foundation for professionalization of and public support for correctional health care as a specialty. Implementation of these standards should result in increased efficiency of health care delivery, greater cost-effectiveness, better overall health protection for inmates, staff members, and the community at large. Further, these standards should assist administrators in planning, developing, and budgeting for health services. Clinicians also should find them helpful in establishing priorities, determining services, identifying referral sources, allocating health resources, and training health care and correctional personnel.

There are 71 standards in this document, organized under six topics. Certain standards (N = 31) are identified as essential and others (N = 40) as important. For accreditation for two years, all applicable essential standards and 85% of the applicable important standards must be met.

Following each standard is a discussion section, which elaborates on the standard and, in some instances, identifies alternative approaches to compliance. Key terms are defined in the discussion section, if not in the standard itself, and also can be found in the glossary and the index.

vii

SECTION A.    ADMINISTRATION

2

### P-01. Responsible Health Authority (essential)

The prison has a designated health authority who is on site at least once a week and is responsible for health services pursuant to a written agreement, contract, or job description. The health authority may be a physician, a health administrator, or an agency. When this authority is other than a physician, final medical judgments rest with a single designated responsible physician licensed in the state.

Discussion. Health care is the sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a population. Among other aspects, health care includes medical, dental, mental health, and dietetic services, and environmental conditions.

The health authority's responsibilities include arranging for all levels of health care and ensuring the quality and accessibility of all health services provided to inmates. (It may be necessary for the prison to enter into contracts or agreements with outside providers and facilities in order to meet all levels of care.) A health administrator is a person who by virtue of education (e.g., RN, MPH, MHA, or a related discipline) or experience is capable of assuming these responsibilities. Even where policies are established from a central office, there must be a designated health authority at the local level to ensure that policies are carried out.

A responsible physician is required in all instances; he or she makes the final medical judgments regarding the care provided to inmates at a specific facility. This includes reviewing the recommendations for treatment made by health care providers in the community. In most situations, the responsible physician will be the health authority. In many instances, the responsible physician also provides primary care.

### P-02. Medical Autonomy (essential)

Although the health service staff is subject to the same security regulations as are other staff members, matters of medical, mental health, and dental judgement are the sole province of the responsible clinicians.

Discussion. The delivery of health care is a joint effort of administrators and health care providers and can be achieved only through mutual trust and cooperation. The health authority arranges for the availability and monitoring of health care services; the official responsible for the facility provides the administrative support for the accessibility of health services to inmates and the physical resources deemed necessary for the delivery of health care.

The term medical as used throughout these standards is intended to include psychiatric services, which are a part of the medical program.

### P-03. Administrative Meetings and Reports (essential)

Health care (including psychiatric) services are discussed at least quarterly at documented administrative meetings among the local health authority, the official legally responsible for the prison, and other members of the health care and correctional staffs, as appropriate. Minutes of these meetings are kept or summaries are made; the

minutes or summaries are distributed to attendees and copies are retained for reference. In addition, there is a health service staff meeting at least monthly to review administrative procedural issues. Further, a statistical report of the types of health care rendered and their frequency is made at least once a year.

Discussion. Administrative meetings attended by medical and security personnel, held at least quarterly, are essential. Regular staff meetings that involve the health authority and the official legally responsible for the prison, and include discussions of the services, meet compliance. If minutes are kept, Meeting minutes must include an account of the effectiveness of the health care system, a description of any health environment factor that may need improvement, changes effected since the last report, and, if necessary, recommended corrective action.

It is also important for the health service staff members to meet among themselves. Monthly health service staff meetings give the supervisor(s) a regular opportunity to receive current information on all aspects of the institution's health care delivery. While the standard does not require minutes per se of these meetings, they should be documented in some fashion. Written documentation of meetings is helpful, and an outline of the topics discussed will suffice. Health care staff members are encouraged to attend other facility staff meetings, to promote a good working relationship within the staff.

The statistical report should state the number of inmates receiving health services by category of care, as well as other pertinent information (e.g., operative procedures, referrals to specialists, and ambulance services).

Meetings held and reports made more frequently than the standard requires also satisfy compliance.

### P-04. Policies and Procedures (essential)

There is a manual of written policies and defined procedures specifically developed for the prison and approved by the health authority. It includes a statement regarding each standard listed in the table of contents of this document. Each policy, procedure, and program in the health care delivery system is reviewed at least annually and revised as necessary under the direction of the health authority. The manual bears the date of the most recent review or revision, and the signature of the reviewer(s). Policies revised after the annual review are dated and signed.

Discussion. The importance of a manual that specifies the health care policies and procedures at a given facility cannot be over-stressed. Such a document serves as an important reference book for the existing health care staff and as an excellent training tool for orienting new health care staff members to the facility. A policy is a facility's official position on a particular issue. The procedure describes in detail how the policy is carried out. (See Appendix I for examples.)

The facility need not develop policies and procedures for standard P-61, Pregnant Inmates, and standard P-62, Prenatal Care, when women are not held there. It is not required that each policy and procedure in the original manual be signed by the health authority. There may instead be a signed declaration at

3

4.

the beginning of the manual, that the entire manual has been reviewed and approved. When changes to specific policies are made in the manual, they must be dated and signed by the health authority. (For ease of access, each policy should be cross-referenced with the appropriate NCCHC standard or standards.)

Annual review of policies, procedures, and programs is good management practice. This process allows the various changes made during the year to be formally incorporated into the agency's manual instead of accumulating in a series of scattered documents. More important, the process of annual review facilitates decision-making regarding previously discussed but unresolved matters.

## P-05. Internal Quality Assurance (essential)

Written policy and defined procedures prescribe a system of quality assurance that includes regular chart review by the responsible physician or other designee and (where applicable) inpatient medical records. Charts are reviewed at least monthly, identified problems are referred to a quality assurance committee, which meets at least quarterly. Documents are kept to verify that the chart reviews occur and that the quality assurance committee meets.

Discussion. The responsible physician must be aware that patients are receiving appropriate care and that all written orders and procedures are properly carried out. The elements to be monitored in a chart review include the adequacy of treatment plans initiated by health care providers, the extent to which physicians' and dentists' orders have been carried out, the completeness and legibility of the medical record, the types of medication ordered and notations regarding their administration, and the implementation of treatment protocols, when used.

The selection of charts can be random (e.g., every tenth chart), on the basis of the disease entity (e.g., all diabetics), or by a special criterion (e.g., all deaths). Certain events should be reviewed routinely: acute care hospital placements, medical emergencies, and conditions requiring outside medical services.

A quality assurance committee is a group of health care providers working at the facility who meet on a fixed schedule to conduct and/or to discuss the results of chart reviews. In addition to the responsible physician, such a committee usually includes representatives of other health services and departments such as nursing, pharmacy, medical records, dentistry, and psychiatry. The number of individuals serving on a quality assurance committee and the services and departments represented vary with the size of the staff and the types of health care provided on-site.

It should be noted that periodic reviews by outside groups such as grand juries and public health departments do not meet compliance. While reviews by legally entitled outside groups are encouraged as additional checks on the quality of care provided, they do not take the place of a systematic internal quality assurance program.

## P-06. Peer Review (important)

Written policy defines the medical peer review program utilized by the facility.

Discussion. In 1976, the American Medical Association's House of Delegates resolved that "the American Medical Association endorse the principle that correctional facilities provide adequate medical care to their inmates which is subject to physician peer review in each community". The Commission supports this position and encourages prisons to develop relationships with their county or state medical societies. Formal peer review by physicians in the community helps to advance the effectiveness of the facility's health care delivery system.

Some medical societies, upon request from an administrator, send in a team of specialists to review the prison's health care system and recommend changes. Others agree to include the prison's physician(s) in whatever peer review mechanism has been established for physicians practicing in the community.

## P-07. Sharing of Information (important)

Written policy requires that the physician or his/her designee has access to information contained in the inmate's confinement record when the physician believes such information may be relevant to the inmate's health and course of treatment. Similarly, correctional staff members are apprised of certain medical conditions of inmates.

Discussion. Newly convicted persons frequently are in a state of high anxiety and forget details of their lives that may be important to their health. A review of an inmate's arrest and confinement record for previous drug and alcohol use and convictions, condition at the time of arrest, and possession of medication may be important to the physician in determining the health of the inmate. In addition, details of the crime itself may be important to mental health care professionals.

While correctional personnel should not have access to inmates' medical records, they should be told about inmates with chronic conditions (e.g., diabetes and epilepsy), mental instabilities (for instance, psychoses and suicidal ideation), and physical limitations, and about those on medication with potential side effects. Such information can help correctional officers to respond appropriately should a medical crisis occur.

## P-08. Consultation on Special Needs Patients (important)

Written policy and defined procedures require consultation between the prison administrator and the responsible physician or other designee prior to the following actions being taken regarding patients who are diagnosed as having significant medical or psychiatric illnesses or developmental disabilities:

housing assignments;
program assignments;
disciplinary measures; and
admissions to and transfers from institutions.

Discussion. Maximum cooperation between custody personnel and health care providers is essential so that both groups are made aware of movements and

5

6

decisions regarding special patients. Medical or psychiatric problems may complicate housing assignments, work assignments, or disciplinary management, which have to be adjusted for the patient's safety. Also, linked medical and psychiatric problems should be reviewed prior to transfer. Aspects of correctional personnel should consider in transferring these patients include suitability for travel based on medical evaluation, preparation of a summary or copy of pertinent medical record information (see standard P-66, Transfer of Medical Records, for guidelines), medication en route, and instructions to transporting personnel regarding medication or other special treatment.

## P-09.  Notification of Next of Kin (important)

Written policy and defined procedures require a system for the notification of the inmate's next of kin or legal guardian in case of serious illness (including major psychiatric disorders), injury, or death.

Discussion. The prison should have a set procedure for notifying an inmate's next of kin. The written policy should specify when such notification must occur (e.g., "any illness or injury resulting in hospitalization and in all cases of death") and who has the responsibility for such notification (such as the prison administrator, a chaplain, or the chief medical officer). Information regarding whom to notify should be sought from inmates.

## P-10.  Notification of Local Authorities (important)

Written policy and defined procedures require that in the event of the death of an inmate, the medical examiner or coroner is notified immediately. If the death was unattended or under suspicious circumstances, a postmortem examination is requested.

Discussion. If the cause of death is unknown or the inmate was not under current medical care, a postmortem examination is in order. If the death was (or is suspected to be) due to suicide, it is suggested that a postmortem psychological profile be completed as well as an autopsy.

## P-11.  Forensic Information (important)

Written policy and procedures prohibit the prison's health care personnel from participating in the collection of certain information for forensic purposes.

Discussion. The role of the health care staff is to serve the health needs of inmate-patients. The position of its members as neutral, caring health care professionals is compromised when they are asked to collect information about inmates that may be used against the latter.

Performing psychological evaluations of inmates for use in adversarial proceedings and conducting body cavity searches for contraband are examples of inappropriate uses of a facility's health care staff. Such acts undermine the credibility of these professionals with their patients, and compromise them by asking them to participate in acts that are usually done without inmates' consent. Where state laws and regulations require that such acts be performed by health care professionals, the services of outside providers should be obtained.

7

Regarding body cavity searches conducted for reasons of security, the House of Delegates of the American Medical Association declared in July 1980 that they should be done in event of the same sex as the inmate who have been trained by a correctional personnel of the same sex as the inmate who have been trained by a physician or other health care provider to probe body cavities (without the use of instruments) so as to cause neither injury to tissue nor infection.

In the case of sexual assault (see standard P-59), health care professionals may gather evidence for forensic purposes with the consent of the inmate-victim. Similarly, court-ordered laboratory tests or radiology procedures may be performed by the prison's health personnel with the consent of the inmate.

## P-12.  Disaster Plan (essential)

Written policy and defined procedures require that the health aspects of the prison's disaster plan be approved by the responsible health authority, and the prison administrator. The health service unit's disaster plan is practiced at least annually, so that the staff is familiar with disaster preparation.

Discussion. Policy and procedures for health care services in the event of a man-made or natural disaster, or an internal (e.g., a riot) or external disaster, must be coordinated with the security plan, incorporated into the institution's overall emergency plan, and made known to all personnel. Review of the health aspects of the disaster plan must be part of the initial orientation for all applicable personnel and part of ongoing training.

Health aspects of the disaster plan should include but not be limited to the following: the triaging process; outlining where care will be provided; procedures for evacuation of patients from the facility; specific roles of health care personnel; and telephone numbers for calling health care personnel, ambulance, and hospital; and a back-up plan. In case injuries need to be treated on-site, separate disaster supplies should be planned, stored, and regularly checked.

The need to practice the disaster plan cannot be overemphasized. Staff members must be familiar with disaster preparation. All personnel need to practice their roles so that they will respond appropriately in the event of an actual disaster. Furthermore, practicing the disaster plan helps to identify weaknesses in it that might otherwise remain uncorrected.

It is recommended that the facility's overall disaster plan be drilled annually. At a minimum, the standard requires that the health care portion of the disaster plan be practiced annually. Security representatives should participate with the health care staff in planning these drills to ensure that they run smoothly.

## P-13.  Environmental Inspections (important)

Written policy and procedures require that monthly sanitation inspections of the prison are conducted, and that written reports are submitted to the prison administrator and the health authority.

Discussion. A safe and sanitary environment promotes good health. The scope of the monthly inspection will vary with the size of the prison and its operations. In general, the areas to be inspected should include food preparation and serving, dining, laundry (including sanitary confinement and segregation), toilets, baths, housing, health service, and industrial operations. The inspections may be conducted by representatives of the health service staff, the correctional staff, an outside agency (such as the state health department), or any combination thereof. Regardless of who conducts the inspections, the health authority should review the safety and sanitation program to ensure that health environmental issues are adequately addressed.

It may be useful to develop a written checklist for these inspections; the completed checklist can serve as the written report also. For items to be inspected in the kitchen, see standard P-14. The check of the laundry should include a review of general cleaning and disinfection practices, and the handling of contaminated linen. Baths or showers should be examined for sanitation and to see that there are both hot and cold running water. Toilets should be in working order. Housing and health service areas should be clean. Finally, workplaces should be inspected for safety and sanitation.

#### P-14.   Kitchen (Important)

The kitchen, dining, and food storage areas are kept clean and sanitary for the preparation and serving of meals.

Discussion. A sanitary kitchen is essential to good health. The area should be free of rodents and insects; floors, walls, and ceilings, and ducts, pipes, and equipment should be free of particles (e.g., dirt, dust, and dried food). Traps and drains should be free of standing water and debris. Dishwashing equipment, freezers, and refrigerators should be equipped with working temperature gauges showing temperatures in accordance with public health requirements. Cooking and baking equipment, utensils, and food trays should be properly washed, rinsed, and sanitized. Smoking should be prohibited wherever food is stored, prepared, served, or held in open containers.

Food (raw and prepared) should be stored off the floor in closed containers, labeled with their contents and dated. If meals are transported to housing areas, the food should be protected from contamination, and the equipment used in the transportation should keep the food at the proper temperature. A sample tray of each meal served should be kept in the refrigerator for at least 24 hours.

Prison administrators are encouraged to ask their local or state health departments to make regular inspections.

SECTION B.   PERSONNEL

8

10

## P-15. Licensure (essential)

State licensure, certification, or registration requirements and restrictions apply to health care personnel who provide services to inmates. Verification of current credentials is on file at the prison or at the central personnel office of the department of corrections.

Discussion. When applicable laws are ignored, the quality of health care is compromised. Verification may consist of copies of current credentials or letters from the state licensing or certifying bodies regarding the status of credentials for currently employed personnel.

## P-16. Job Descriptions (important)

Written job descriptions define the specific duties and responsibilities of personnel who serve in the prison's health care system. These are approved by the health authority, reviewed at least annually, and updated as needed.

Discussion. The job descriptions required by this standard are more than civil service job classifications. They are specific to the facility and to the position held. For example, for a nurse working the evening shift who is assigned to the infirmary, there should be a job description for "Infirmary Nurse, Evening Shift" that specifies the responsibilities associated with that position.

## P-17. Staffing Levels (important)

An adequate number of health care staff members of varying types is available commensurate with the level of health services provided at the prison.

Discussion. The numbers and types of health care professionals required at a prison depend upon the size of the facility, the types (medical, dental, psychiatric) and scope (out-patient, specialty care, in-patient) of services delivered, and the needs of the inmate population. Staffing must be sufficient to ensure that medication is passed out as prescribed and that inmates have timely access to a physician. Also, special consideration should be given to the number of inmates in segregated housing, since the more restricted inmates' movement is, the more demands there are on staff time.

While it is difficult to establish staffing patterns that apply equally to all facilities, it is important to ensure that there is sufficient physician time. It is recommended that there be one full-time-equivalent physician in prisons with an average daily population of 750 - 1000 or greater. The tasks of the physician include conducting physical examinations, seeing patients in clinics, reviewing policies, procedures, and protocols; monitoring charts, holding staff meetings and in-service training programs; reviewing the results of laboratory and other diagnostic tests; co-signing charts; and developing individual treatment plans.

## P-18. Training for Health Care Providers (essential)

A written plan approved by the health authority arranges for the participation of all health service personnel in initial orientation and on-going in-service training appropriate to their positions. It outlines the frequency and number of hours of the-

service training for each category of the staff. A minimum of 12 hours of training is required annually for full-time health care providers. Documentation of all training is maintained.

Discussion. Providing health services in a correctional facility is a unique task that requires special orientation for new personnel. These needs should be formally addressed by the health authority, based on the requirements of the institution. All levels of the health care staff also require regular, continuing staff development and training. Proper initial orientation and continuing training may help prevent burnout of providers and re-emphasize the goals of the health care system.

In-service training may include instruction given on-site by a member of the health care staff or a guest lecturer, attendance at in-service programs offered by community hospitals or agencies, or participation in a program such as the Commission's annual conference where formal continuing education credits are offered. Documentation of training should include a list of the courses attended, the dates, and the number of hours for each health care provider.

## P-19. Training for Correctional Officers (essential)

Written policy and a training program established or approved by the responsible health authority in cooperation with the prison administrator guide the health-related training of all correctional officers who work with inmates. Training covers at least the following areas:

a. the administration of first aid;

b. recognizing the need for emergency care in life-threatening situations (for example, heart attack and potential suicide);

c. recognizing acute manifestations of certain chronic illnesses (e.g., seizures, intoxication and withdrawal, and adverse reaction to medication);

d. recognizing other chronic conditions (such as mental illness and developmental disability); and

e. procedures for appropriate disposition and referral.

Discussion. It is imperative that correctional personnel be made aware of potential emergencies, what they should do when they face life-threatening situations, and their responsibility for the early detection of illness and injury. The correctional officers are the eyes and ears of the medical staff; they must be able to recognize a symptom and to describe what they have seen.

It is recognized that at a given time, a facility may not have 100% of its correctional staff trained in these areas, although that is the goal. What is required for compliance is evidence that a substantial portion of the staff (75% or more) has been trained and that the facility has an on-going training program.

Implementation of this standard requires the full cooperation and support of the facility's top administrative staff.

11

12

Written policy and defined procedures require a training program in cardiopulmonary resuscitation for all health care providers and correctional officers who work with inmates. Verification of this training is on file.

## P-20. CPR Training (essential)

Discussion. This standard applies to direct health care providers and to correctional officers who work with inmates. Administrative and clerical personnel are exempt, as are physicians in those states that no longer require them to be CPR-certified. However, it is expected that physicians who are not CPR-certified be familiar with advanced life support techniques.

The standard does not require certification per se in CPR. However, CPR training must be provided by an approved body, such as the American Red Cross, a hospital, a fire or police department, a clinic, or a training academy, or from an individual possessing a current instructor's certificate from an approved body.

It is recognized that at a given time, a facility may not have 100% of its correctional staff trained in CPR, although that is the goal. What is required for compliance is evidence that a substantial portion of the staff (75% or more) has been CPR-trained and that the facility has an on-going training program.

Verification of CPR training should include an outline of the course content and the length of the course as well as the dates the training was offered and a list of participants.

## P-21. Medication Administration Training (essential)

Discussion. Training from the responsible physician encompasses the medical aspects of the administration of medications, including common side effects of specific drugs (see Appendix II for sample training materials). Training from the prison administrator encompasses security matters inherent in the administration of medications in a timely manner according to physicians' orders, and recording the administration of medications in a manner and on a form approved by the health authority.

Administration of medications according to orders includes performance in a timely manner. Administration of medications is defined under standard P-29, Pharmaceuticals, and in the glossary.

## P-22. Food Service Workers (important)

Written policy and defined procedures require that (a) all inmates and other persons working in food service are free from diarrhea and skin infections and other illnesses transmissible by food or utensils, and (b) workers are monitored each day for health and cleanliness by the director of food services or his/her designee.

Discussion. Laws and regulations governing food service workers often differ by state. An administrator of the prison should check to see what is required in that jurisdiction with respect to pre-service examinations. If they are not required in that state or locality, it is not necessary to conduct pre-service physical examinations for food service workers. It is more important that workers be checked daily to ensure that they are healthy (e.g., free from diarrhea and open sores) and that they follow hygienic practices. For example, workers should be told to wash their hands upon reporting to duty, after touching contaminated surfaces, before preparing food, and after using the toilet. Also, the use of hairnets or caps and plastic gloves should be considered for those working in food preparation or serving areas.

If the prison's food services are provided by an outside agency or individual, the prison should have written verification that the outside provider complies with the local and state regulations regarding food service workers.

## P-23. Inmate Workers (essential)

Written policy prohibits inmates from being used as health care workers.

Discussion. Understaffed correctional institutions are inevitably tempted to use inmates in health care delivery to perform services for which civilian personnel are not available. Their use frequently violates state laws, invites litigation, brings discredit to the correctional health care field, and gives the unwarranted power over their peers.

Inmates may not be used to schedule appointments, to handle medical records, medications, or surgical instruments, or to provide any patient care. Inmates may be used to clean the health service area only if they are supervised at all times, and supervised closely and directly in areas that hold medical records, medications, syringes, needles, sharp implements, or supplies. Inmates also may be used in a laboratory that makes prosthetic devices such as dentures or orthotics, provided that the laboratory is located outside the main clinic area, and that a coding system is used to protect the identity of the inmate-patients receiving the prostheses.

13

SECTION C.  SUPPORT SERVICES

16

## P-24. First-aid Kits (important)

First-aid kits are available in designated areas of the facility. The health authority approves the contents, number, location, and replenishment of the kits.

Discussion. First-aid kits should include roller gauze, sponges, triangle bandages, adhesive tapes, and Band-aids, but not emergency drugs. Kits can be either purchased or improvised from assembled materials. All kits, whether purchased or assembled, meet compliance if the following points are observed in their selection:

a. The kits have the proper quantities and types of material for the place where they are to be used, and are easily identifiable as first-aid kits.

b. The contents are arranged so that the desired package can be found quickly without unpacking the entire contents of the box.

c. Material is wrapped so that unused portions do not become dirty through handling.

The monthly inspections must be documented.

## P-25. Equipment, Supplies, and Publications (important)

Equipment, supplies, materials, and current publications (as determined by the health authority) are adequate for the delivery of health care. Inventories exist and are checked at least weekly for those items subject to abuse (e.g., syringes, needles, and sharp instruments).

Discussion. The types of equipment, supplies, and materials for examination and treatment depend upon the level of health care providers. Basic items generally include these:

handwashing facility;
examining table;
goose-neck light;
scale;
thermometers;
blood pressure cuff;
stethoscope;
ophthalmoscope;
otoscope;
transportation equipment (e.g., wheelchair and stretcher);
current medical reference textbooks and drug information books (such as the Physician's Desk Reference or AMA Drug Evaluations, a medical diction- ary, general medical and surgical texts, and emergency medical care reference works); and
in institutions housing women, an obstetrical-gynecological text and equipment for pelvic examinations.

It is good administrative practice to maintain inventory lists of all equipment, supplies, and publications purchased for health services. At a minimum, the standard requires that inventories be kept and checked weekly for items that pose a security risk.

## P-26. Clinic Space (important)

There is sufficient space for the maintenance of an adequate health care delivery system in the prison, as follows:

a. Examination and treatment rooms for medical, dental, and mental health care are large enough to accommodate the necessary equipment (see standard P-25, Equipment, Supplies, and Publications) and fixtures, and to permit privacy for the inmate-patients.

b. There is sufficient space for pharmaceuticals, medical supplies, and mobile emer- gency equipment, and for storage of medical records. There is office space with administrative files, writing desks, and shelves for publications.

c. Private interviewing space, desks, chairs, and lockable file space are available for the provision of psychiatric services.

d. If laboratory, radiological, in-patient, or specialty services are provided on site, the area(s) devoted to any of these services is appropriately constructed and sufficiently large to hold equipment and records and for the provision of the services themselves.

e. There is a waiting area with seats, drinking water, and access to toilets for inmate-patients during sick call.

Discussion. While the amount of space and the configuration of the room(s) needed for the care and treatment of inmate-patients vary with the size of the facility and the kinds of services provided on site, the guidelines for space noted in the standard are considered basic.

## P-27. Laboratory and Diagnostic Services (important)

Written policy and defined procedures require a list of the types of laboratory and diagnostic services used by the prison's health care professionals, and where they are available (that is, whether at the prison or at a referral site). Some on-site diagnostic testing with immediate results is available: at a minimum, multiple-test dipstick urinalysis, fingerstick blood glucose test (glucose range 0-800), peak flow testing (hand-held or other), hematocrit, and stool blood-testing material. Prisons housing women have, on-site, slides with slip covers, and a microscope. Where separate laboratory or diagnostic services are provided on site, a written procedural manual for each service is developed and kept current.

Discussion. Specific resources for the studies and services required to support the level of care provided to inmates, whether in the facility or outside (as in private laboratories, hospital departments of radiology, and public health agencies), are important aspects of a comprehensive health care system and need to be identified and specific procedures outlined for their use.

17

18

The prison has arrangements for providing in-patient hospital care for medical and psychiatric illnesses in facilities that meet the legal requirements for a licensed general or psychiatric hospital in the state.

## P-28. Hospital Care (important)

Discussion. The prison should have an agreement in writing with each hospital it uses for in-patient medical and psychiatric services. The agreement may be in the form of a letter acknowledged by both parties, citing the willingness of the hospital to accept patients from the prison and the conditions imposed on both parties (for example, that the inmate-patient is to be transferred with a summary of his/her medical record and discharged with a summary of the treatment received, the procedures that transporting personnel are to follow at the hospital, and the terms of payment).

## P-29. Pharmaceuticals (essential)

Pharmaceutical services are sufficient to meet the needs of the prison and are in accordance with all legal requirements.

a. The prison complies with all applicable state and federal regulations regarding prescribing, dispensing, administering, and procuring pharmaceuticals.

b. Where there is no staff pharmacist, a consulting pharmacist is used for visits and consultation on a regular basis, and not less than quarterly.

c. All drugs are stored under proper conditions of sanitation, temperature, light, moisture, ventilation, segregation, and security. Antiseptics, other drugs for external use, and disinfectants are stored separately from internal and injectable medications. Drugs requiring special storage for stability—for example, drugs that need refrigeration—are so stored.

d. An adequate and proper supply of antidotes and other emergency drugs, and related information, are readily available to the staff to meet the needs of the facility.

e. Written policies and procedures are followed that govern the pharmaceutical services and that include but are not necessarily limited to the following:

i. Development and subsequent updating of a facility formulary or drug list for pharmaceuticals stocked by the prison. The formulary also includes the availability of non-legend medications.

ii. Procurement, dispensing, distribution, accounting, administration, and disposal of pharmaceuticals.

iii. Maintenance of records as necessary to ensure adequate control of and accountability for all drugs.

iv. Maximum security storage of and accountability by use for DEA-controlled substances, needles, syringes, and other abusable items.

v. Automatic drug stop orders or required periodic review of all orders for DEA-controlled substances, psychotropic drugs, or any other drug that should be restricted because it lends itself to abuse or for any other reason dictating that patient compliance be monitored.

vi. A method for notifying the responsible practitioner of the impending expiration of a drug order, so that the practitioner can determine whether the drug administration is to be continued or altered.

vii. Administration of drugs only upon the order of a physician, dentist, or other authorized individual with designated privileges.

viii. The prescribing of psychotropic or behavior-modifying medications only when clinically indicated (as one facet of a program of therapy) and not for disciplinary reasons.

ix. All medications under the control of appropriate staff members. Inmates do not prepare, dispense, or administer medication.

x. Drug storage and medication areas devoid of drugs that are outdated, discontinued, or recalled.

Discussion. A formulary is a written list of prescription and non-prescription medicines stocked in the facility. This does not restrict the name of the medication generated by outside, community health care providers; however, these are still subject to review and approval by the responsible physician.

Procurement is the system for ordering medications for the facility.

Dispensing is the placing of one or more doses of a prescribed medication into containers that are correctly labeled to indicate the name of the patient, the contents of the container, and all other vital information.

Medication distribution is the system for delivering, storing, and accounting for drugs from the source of supply to the nursing station or point where they are administered to the patient.

Medication accounting is the act of recording, summarizing, analyzing, verifying, and reporting medication usage.

Medication administration is the act in which a single dose of an identified drug is given to a patient.

Disposal is (a) the destruction of medication on its expiration date or when retention is no longer necessary or suitable or (b), upon the discharge of the user from the facility, its destruction or provision to the former inmate (in line with the continuity-of-care principle). When a prison uses the sealed, pre-packaged unit dose system, the unused portion often can be returned to the pharmacy.

19

20

DEA-controlled substances are the drugs that come under the jurisdiction of the Federal Controlled Substances Act. They are divided into five schedules (I through V). The Drug Enforcement Administration (DEA) is the leading federal law-enforcement agency charged with the responsibility for combating drug abuse. Requirements of the Controlled Substances Act and a list of controlled drugs can be obtained from any office of the DEA.

SECTION D.  CARE AND TREATMENT

Part One.  Regular Services

22

Written policy and defined procedures require receiving screening to be performed by qualified health care personnel on all inmates (including transferees) immediately upon their arrival at the prison. Individuals who are urgently in need of medical attention are referred immediately for emergency care. If they are referred to a community hospital, their admission or return to the prison is predicated upon written medical clearance. The receiving screening findings are recorded and approved by the health authority. At a minimum, the screening process includes the following:

a. Inquiry into current illnesses, health problems, and conditions:

mental, dental, and communicable diseases; medications taken and special health (including dietary) requirements; for women, current gynecological problems and pregnancy; use of alcohol and other drugs, including types, methods, date or time of last use, and a history of problems that may have occurred after ceasing use (e.g., convulsions).

b. Observation of the following:

behavior, which includes state of consciousness, mental status (including suicidal ideation), appearance, conduct, tremors, and sweating; bodily deformities and ease of movement; and condition of skin, including trauma markings, bruises, lesions, jaundice, rashes, infestations, and needle marks or other indications of drug abuse.

c. Administration of a test for tuberculosis.

d. Notation of the disposition of the patient, such as immediate referral to an appropriate health care service, placement in the general inmate population and later referral to an appropriate health care service, or placement in the general inmate population.

Discussion. Receiving screening is a system of structured inquiry and observation designed to prevent newly arrived inmates who pose a threat to their own or others' health or safety from being admitted to the prison's general population and to get them rapid medical care. It must occur immediately upon the inmate's admission to the facility and must be performed on all new arrivals. The only exceptions permitted are inmates who are transferred from other institutions and are accompanied by their initial health screening forms and a copy or summary of their medical record from the transferring institution. In this case, a new initial screening need not be conducted, but the medical information must still be reviewed and verified to ensure continuity of care.

It is extremely important for screeners to explore fully the inmate's suicide and withdrawal potential. Reviewing with an inmate any history of suicidal behavior, and visually observing the inmate's behavior (delusions, hallucinations, communication difficulties, speech and posture, impaired level of consciousness, disorganization, memory defects, depression or evidence of self-mutilation), are

## P-30. Receiving Screening (essential)

recommended. This approach, coupled with the training of the staff in all aspects of mental health and chemical dependency, should enable facilities to intervene early to treat withdrawal and to prevent most suicides.

Particular attention also should be paid to careful descriptions of signs of trauma. All staff members should be reminded of their responsibility for reporting suspected abuse of inmates to the appropriate authorities. Inmates arriving with signs of recent trauma should be referred to the medical staff immediately for observation and treatment.

## P-31. Access to Treatment (essential)

Written policy and defined procedures require that information about access to health care services be communicated orally and in writing to inmates upon their arrival at the prison.

Discussion. The facility should follow the policy of orally explaining to all inmates the procedures for gaining access to health care. This notification should take place at the time of receiving screening or upon arrival at a new facility. Special procedures should be developed to ensure that inmates who have difficulty communicating (e.g., those who are developmentally disabled, illiterate, mentally ill, or deaf) have access to health services. Where the facility frequently has non-English-speaking inmates, procedures should be written in their language(s), as well as in English, in the form of a handbook, a handout, or signs in the inmates' housing areas.

## P-32. Health Assessment (essential)

Written policy and defined procedures require the following.

a. A full health assessment is completed for each inmate within 7 days after the inmate arrives at the prison, and includes these items:

i. a review of the receiving screening results; the collection of additional data to complete the medical, dental, and psychiatric histories;

ii. laboratory and/or diagnostic tests to detect communicable diseases, including venereal diseases, and other tests as determined by the responsible physician upon consultation with and approval by the local or state public health authority;

iii. recording of height, weight, pulse, blood pressure, and temperature;

iv. a physical examination, (including a pelvic examination and Pap smear for women), with comments about mental and dental status;

v. other tests and examinations as appropriate;

vi. a review of the results of the physical examination and tests, and identification of problems by a physician; and

vii. initiation of therapy and immunizations when appropriate.

23

b. The collection and recording of health assessment data are handled as follows. The forms are approved by the health authority. Health history and vital signs are collected by qualified health personnel (see the glossary for definition). The "hands-on" assessment is performed only by an appropriately trained RN or by a PA, an NP, or a physician.

c. In the case of a reincarcerated inmate who has received a documented health assessment within the previous three months, the prior results are reviewed and examinations, etc., updated as needed. Physical examinations are repeated annually. A protocol defining the extent of the annual physical examination is developed by the responsible physician.

Discussion. The health assessment is the process whereby the health status of an individual is evaluated. The extent of the health assessment, including physical examinations, is defined by the responsible physician, but should include at least the steps above.

When appropriate, additional investigation should be carried out regarding the abuse of alcohol and/or drugs, including the type(s) of substance abused, mode(s) of use, amounts used, frequency of use and date or time of last use; current or previous treatment for alcohol or drug abuse and, if any, when and where; whether the inmate is taking any medication for an alcohol or drug abuse problem; current or past illnesses and health problems related to substance abuse, such as hepatitis, seizures, traumatic injuries, infections, and liver diseases; whether the inmate has a history of psychiatric hospitalization and/or is taking medication for a psychiatric disorder, and if so what drug(s) and for what disorder; and the presence of medical and psychiatric factors that contribute to intermittent explosive disorder (see glossary for definition).

If a facility requests that laboratory tests for a communicable disease be waived, evidence of the incidence of that disease in the institution and the justification for not conducting such tests on all inmates are required.

A physical examination is a review of the major organ systems for the detection of disease. It may be more extensive depending on the risk factors inherent in the population (to be outlined by the responsible physician). Also, the protocol defining the annual re-examination should take into account inmate age and risk factors when determining the tests to be performed.

Assessment of mental problems identified at receiving or after admission should be provided by the mental health service staff within 14 days (standard P-33, Mental Health Evaluation). The mental health service staff may include psychiatrists, physicians with psychiatric experience, clinical psychologists, psychiatric nurses, and clinically trained social workers, practicing within their respective areas of expertise.

For more specific guidelines on the role of nurses in the health assessment, see the most recent edition of the American Nurses' Association's Standards of Nursing Practice in Correctional Facilities.

24

---

P-33.  Mental Health Evaluation (essential)

Written policies and defined procedures require post-admission evaluation of all inmates by a mental health worker within 14 days of admission. Inmates found to be suffering from serious mental illness or developmental disability are immediately referred for care. Those who require acute care mental health services beyond those available at the prison or whose adaptation to an appropriate facility is significantly impaired are transferred to an appropriate facility as soon as the need for such treatment is determined by a mental health professional. A written list of referral sources exists.

Discussion. Mentally disordered and developmentally disabled inmates must be identified and their treatment needs addressed soon after admission. The urgency of their distress determines the response. Acutely suicidal and psychotic inmates are identified and should immediately be placed in a treatment setting within the correctional system or transferred to an appropriate facility. If not, less serious cases should be housed in a specially designated area with frequent observation by qualified health professionals (when available) or by health-trained correctional personnel.

The post-admission mental health evaluation should include, at a minimum:

(a) a structured interview by a mental health worker in which inquiries into the items listed below are made:

history of psychiatric hospitalization and outpatient treatment;
current psychotropic medication;
suicidal ideation and history of suicidal behavior;
drug and alcohol usage;
history of sex offenses;
history of behavior suggestive of intermittent explosive disorder;
special education placement;
history of cerebral trauma or seizures; and
emotional response to incarceration.

(b) testing of intelligence to screen for mental retardation. It is recommended that inmates identified as possibly retarded on group tests of intelligence or brief intelligence screening instruments be further evaluated by a comprehensive, individually administered instrument such as the Wechsler Adult Intelligence Scale (WAIS-R).

P-34.  Daily Handling of Non-emergency Medical Requests (essential)

Written policy and defined procedures ensure that all inmates have the opportunity daily to request medical assistance and that their requests are documented. Inmates' requests are received and acted upon by qualified health personnel and, where individually indicated, by appropriate triage and treatment. When qualified health personnel are not available, health-trained correctional personnel ensure timely access to an appropriate level of health care provider.

25

26

Discussion. Each facility should have a mechanism in place that enables all inmates (including those in segregation) to request health services daily. In some facilities, the health staff makes daily rounds of each housing area and notes requests for health services in a log; in others, written request slips are supplied to each housing area; the completed slips are dropped in a locked box or picked up by the medical staff during rounds. In either case, inmates' requests are reviewed daily and appropriate disposition is made and noted (e.g., "scheduled for next sick call", "dental appointment made", "referred to psychologist").

## P-35. Sick Call (essential)

Written policy and defined procedures require (a) that sick call be conducted by nurses and/or other qualified health personnel five days a week and (b) that a physician conduct clinics on the following schedule:

a. in prisons with up to 200 inmates, a minimum of three times a week;

b. in prisons with from 200 to 500 inmates, a minimum of four times a week;

c. in prisons with over 500 inmates, a minimum of five times a week.

Further, inmates are seen in a clinical setting in a timely fashion according to treatment priorities.

Discussion. The size of the facility is determined by annual average daily popula-tion, rather than by rated capacity. Sick call is not just triage. Some people refer to "sick call" as a "clinic visit". Clinic care or sick call is care for an ambulatory inmate with health care requests that are evaluated and treated in a clinical setting. It is the system through which each inmate reports for and receives appropriate medical services for non-emergency illness or injury.

Sick call provides inmates with an opportunity to have their requests evaluated by health professionals and responded to within a reasonable time. While it is difficult to give precise time limits, as a rule, non-emergency requests should be triaged within 24 hours and the inmate seen by a qualified health professional at sick call within the next 24 hours (72 hours on a weekend); and, when necessary, a referral made for the inmate to see a physician within two days of the original complaint. In general, if an inmate reports to sick call more than two times with the same complaint and has not seen a physician, s/he should receive an appoint-ment to do so.

Discussion. Health care should be provided with consideration of the patient's dignity and feelings. For example, verbal consent is obtained from the patient before a rectal or pelvic examination is made.

## P-36. Treatment Philosophy (important)

Health care encounters are private, with a chaperone present when indicated, and are carried out in a manner designed to encourage the patient's subsequent use of health services.

27

## P-37. Grievance Mechanism (important)

Written policy and procedures define the the grievance mechanism used by the prison to address inmates' complaints about health services.

Discussion. Each facility should have a mechanism in place to allow inmates to express their complaints regarding health services. Examples of the means select-ed include: inmates are told to write complaints in their formal grievance process. Regardless of the means select-ed, inmates should be told soon after they are the responsible physician or health authority. They are advised what the procedures are. Also, if someone other than a member of the medical staff responds to an inmate's grievances, medical staff input should be solicited prior to responding to an inmate's complaint.

Grievance mechanisms are an important component of a facility's quality assurance program. While not all complaints from inmates are well founded, those that are can help administrators to identify problems with specific providers or procedures.

## P-38. Medical Orders (essential)

Treatment by qualified health personnel other than physicians and dentists is per-formed pursuant to medical orders written and signed by personnel authorized by law to give such orders.

Discussion. Professional practice acts differ in various states as to the issuance of direct orders for treatment; therefore, laws in each state need to be studied for implementation of this standard.

## P-39. Standing Orders and Treatment Protocols (important)

Standing orders are not used by the prison. If treatment protocols are employed, they are developed by the responsible physician, each one is dated, signed, and reviewed at least annually. Each protocol is appropriate to the level of skill and preparation of the practitioner who will carry it out and complies with the relevant state practice act(s). When a protocol is used, it is countersigned in the medical record by the responsible physician within 72 hours.

Discussion. Standing orders are written orders that specify the same course of treatment for each patient suspected of having a given condition. Treatment protocols are written orders that specify the steps to be taken in appraising a patient's physical status. Treatment is initiated only upon the written or verbal orders of a licensed physician. Treatment protocols should not include any direc-tions regarding dosages of prescription medication. An example of a standing order versus an acceptable treatment protocol is given in Appendix III.

Instructions for first-aid procedures written by the responsible physician are acceptable for the identification and care of such minor ailments as would ordinarily be treated by an individual with self-care and over-the-counter medication, e.g., minor cuts, abrasions, and burns; minor headaches; and simple constipation and diarrhea. Administration of over-the-counter medication by health care personnel should be documented in the

28

patient's record. However, it need not be co-signed by a physician unless this is required by the prison's own policy.

## P-40. Infection Control Program (important)

Written policies and procedures for the prevention and control of infection are adopted for the prison, as approved by the responsible health authority. The infection control program includes, but is not limited to, concurrent surveillance of patients and staff, prevention techniques, and treatment and reporting of infections in accordance with local or state laws.

Discussion. An infection control committee that meets on a regular basis to review and discuss infection control policies and procedures, surveillance, cleaning and disinfection techniques, and other matters related to infection control (e.g., banning the shared use of razors) is an appropriate means of meeting this standard. Such a committee should include a representative of the prison administration, the responsible physician or a designated medical representative, the director of nursing or a designated nursing representative, and other professional personnel involved in sanitation and infection control. Minutes or records of committee activities should be maintained.

## P-41. Health Promotion and Disease Prevention (important)

Written policy and defined procedures require that health education and training in self-care skills be given to inmates in the prison, and that inoculations for immunization be available as determined by the responsible physician, as advance measures against disease.

Discussion. The following list contains some subjects for health education.

personal hygiene
physical fitness
nutrition
dental hygiene
effects of smoking
tuberculosis
chronic diseases and disabilities
substance abuse
self-examination for breast and testicular cancer
comprehensive family planning (including, as appropriate, both services and referral)
sexually transmitted diseases
AIDS and AIDS-related complex
prevention of sexual and other physical violence
counseling in preparation for release

Self-care is defined as care for a condition that can be treated by the inmate and may include over-the-counter-type medication.

---

indicated.

## P-42. Continuity of Care (important)

Written policy and defined procedures require continuity of care from admission to the prison to discharge to, including referral to community resources when indicated.

Discussion. As in the community, health care providers should obtain information about previous care when undertaking the care of a new patient. Likewise, when the care of the patient is transferred to providers in the community, information is shared with the new providers in accordance with consent requirements.

Inmates identified in the correctional facility as having long-term or potentially serious conditions should be referred to follow-up clinics or community resources when released. Examples of such conditions are hypertension, if this is medically indicated; communicable diseases, psychiatric disorders, diabetes, epilepsy, serious trauma, and post-operative status for infection, chronic otitis, serious trauma, and post-operative status. The records of these patients should be marked in some fashion (e.g., color-coded or stamped) to indicate any special medical needs.

## P-43. Emergency Services (essential)

Written policy and defined procedures require that the prison provide 24-hour emergency medical and dental care, outlined in a written plan that includes arrangements for the following:

emergency evacuation of the inmate from within the facility when required;

use of an emergency medical vehicle;

use of one or more designated hospital emergency departments or other appropriate facilities;

emergency on-call physician and dentist services when the emergency health care facility is not located nearby; and

security procedures for the immediate transfer of inmates when it is necessary.

Discussion. Emergency medical and dental care is care for an acute illness or an unexpected health need that cannot be deferred until the next scheduled sick call or clinic. All members of the staff (both health care and correctional) should be familiar with procedures for obtaining emergency medical care or services. The names, addresses, and telephone numbers of people to be notified and/or services (such as ambulance and hospital) to be used should be readily accessible to all personnel.

## P-44. Dental Care (essential)

Written policy and defined procedures require that dental care be provided to each inmate under the direction and supervision of a dentist licensed in the state. Dental screening is performed, and instruction in oral hygiene and dental health education are given, within 7 days of admission. A dental examination is made within one month of admission. Dental treatment, not limited to extractions, is provided according to a system of treatment priorities, when in the dentist's judgment the inmate's health would otherwise be adversely affected. Each inmate has access to the preventive

29

30

benefits of fluoride in a form determined by the dentist to be appropriate for the needs of the individual. Consultation through referral to dental specialists is available.

In the case of a re-admitted inmate who has received a dental examination within the past ninety days, a new exam is not required except as determined by the supervising dentist.

Discussion. As part of the initial health assessment, dental screening should be performed by a dentist or health care personnel trained and designated by the dentist. It should determine the presence of the teeth and gums, noting any obvious or gross abnormalities requiring immediate referral to a dentist. Oral hygiene instruction and dental health education should be given by dentists, dental hygienists, or dentally trained health personnel, and should consist of measures to assist the patient in caring for his/her own oral health, such as instruction in the proper brushing and flossing of teeth.

Dental examinations and treatment should be performed only by licensed dentists. The dental examination should include the taking or review of the patient's dental history, charting of teeth, and examination of the hard and soft tissue of the oral cavity with a mouth mirror, explorer, and adequate illumination. X-rays for diagnostic purposes should, when taken if necessary. The results of the examination should be recorded on a uniform dental record system, such as the Attending Dentist's Statement, approved by the American Dental Association.

A professional dental prophylaxis should be performed when prescribed by the dentist. Fluoride toothpaste or oral fluoride rinses should be available for all inmates.

P-45. Ectoparasite Control (important)

Written policy approved by the responsible physician defines ectoparasite control procedures used in the prison. A means is available for the disinfection of bedding and clothing.

Discussion. Ectoparasites such as pediculosis and scabies are skin infestations. They are communicable and may lead to secondary infections. Screening for ectoparasites should occur at admission. Treatment should be carried out on an individual basis, after it is determined that no contra-indicating condition (such as pregnancy) is present.

P-46. Diet (important)

An adequate diet incorporating the four basic food groups, based on the current Recommended Dietary Allowances, is supplied to all inmates. Written policies and procedures require provision of therapeutic (special) medical and dental diets, which are prepared from specially developed menus or in accordance with an approved diet manual, and served to inmates according to the orders of the treating physician and/or dentist, and/or as directed by the responsible physician. Regular and therapeutic diets are evaluated for nutritional adequacy by a registered dietitian at least every six months or whenever a substantial change in the menus is made. Copies of

regular and therapeutic diet menus are retained by the prison for the dietitian's review, along with documentation of deviations from the menu as served.

Discussion. Adequate diets are based on the recommended national allowances or guidelines. Equivalent nutritional guidelines containing the four basic food groups satisfy the standard. The four basic food groups are milk and milk products, other proteins (meat, poultry, fish, eggs, and vegetable sources, notably legumes), breads and cereals; and vegetables and fruits. Written consultation with a registered dietitian is acceptable if direct access is not possible. The "adequate diet" referred to in this standard should be given to inmates in administrative and punitive segregation as well as to all others.

Certain chronic conditions (e.g., diabetes and obesity), as well as temporary ones (e.g., pregnancy and post-surgery status), require individual attention. Consideration should be also given to dietary restrictions for psychiatric patients on medication whose symptoms. For example, patients suffering from anxiety disorders or insomnia may benefit from the elimination of caffeine.

Orders for therapeutic diets should include the type of diet, the duration for which it is to be provided, and special instructions, if any. The facility should have procedures for ensuring that the members of the kitchen staff who prepare therapeutic diets have been trained and that the right patient receives the right diet.

P-47. Exercise (important)

Written policy and defined procedures outline a program of exercise and require that each inmate be allowed a minimum of one hour a day, three times a week of exercise involving large-muscle activity.

Discussion. Examples of large-muscle activity are walking, jogging, basketball, and isometrics. While it is recognized that many facilities do not have a special facility for exercise, there should be a separate room or area (inside or outside) designated for this purpose. Regarding the use of outside yards, gymnasia, and multi-purpose rooms, making available opportunities for exercise (such as basketball, running, and calisthenics) satisfies the standard even if inmates do not take advantage of them. While such activities may be more productive under the supervision of a recreational staff person, this is not required.

This standard is intended to apply to inmates in all custody classes. However, individuals who are transient for no longer than a week may be exempted.

P-48. Smoking (important)

The prison has a written policy on smoking prevention and abatement that requires a smoke-free environment for individuals whose immediate health would be compromised by exposure to smoke (for example, asthmatics, those with chronic obstructive pulmonary disease, and cardiac patients) and designated non-smoking areas within the health care facilities for both staff members and inmates.

31

32

Discussion. Recognizing the evidence that smoking is dangerous to health, all possible efforts should be made toward smoking prevention and abatement.

P-49. Personal Hygiene (important)

Written policy and defined procedures outline a program of personal hygiene. In every area where inmates are normally detained for at least 48 hours, there is a tub or a shower with hot and cold running water, and bathing is permitted daily. The following items are available to inmates:

    soap;
    comb;
    toothbrush;
    fluoridated toothpaste;
    toilet paper;
    sanitary napkins and tampons when required.

Laundry services are offered at least weekly. Haircuts and implements for shaving are made available to inmates subject to security regulations and mental health considerations.

SECTION D.   CARE AND TREATMENT

Part Two.   Special Services

34

Written policy and defined procedures require that inmates who are to be removed from the general population and placed in solitary confinement because of behavior problems be given a physical examination prior to such placement and once placed, be evaluated daily by qualified health personnel. These encounters are documented and filed in the inmate's medical record.

## P-50. Health Evaluation of Inmates in Solitary Confinement (essential)

Discussion. The purpose of the physical examination prior to placing an inmate in solitary confinement (disciplinary segregation) is to ensure that the inmate does not have any contra-indicating medical conditions that would require the postponement of this disciplinary measure. The purpose of the daily evaluations is to ensure that the inmate's health status does not decline while in solitary. Owing to the possibility of injury, and depression during such periods of isolation, daily health evaluations should include notation of bruises or other trauma markings, comments regarding the inmate's attitude and outlook, and any health complaints. Carrying out this policy may help to prevent suicide or serious illness. Further, in recognition of the deleterious effects of prolonged isolation on inmates, it is recommended that the health care staff be involved in the development and/or review of solitary confinement policies.

## P-51. Health Evaluation of Inmates in Segregation (important)

Written policy and defined procedures require that all inmates who are segregated from the general population be evaluated by qualified health personnel whether for administrative or medical reasons. Each segregated inmate should be asked if s/he has any medical requests. If so, arrangements for triage, examination, and treatment in an appropriate clinical setting should be made. A record of these segregation rounds is made on a log or a cell card and any health encounters are noted in each inmate's medical record.

Discussion. The intent of this standard is to ensure that inmates who are confined to their quarters have direct access to health care personnel. Each segregated inmate should be asked if s/he has any medical requests. If so, arrangements for triage, examination, and treatment in an appropriate clinical setting should be made.

## P-52. Intoxication and Withdrawal (essential)

The responsible physician has approved written policy, procedures, and specific protocols for inmates under the influence of alcohol or other drugs or undergoing withdrawal. Inmates experiencing severe, life-threatening intoxication (overdose) or withdrawal are immediately transferred to a licensed acute care facility. Established guidelines for the treatment and observation of individuals manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and other drugs are developed and followed. Individuals at risk for progression to more severe levels of

intoxication or withdrawal are kept under constant observation by qualified health professionals. Detoxification is done only under medical supervision in accordance with local, state, and federal laws.

Discussion. Significant percentages of inmates admitted to correctional institutions have a history of alcohol and/or other drug abuse. Newly incarcerated individuals may enter intoxicated or develop symptoms of alcohol or drug withdrawal. Alcohol withdrawal is the abstinence syndrome with the highest mortality rate, although opiate and tranquilizer withdrawal are, on occasion, life-threatening. Barbiturate withdrawal, while rare in confinement settings, is also often life-threatening. Severe withdrawal syndromes should never be managed in the non-hospital setting.

With the exception of methadone detoxification, the treatment of most non-life-threatening withdrawal consists of the amelioration of symptoms and can be managed in the convalescent or out-patient setting. Abstinence syndromes in certain groups (including psychotics, geriatrics, epileptics, pregnant women, and juveniles) require special attention.

Detoxification refers to the process by which an individual is gradually withdrawn from a drug by the administration of decreasing doses of the drug upon which the person is physiologically dependent, one that is cross-tolerant (antagonistic) to it, or one that has been demonstrated to be effective on the basis of medical research. Detoxification in alcohol-dependent individuals does not involve administering decreasing doses of alcohol; it involves administering decreasing doses of drugs that are cross-tolerant to it, e.g., benzodiazepines.

## P-53. Chemically Dependent Inmates (important)

Written policy and defined procedures regarding the clinical management of chemically dependent inmates require diagnosis of chemical dependency by a physician or (if authorized by law) a properly qualified designee; an individual treatment plan to be developed and implemented; and referral to specified community resources upon release, when appropriate.

Discussion. Existing community resources should be utilized if possible. The term chemical dependency refers to the state of physiological and/or psychological dependence on alcohol, opium derivatives and synthetic drugs with morphine-like properties (opioids), stimulants (for instance, amphetamines and cocaine), and depressants.

## P-54. Communicable Disease and Isolation (important)

There are written policies and procedures regarding the care of inmates with communicable disease, including provision for isolation if medically indicated.

Discussion. Isolation procedures for inmates with a communicable disease must meet the following requirements:

a. The inmate is accommodated in a separate room with separate toilet, hand-washing facility, soap dispenser, and single-service towels.

35

36

b. If used to house individuals with air-borne diseases (such as tuberculosis), the room is properly vented.

c. Procedural techniques include, but are not limited to, handwashing upon entering and leaving, proper handling and disposal of infectious materials, proper isolation methods, instructions to the inmate and to visitors, proper handling of food utensils and dishes, proper handling of patient care equipment, and cleaning and disinfection of isolation accommodations.

P-55.  Skilled Nursing and Infirmary Care (essential)

Written policy and defined procedures guide skilled nursing or infirmary care. They contain a definition of the scope of skilled nursing care provided at the prison. A physician is on call 24 hours a day; the infirmary is supervised by a registered nurse who is present daily. Sufficient and appropriate health care personnel are on duty 24 hours per day. All inmate-patients are within sight or hearing of a health care staff person. There is a manual of nursing care procedures. A complete in-patient medical record is kept for each inmate. Admission to and discharge from the infirmary are on the order only of a physician, or another health professional where permitted by state law.

Discussion. An infirmary is an area within the confinement facility accommodating two or more inmates for a period of 24 hours or more, expressly set up and operated for the purpose of providing skilled nursing care for persons who are not in need of hospitalization. Skilled nursing or infirmary care is defined as inpatient bed care by or under the supervision of a registered nurse for an illness or diagnosis that requires limited observation and/or management and does not require admission to a licensed hospital.

The determination of sufficient and appropriate health care personnel is based on the number of patients, the severity of their illnesses, and the level of care required for each. Being within sight or hearing of a health care staff person means that the inmate-patient can readily gain the person's attention. Call lights and buzzer systems are useful ways of ensuring this.

Advancement of the quality of care in this type of medical area begins with the assignment of responsibility to one physician. Depending upon the size of the infirmary, this physician may be employed part- or full-time.

Nursing care policies and procedures should be consistent with professionally recognized standards of nursing practice (for example, the most recent Standards of Nursing Practice in Correctional Facilities of the American Nurses' Association) and in accordance with the nursing practice act of the state. Policies and procedures should be developed on the basis of current scientific knowledge and take into account new equipment and current practices.

The in-patient record should include admitting notes and a discharge summary as well as complete documentation of the care and treatment given. If the in-patient record is retained separately from the out-patient record, a copy of the discharge summary from the in-patient facility should be placed in the inmate's out-patient chart.

P-56.  Care of the Physically Disabled, Mentally Ill, or Developmentally Disabled Inmate (important)

Written policy and defined procedures require referral for appropriate evaluation and follow-up care of inmates whose moderate or severe physical disability, mental illness, or developmental disability whose adaptation to the correctional environment may be significantly impaired. A written treatment plan is created for each of these inmates. The health authority puts together a written list of specific referral resources.

Discussion. All sources of assistance for physically disabled, mentally ill, and developmentally disabled inmates should be identified in advance of need. The Developmental Disabilities Assistance and Bill of Rights Act (U.S. Public Law 95-602, as amended), defines a developmental disability as follows:

A severe, chronic disability of a person which (a) is attributable to a mental or physical impairment or combination of mental or physical impairments, (b) is manifested before the person attains age 22, (c) is likely to continue indefinitely, (d) results in substantial functional limitations in three or more of the following areas of major life activity: self-care; receptive and expressive language; learning; mobility; self-direction; capacity for independent living; economic self-sufficiency, and (e) reflects the person's need for a combination of special interdisciplinary or generic care, treatment, or other services which are of lifelong or extended duration and individually planned and coordinated.

P-57.  Special Needs Treatment Planning (essential)

Written policy and defined procedures guide the care of inmates with special needs and problems. Epilepsy, physical handicap, AIDS, bleeding tendencies, diabetes, potential suicide, pregnancy, chemical dependency, and psychosis are some of the special medical conditions that dictate close supervision. In such cases, the prison must design a program directed to each individual's needs.

Discussion. The special needs program serves a broad range of health conditions requiring a written, individual treatment plan, developed by a physician or another practitioner, exists for each of these patients. The plan may include instructions about diet, exercise, medication, the type and frequency of laboratory and diagnostic testing, and the frequency of follow-up for medical evaluation and adjustment of treatment modality.

Chronic care is service rendered to a patient over a long period of time; courses of treatment for diabetes, hypertension, asthma, and epilepsy are examples. Convalescent care is service rendered to a patient to assist in the recovery from illness or injury.

A treatment plan is a series of written statements specifying the particular course of therapy and the roles of medical and non-medical personnel in carrying it out. It is individualized and based on an assessment of the patient's needs, and it includes a statement of short- and long-term goals as well as the methods by which these goals will be pursued. When clinically indicated, the treatment plan

37

38

gives inmates access to the range of supportive and rehabilitative services (such as physical therapy, individual or group counseling, and self-help groups) that the treating practitioner deems appropriate.

Individuals with special needs should be followed closely. Regularly scheduled chronic clinics are a good way to ensure continuity of care. Special medical problems should be identified on the outside of the patient's chart. A master problem list that includes chronic medication and known drug allergies also may be helpful.

P-58.  Suicide Prevention (essential)

The prison has a written plan for identifying and responding to suicidal individuals.

Discussion.  While inmates may become suicidal at any point during their stay, high-risk periods include the time immediately upon admission to a facility; after adjudication, when the inmate is returned to a facility from court; following the receipt of bad news regarding self or family (such as serious illness or the loss of a loved one); and after suffering some type of humiliation or rejection. Individuals who are in the early stages of recovery from severe depression may be at risk as well. The facility's plan for suicide prevention should include the following elements.

a.  Identification.  The receiving screening form should contain observation and interview items related to the inmate's potential suicide risk (see the sample screening forms in Appendix IV).

b.  Training.  All staff members who work with inmates should be trained to recognize verbal and behavioral cues that indicate potential suicide.

c.  Assessment.  This should be conducted by a qualified mental health profession-al, who designates the inmate's level of suicide risk.

d.  Monitoring.  The plan should specify the facility's procedures for monitoring an inmate who has been identified as potentially suicidal. Regular, documented supervision should be maintained.

e.  Housing.  A suicidal inmate should not be placed in isolation unless constant supervision can be maintained. If a sufficiently large staff is not available that constant supervision can be provided when needed, the inmate should not be isolated. Rather, s/he should be housed with another resident or in a dormitory and checked every 10-15 minutes. The room should be as nearly suicide-proof as possible (that is, without protrusions of any kind that would enable the inmate to hang him/herself).

f.  Referral.  The plan should specify the procedures for referring potentially suicidal inmates and attempted suicides to mental health care providers or facilities.

g.  Communication.  Procedures for communication between health care and correctional personnel regarding the status of the inmate should exist, to provide clear and current information.

h.  Intervention.  The plan should address how to handle a suicide in progress, including how to cut down a hanging victim and other first-aid measures.

i.  Notification.  Procedures for notifying prison administrators, outside authorities, and family members of potential, attempted, or completed suicides should be in place.

j.  Reporting.  Procedures for documenting the identification and monitoring of potential or attempted suicides should be detailed, as should procedures for reporting a completed suicide.

k.  Review.  The plan should specify the procedures for medical and administrative review if a suicide does occur.

P-59.  Sexual Assault (important)

The prison has a written plan for responding immediately to allegations of sexual assault of inmates.

Discussion.  Sexual assault is probably the most serious non-lethal offense to occur in a correctional setting. Most jurisdictions define a sexual assault as a sexual act that includes penetration that is coercive or assaultive in nature and where there is use or the threat of force.

In some jurisdictions, victims of sexual assault are referred to a community facility for treatment and the gathering of evidence. In others, these procedures are performed in-house. In the latter case, the following guidelines should be observed.

a.  A history is taken and a physician makes an examination to document the extent of physical injury and to determine if referral to another medical facility is indicated. With the victim's consent, the examination includes the collection of evidence, using a kit approved by the local legal authority.

b.  Prophylactic treatment of venereal disease is offered to all victims.

c.  Following the physical examination, there is an evaluation by mental health personnel for crisis intervention counseling and long-term follow-up.

d.  A report is made to the correctional authorities to effect a separation of the victim from his or her assailant in the housing assignment.

P-60.  Use of Restraints (important)

Written policy and defined procedures guide the use of physical restraints for medical reasons. They specify the type(s) of restraint that may be used and when, where, how, and for how long. Use is authorized in each case by a physician. The health care staff does not participate in disciplinary restraint of inmates, except for monitoring their health.

39

40

Discussion. This standard applies to those situations where the restraints are part of health care treatment. Generally an order for medical restraints should not exceed twenty-four hours. There should be fifteen-minute checks by qualified health personnel.

The same kinds of physical restraints that would be appropriate for individuals treated in the community may likewise be used for medically restraining incarcerated individuals; for example, leather or canvas hand and leg restraints, and straitjackets. Metal or hard plastic devices (such as handcuffs and leg shackles) should not be used for prolonged restraint. Persons should not be restrained in an unnatural position (for instance, hog-tied).

When procedures are developed for disciplinary restraint, input from the medical area should be sought. Medical monitoring of the health of inmates held under disciplinary restraint should be carried out periodically by qualified health personnel. When staff members note what they consider to be improper use of restraints, jeopardizing the health of an inmate, they should communicate their concerns as soon as possible to the prison administrator or his/her designee.

P-61.  Pregnant Inmates (important)

Written policy and defined procedures require that comprehensive counseling and assistance are given to pregnant inmates in keeping with their express desires in planning for their unborn children, whether they desire abortion, adoption service, or to keep the child.

Discussion. It is advisable that a formal legal opinion on the law relating to abortion be obtained, and based upon that opinion, written policy and defined procedures should be developed for each jurisdiction.

Counseling and social services should be available from either the prison's staff or community agencies.

P-62.  Prenatal Care (essential)

Inmates remaining in the prison after pregnancy has been diagnosed receive regular prenatal care, including medical examinations, advice on appropriate levels of activity and safety precautions, nutrition guidance, and counseling.

Discussion. Pregnant inmates remaining in the facility should, ideally, be followed by the practitioner who will assist at the birth and, if delivery will be at a community hospital, should be registered at the hospital where the birth will take place. Documentation of the patient's prenatal history should accompany her to the hospital.

A number of communities have excellent agencies that can assist with prenatal care (e.g., health departments, specialty clinics, and local hospitals). In view of the high-risk nature of many inmates' pregnancies, it is strongly urged that such specialty care be sought.

P-63.  Prostheses (important)

Written policy and defined procedures require that medical and dental prostheses be supplied when the health of the inmate would otherwise be adversely affected, as determined by the responsible physician or dentist.

Discussion. Prostheses are artificial devices to replace missing body parts or to compensate for defective bodily functions, such as artificial limbs, eyeglasses, and full and partial dental plates.

41

SECTION E.    MEDICAL RECORDS

44

At a minimum, the medical record file contains these documents:

problem list;

receiving screening and health assessment forms;

all findings, diagnoses, treatments, and dispositions;

prescribed medications and their administration;

reports of laboratory, x-ray, and diagnostic studies;

consent and refusal forms;

release of information forms;

progress notes;

discharge summary of hospitalizations;

reports of dental, psychiatric, and other consultations;

special treatment plan, if any;

place, date, and time of each medical encounter;

signature and title of each medical encounter;

The method of recording entries in the record and the format of the record are approved by the health authority.

Discussion. The problem-oriented medical record structure is suggested. However, whatever medical record structure is used, every effort should be made to establish standardized and uniformly used medical record forms and content. All findings should be recorded, including notations concerning psychiatric, dental, and other consultative services.

P-64. Medical Record Format and Contents (essential)

A complete medical record file is established on every inmate. If an inmate is admitted more than once, the prior medical record should be re-activated.

When patients are seen at community health care facilities, their records are generally kept there. However, a standard form for recording the visit should accompany the inmate, so that the treating practitioner can enter the diagnosis, the treatment provided, and recommendations for follow-up care. A copy of this form should be placed in the inmate's medical record at the prison.

P-65. Confidentiality of Medical Records (essential)

Written policy and defined procedures that establish the principle of confidentiality require that medical records stored in the prison are maintained under secure conditions, separate from confinement records, and that access to medical records is controlled by the health authority.

Discussion. The principle of confidentiality protects the patient from disclosure of certain confidences entrusted to a practitioner during a course of treatment. The confidential relationship of doctor and patient extends to inmate-patients and their clinicians. Thus, it is necessary to maintain medical record files under security, and completely separate from inmates' confinement records.

---

The health authority should maintain a current file on the rules and regulations covering the confidentiality of medical records and the types of information that may and may not be shared. For example, information gathered and recorded about alcohol and drug abuse and psychiatric conditions may have special restrictions on disclosure under state or federal regulations.

P-66. Transfer of Medical Records (important)

Written policy and defined procedures require that, when an inmate is transferred to another correctional facility, summaries or copies of the inmate's medical record are routinely sent to the facility to which the inmate is transferred either before or at the same time as the inmate. Written authorization by the inmate is required for the transfer outside the correctional system of medical records and information, unless otherwise provided by law or administrative regulation.

Discussion. An inmate's medical record or summary should accompany or precede the inmate in order to ensure continuity of care and to prevent the duplication of tests and examinations at the receiving institution. For inmates with critical or chronic health problems, the medical record should be flagged in some fashion (e.g., with color coding) to expedite an immediate referral to a medical care provider.

The transferring institution should provide a discharge summary (see sample in Appendix V) that includes, at least, the medical history, the date of the last physical examination, the immunization record, a summary of medical problems, the inmate's current health status, current level of activity, and current therapy (including medications), and anticipated future health care needs.

P-67. Retention of Medical Records (important)

Written policy and defined procedures require that inactive medical record files are retained according to legal requirements of the jurisdiction and are re-activated if an inmate returns to the system.

Discussion. The storage of inactive medical records needs to conform to the legal requirements for record retention. The inactive files should be marked in such a way that inmates can be identified as long-term-care patients if they re-enter the system.

45

SECTION F.  MEDICAL-LEGAL ISSUES

48

All examinations, treatments and procedures governed by informed consent practices applicable in the jurisdiction are observed for inmate care. The informed consent of next of kin, guardian, or legal custodian applies when required by law.

Discussion. Informed consent is the written agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination, or procedure, and the alternatives to it.

Medical treatment of an inmate without his/her consent (or the consent of next of kin, guardian or legal custodian) can result in legal action. The law regarding consent to medical treatment by inmates, and their right to refuse treatment, varies from state to state. The law of the jurisdiction within which the facility is located should be reviewed by legal counsel, and, based upon counsel's written opinion, a policy regarding informed consent should be developed.

It is not necessary in all cases to obtain informed consent. The exceptions to the requirement for informed consent should be reviewed in the light of each state's laws, and policies and procedures should be drafted outlining then informed consent is not required. Examples of exceptions are life-threatening conditions that require immediate medical intervention for the safety of the patient, emergency care of patients who do not have the capacity to understand the information given, and certain public health matters. In some cases, a court order for treatment may be sought, just as it might be in the general community.

When a clinician proceeds without obtaining informed consent, s/he must exercise her/his best medical judgment. The health care provider should enter in the medical record all aspects of the patient's condition and the reasons for medical intervention. Such documentation facilitates review and may provide a defense against charges of battery.

P-69.  Right to Refuse Treatment (important)

Written policies and defined procedures allow an inmate to refuse, in writing, medical treatment and care.

Discussion. An inmate may, at the time of being offered medical evaluation, treatment, or care, refuse it. The refusal should be in writing and describe the nature of the service to be provided. The requirement for written refusal is generally satisfied by the signature of the inmate on the refusal document, with a witness who acknowledges that the inmate read the refusal form or had it read to him/her in a language understood by the inmate.

Facilities should not maintain a policy that allows inmates to give a blanket refusal to treatment on admission. By refusing treatment at a particular time, the inmate does not necessarily waive his/her right to subsequent health care. Health professionals should counsel inmates against refusals of treatment and should continue to counsel inmates who have refused a particular treatment, when they believe it to be in the patient's best interest.

P-70.  Forced Psychotropic Medication (essential)

Written policy and defined procedures guide the use of forced psychotropic medication. This policy and these procedures, while governed by the laws applicable in the jurisdiction, include requirements for authorization by a physician and specification of the duration of the regimen, and when, where, and how the procedures may be used.

Discussion. Though the right to refuse treatment is inherent in the notion of informed consent, exceptions may arise in psychiatric emergencies. State laws vary on this matter, but as a rule, forced psychotropic medication should be employed only under the following conditions:

a. The inmate poses a clear and immediate threat to self or others.

b. All less restrictive or intrusive measures have been employed or have been judged by the treating physician or psychiatrist to be inadequate.

c. The physician or psychiatrist clearly documents in the medical record the inmate's condition, the threat posed, and the reason for the proposed forcing of medication, including other treatments attempted.

d. Where possible, a documented consultation with another psychiatrist or physician is obtained prior to the forcing of medication.

e. Where possible, orders for forced medication are reviewed through independent psychiatric evaluation and safeguard the inmate's right to due process.

P-71.  Medical Research (important)

Biomedical, chemical, or behavioral research using inmates as subjects either is not performed, or, if performed, meets ethical, medical, and legal guidelines for human research.

Discussion. This standard recognizes past abuses in research on involuntarily confined individuals and protects the autonomy of inmate-patients. It is not intended to discourage the collection of aggregate data and the reporting of information relevant to unraveling the epidemiology of certain conditions. For example, head injury, psychotic symptoms or a history of extreme violence, psychotic relatives, and being a witness or victim of child abuse have been significantly correlated with future psychotic behavior. Correctional facilities can be information collection bases for the confirmation and refinement of such reports.

If research is to be conducted, there should be adequate assurance of the safety and anonymity of the subjects, the research should meet standards of design and control, the inmates must have given their consent, and the project should be reviewed by a human subjects review committee.

49

APPENDICES

Prison Standards

APPENDIX 1

POLICIES AND PROCEDURES

A. Development of a Manual of Policies and Procedures

B. Sample Policy Directive and Accompanying Procedure

54

## A. Development of a Manual of Policies and Procedures[1]

All organizations have policies and procedures. Such policies and procedures may not be in writing; they may not even be called by those names. They may be referred to simply as "routines" or "the way we always do things." Whatever form they take, policies and procedures are important guides to decision-making and efficient management. Standardized and consistently interpreted policies and procedures provide the staff with a clear sense of the organization's directions and provide management with a means of control. When decisions are not in line with written policy, the decisions can be examined and brought into line with policy. If current practices turn out to be inappropriate, or different practices make more administrative sense, policies can be changed in accordance with management's objectives. To be most effective, policies and procedures should be formally established and in written form.

### Definition of Terms

A policy is a general statement of the goals of the organization in a specific topic area, and is a guideline for specifying and regulating operations designed to accomplish organizational objectives. It answers the question of why a certain action is favored.

A procedure is a specification of how a policy is to be carried out. It usually describes who will do what, when and how.

### Content Issues

In the final analysis, the most important issue involved in the development of policies and procedures is the content thereof. There are certain criteria that prescribe the nature of the content of policies and procedures. For example, written procedures should clearly specify the actions required of employees. The specific questions to be answered by a procedure statement are, Who does what? When? and How? and sometimes, for how long?

There are other questions that can be asked to test how well a policy or procedure is written. For example:

1. Does the procedure address policy objectives?
2. Is the procedure realistic?
3. Is the procedure adequate?
4. Are all relevant contractual arrangements and requirements covered?
5. Are other policies and procedures compatible with this one?

[1] This section was adapted from a publication entitled The Development of Policy and Procedure Manuals for Correctional Health Care Programs (Michigan Department of Corrections, 1979). The original publication is one of 19 Correctional Health Care Program (CHCP) resource manuals and is available for purchase from the National Commission on Correctional Health Care.

6. Are procedural steps in the best order?
7. Is the sequence of procedural steps unnecessarily rigid?
8. Can any procedural step(s) be eliminated?
9. Does the procedure avoid bottlenecks?
10. Are the procedural steps designed to operate at the lowest level of authority?
11. What is the effect of proposed changes on other policies and procedures?
12. Will the procedure work on all shifts?

Two other questions should be asked once the manual is complete:

13. What arrangements are needed to keep manuals current?
14. Who should receive a copy of the manual, and how should these people be trained in its use?

### Form

Clarity of the content of the policy or procedure is far more important than either its form or its format. Nevertheless, serious thought should be given to form and format, since they can contribute to clarity. The content of policies and procedures is usually typed onto official forms. Consideration should be given to providing space on the forms for the following items:

a. The title of policy or procedure
b. The date it goes into effect
c. The date of revision
d. The page number (out of how many pages (e.g., Page 1 of 4)
e. The application: for example, when there are institutional differences in policies or procedures, this space shows the institution(s) to which this particular policy or procedure applies.
f. The number of the policy or procedure it supersedes (if any)
g. The number of the policy or procedure or title(s) of the signer(s).
h. The signature(s) of approval and title(s), of the signer(s).
i. The department, division or issuing agency and office of origin.
j. A reference to professional standards and state laws or administrative rules.

Some of these items may appear in the body of the policy or procedure as part of the text, while others may be incorporated into the form itself. These are stylistic differences that have little consequence as long as the items are included somewhere in the written statement.

### Summary

Policies and procedures need to be developed for each of the areas listed in the table of contents of the Commission's standards.

55

56

B. Sample Policy Directive and Accompanying Procedure

The sample that follows sets forth the policy statement and procedures for keeping the health services manual current at the Hardrock State Prison. It includes the basic elements of form noted in the prior section of this appendix. The sample policy statement is intended to address that portion of the Commission's standard P-04 that requires annual review and revision as necessary of all policy statements. It is suggested that during the development of policy statements, the Commission's standards be consulted to ensure that all requirements of each standard are addressed.

HARDROCK STATE PRISON
MANUAL OF POLICIES AND PROCEDURES
for Health Services

No. ___I-6___
Page ___1___ OF ___2___
Issued: 11/86
Revised:

SUBJECT: POLICY, PROCEDURE, PROGRAM UPDATING

PURPOSE: To provide an organized process for updating and amending the Hardrock State Prison's Health Services Policies and Procedures Manual.

POLICY:

I. The Health Services Division of the Hardrock State Prison will review its policies and procedures manual at least annually and will revise it as needed to keep it current.

II. Proposed changes to existing policies and/or procedures are reviewed by the Health Services Policies and Procedures Committee.

PROCEDURES:

I. All suggestions for new policies, or revision of current policies must be submitted to the appropriate Health Services department head.

II. The department head or his/her designee submits a draft of the proposed policy/policy revision to the coordinator of the Policies and Procedures Committee (see Policy #I-7).

III. Mechanisms for Review

A. Copies of the policy to be reviewed will be distributed to members of the Policies and Procedures Committee prior to the next scheduled meeting of the Committee.

B. Should the policy require immediate action, the committee coordinator will convene at least a quorum of the committee at the earliest available date.

IV. Authority for approval of all Health Services policies and procedures rests with the Medical Director.

V. Distribution

A. New/revised policies and procedures will be sent along with a cover memo specifying instructions for the insertion of a new policy or replacement of a revised policy (see sample, Attachment A).

57

58

HARDROCK STATE PRISON
MANUAL OF POLICIES AND PROCEDURES
for Health Services

No. I-6
Page 2 of 2
Issued: 11/86
Revised:

B. Distribution of new/revised policies and procedures will include, but not be limited to, the following:

1. Appropriate Health Services Administration
2. Appropriate Prison Administration

C. A detailed distribution list is maintained in the office of the Medical Director.

Approved:

Prison Administrator _____    Medical Director _____

Reference: NCCHC Standard P-04, Policies and Procedures

---

POLICY I-6
ATTACHMENT A

SAMPLE

HARDROCK STATE PRISON

MEMORANDUM

To: Recipients of the Health Services Policies and Procedures Manual

From: Policy and Procedure Committee Coordinator

Date _____

Subject: New and/or Revised Policies

Attached is a copy of Health Services Division policy number _____. Please place it in your Health Services Policies and Procedures Manual as follows:

_____ Insert the policy behind policy number _____.

or

_____ Replace policy number _____ with this policy.

It is very important that your Policies and Procedures Manual remain current. Please insert this policy in your manual as soon as possible.

Thank you for your assistance.

59

APPENDIX II

MEDICATION ADMINISTRATION INFORMATION

Standard P-21 requires that personnel who administer medication receive training from the facility administrator (or a designee) in the security issues inherent in the management of medication in a confinement setting. Further, the standard requires training from the responsible physician (or a designee) in medical aspects of medical administration, including common side effects of specific drugs. One potential source of training materials is the set of "Patient Medication Instruction Sheets" (PMIs) originally developed by the American Medical Association and currently distributed by the United States Pharmacopeia. While the PMIs are used most often by physicians to provide information to their patients about medication that has been prescribed, some detention and correctional facilities have found them useful as training aids. Each PMI describes the uses of a particular medicine, notes contraindications for its use, and lists precautions to be observed while taking the medicine, and common side effects that should be watched for. A list of available PMIs and ordering information are provided on the next page.

61

62

**AMA/PMI RE-ORDER FORM**

U.S. Pharmacopeial Convention, Inc.
Order Processing Dept. 470
P.O. Box 5367, Twinbrook Station
Rockville, MD 20851

AMA/PMI pads are available from USPC at a charge of $2.00 per pad. The minimum order is 15 pads (of PMI's per pad). Please allow 3 weeks for delivery.

□ Enclosed is my check payable to USPC
□ Charge to my:   □ MasterCard   □ VISA

Name: _____
Address: _____
City: _____
State: _____ Zip: _____

Occupation (check one):
□ 1 □ Physician     □ 3 □ Dentist
□ 2 □ Pharmacist

Exp. Date _____
Acct # _____

Or call toll-free 1-800-227-USPC to charge to your MasterCard or VISA.

Please send me the PMI's in the following quantities:

Number of pads—PMI number and title

| | | |
|---|---|---|
| ___ 079 Acetaminophen | ___ 063 Glaucoma Eye Medicine— | ___ Quinidine/Procainamide |
| ___ 078 Allopurinol | ___ Glaucoma Eye Medicine— | ___ Rauwolfia Alkaloids |
| ___ Amiloride and with Thiazide | ___ 061 Long-Acting | ___ Scopolamine |
| ___ Amphetamines | ___ Guanethidine Eye Medicine— | ___ Spironolactone and with Thiazide |
| ___ Aspirin | ___ Music | ___ Steroid and Antibiotic Eye Drops |
| ___ 018 Barbiturates | ___ H-2 Blockers | ___ Sulfamethoxazole and |
| ___ 01? Benzodiazepines | ___ Haloperidol | ___ Trimethoprim |
| ___ Beta-Blockers | ___ Insulin | ___ Sulfasalazine |
| ___ 001 Bronchodilator Aerosols | ___ Indomethacin | ___ Sulfinpyrazone |
| ___ 004 Calcium Channel Blockers | ___ Iron Supplements | ___ Sulfonamides |
| ___ Carbamazepine | ___ Isoniazid | ___ Sulfonylureas |
| ___ Cephalosporins—Oral | ___ Levodopa | ___ Tetracyclines |
| ___ Chloramphenicol—Oral | ___ Levodopa/Carbidopa and | ___ Theophylline |
| ___ Chlorpropamide | ___ Lithium | ___ Thiazide Diuretics |
| ___ Clonidine | ___ Loop Diuretics | ___ Thyroid Replacement |
| ___ Codeine | ___ Meclofenamate | ___ Timolol—Ophthalmic |
| ___ Codeine | ___ Methotrexate | ___ Tolazamide and with Thiazide |
| ___ Codeine | ___ Methyldopa | ___ Tolbutamide |
| ___ Cromolin—Type Anticoagulants | ___ Metronidazole | ___ Tricyclic Antidepressants |
| ___ Digitalis Medicines | ___ Nifedipine | ___ Valproic Acid |
| ___ Diphenoxylate with Atropine | ___ Nitroglycerin Sublingual Tablets | ___ Xanthine Derivatives—Oral |
| ___ Ergot Derivatives | ___ Nonsteroidal Anti-Inflammatory | |
| ___ Erythromycin—Oral | ___ Drugs | |
| ___ Estrogens—Oral | ___ Penicillins—Oral | |
| ___ Ethambutol | ___ Pentazocine | |
| ___ Ethosuximide | ___ Phenothiazines | |
| | ___ Phenytoin | |
| | ___ Potassium Supplements | |
| | ___ Prazosin | |
| | ___ Propranolol and With Aspirin | |
| | ___ or Acetaminophen | |

_____ Total number of pads (15 pad minimum, 50 PMI's per pad)
$2.00 Per pad
$_____ Subtotal
$_____ Residents of MD must add 5% sale tax to subtotal
$_____ Total payment

---

## IMPORTANT MESSAGE

Effective October 1, 1996, the American Medical Association has granted authority to the United States Pharmacopeial Convention, Inc. (USPC) to distribute AMA Patient Medication Instruction (PMI) Sheets.

USPC reviews and publishes *The United States Pharmacopeia* and *The National Formulary* (USP–NF), the legally recognized compendia of standards for drugs and the USP DI® from which portions of the text of PMI's are extracted. USPC is a private, non-profit organization that is not supported by government funds.

On the reverse side you will find a re-order form for your convenience in ordering the PMI's of your choice.

**Please Note:** The address at the top of the form to which all future orders are to be sent is now:

USPC Order Processing
P.O. Box 5367
Twinbrook Station
Rockville, MD 20851

**Also Note:** The cost of PMI's per pad of 50 is now $2.00 and the minimum order is 15 pads. Shipping charges are included. **Please make checks payable to USPC.** The increase in price of PMI's was necessary to make the distribution process economically feasible so that the program could be continued as a valuable service to physicians and other health care professionals.

We hope that you will continue to distribute PMI's to your patients in support of our combined efforts to promote consumer drug education.

## ADDITIONAL SERVICE

You may call our toll-free number 1-800-227-USPC (8:30 AM – 5:00 PM, Eastern time, Mon.–Fri.) to order your PMI's to be charged to your VISA or MasterCard. Your comments and suggestions are invited.

See order form on reverse side.

63

64

In addition, you may want to consider USP DI,® a publication presenting drug use information and guidelines for both the health care provider and the patient, and including information on nearly every drug available in the United States. Developed by the United States Pharmacopeial Convention, USP DI Volume I (Drug Information for the Health Care Provider) is directed at the information needs of the care giver, while Volume II (Advice for the Patient) is written in easy-to-understand English for the patient. This database serves as the source of the PMI leaflets previously described. Volume II can be used as a patient reference or pages can be photocopied when used as part of a patient education program. USP also produces drug education leaflets similar in content to the PMIs. These leaflets are available in English or Spanish. For samples of the information USP provides or for ordering information, call (800) 227-8772 or write to USPC, 12601 Twinbrook Parkway, Rockville, MD 20852.

65

APPENDIX III

EXAMPLE: STANDING ORDER VERSUS TREATMENT PROTOCOL

Moderate Alcohol Withdrawal

A. Standing Order

Administer Chlordiazepoxide (Librium) 50 mg IM stat and po q A.M. Thiamine 50 mg IM stat and po q 8 hours.

B. Treatment Protocol

1. Symptoms/Presentation

- History of alcohol abuse
- History of recent (12 - 72 hours) abstinence
- Tremulousness
- Diaphoresis
- Restlessness
- No hallucinations, no disorientation, no convulsions

2. Take vital signs

3. Evaluate for history or signs of trauma.

4. Contact physician to discuss disposition/medication.

5. House in area of constant observation.

6. If disorientation, confusion, convulsions, etc. occur, arrange for immediate hospital emergency department transfer.

Note: More detailed therapeutic guidelines are acceptable in sites where nurse practitioners/physician assistants are employed and state regulations allow for enhanced responsibility.

APPENDIX IV

Sample Receiving Screening Forms

The purpose of the initial health screening is to identify on admission those individuals who need immediate medical attention so that they can be referred for care. It is intended to avert potential medical and psychiatric crises that may develop if the staff is not aware of inmates' medical history and current health status.

The extent of the receiving screening is somewhat dependent on the time period for conducting the health assessment. If the detailed examination is not done until the seventh day after admission, the initial health screening should be comprehensive. On the other hand, if a full health assessment is performed within a day or two of admission, the initial screening can be more brief.

Two sample screening forms are provided in this section — a long and a short version. In adapting these forms for use at your institution, please consult standard P-30 to ensure that all necessary elements are included. Please note that if the short form is used, the subsequent health assessment must contain more detailed mental, psychiatric, dental, and alcohol and drug abuse histories than it would if the long form were used.

## SHORT FORM

68

SAMPLE RECEIVING SCREENING FORM for use when a full health assessment is done within 48 hours of an inmate's admission.

Note: Each "yes" answer requires a response. Guidelines for disposition should be developed that tell the examiner what to do or whom to call for each of the items on the form.

NAME OF INSTITUTION

Inmate's name _____

Date of birth _____   Inmate's number _____   Sex _____

Examiner's name _____   Date _____   Time _____

**Examiner's Visual Opinion**

|  |  | Yes | No |
|---|---|---|---|
| 1. | Does inmate have obvious pain or injury? | ___ | ___ |
| 2. | Is there obvious sign of infection? | ___ | ___ |
| 3. | Does inmate appear to be under the influence of alcohol or drugs? | ___ | ___ |
| 4. | Are there visible signs of alcohol and/or drug withdrawal? | ___ | ___ |
| 5. | Does inmate appear to be despondent? | ___ | ___ |
| 6. | Does inmate appear to be irrational or "crazy"? | ___ | ___ |
| 7. | Is inmate carrying medication? | ___ | ___ |

**Examiner-Inmate Questionnaire**

|  |  | Yes | No | Refused |
|---|---|---|---|---|
| 8. | Are you taking any medication? | ___ | ___ | ___ |
| 9. | (If female) Are you pregnant? | ___ | ___ | ___ |
| 10. | Is this the first time you have ever been incarcerated? | ___ | ___ | ___ |
| 11. | Have you ever tried to kill yourself or done serious harm to yourself? | ___ | ___ | ___ |
| 12. | Do you have any serious medical or mental problems that you haven't told me about? Are you receiving any treatment? | ___ | ___ | ___ |

(Specify below)

_____

**Disposition or referral** (circle appropriate response)
general population   emergency care   sick call   medical isolation
other (specify)

(A copy of this form should be included in the inmate's medical record.)

---

## LONG FORM

69

SAMPLE RECEIVING SCREENING FORM for use when a full health assessment is not performed within the first 48 hours.

NAME OF INSTITUTION

Inmate's name _____

Date of birth _____   Inmate's number _____   Sex _____

Examiner's name _____   Date _____   Time _____

**Examiner's Observations**
(Where applicable, circle specific condition)

|  |  | Yes | No |
|---|---|---|---|
| 1. | Unconscious? | ___ | ___ |
| 2. | Visible signs of trauma or illness requiring immediate emergency or doctor's care? Describe: | ___ | ___ |
| 3. | Obvious fever, swollen lymph nodes, jaundice or other evidence of infection that might spread through the facility? Describe: | ___ | ___ |
| 4. | Poor skin condition, vermin, rashes, or needle marks? | ___ | ___ |
| 5. | Under the influence of alcohol, barbiturates, heroin, or other drug(s)? | ___ | ___ |
| 6. | Visible signs of alcohol or drug withdrawal (extreme perspiration, pinpoint pupils, shakes, nausea, cramping, vomiting)? | ___ | ___ |
| 7. | Behavior suggesting risk of suicide or assault? | ___ | ___ |
| 8. | Carrying medication or reports being on medication? List: | ___ | ___ |
| 9. | Deformities? List: | ___ | ___ |

70

Examiner-Inmate Questionnaire

10. Admits to the following (indicate by number and letter below):

1  (over one year ago)        H  (hospitalized)
2  (within past year)         M  (medications, current)
3  (present now)

| | |
|---|---|
| allergies | high blood pressure |
| arthritis | physician-prescribed diet |
| asthma | psychiatric disorder |
| delirium tremens (DTs) | suicide attempt |
| dental condition | tuberculosis |
| diabetes | ulcers |
| epilepsy | urinary tract problems |
| fainting | venereal disease (VD) |
| heart condition | other (specify) |
| hepatitis | |

11. Use alcohol?
a. How often?
b. How much? _____
c. When were you drunk last?
d. When did you drink last?

12. Use any "street" drugs?
a. What type(s)?
b. How often? _____  c. How much? _____
d. When did you get high last?
d. When did you take drugs last?

13. (For women)
a. Are you pregnant?     Number of months _____
b. Have you delivered recently?     Date _____
c. Are you on birth control pills?
d. Any gynaecological problems? (Specify)

14. Immunization history (specify dates and diseases)

Remarks (e.g., unusual behavior, special diet, type of VD, etc.)

Disposition or referral (circle appropriate response)
general population        emergency care        sick call        medical isolation
other (specify)

(A copy of this form should be included in the inmate's medical record.)

---

71

APPENDIX V

SAMPLE
HARDROCK STATE PRISON
TRANSFER/DISCHARGE HEALTH SUMMARY

Patient Name _____          ID # _____          Date of Birth _____

Date of Last Physical Exam _____          Date of Last TB Test and Result _____

KNOWN ALLERGIES (foods, medicines, insects, etc.)

SIGNIFICANT HEALTH PROBLEMS NOTED PRIOR TO ADMISSION (include treatment given and where care was given if available)

SIGNIFICANT HEALTH PROBLEMS DIAGNOSED DURING RESIDENCE (include dates and treatment)

HEALTH PROBLEMS REQUIRING FURTHER CARE (include treatments started)

MEDICATIONS BEING TAKEN AT TIME OF DISCHARGE

RESTRICTIONS (if any) PLEASE SPECIFY:
Activities
Diet
Housing

COMMENTS:

Signature and Title _____          Date _____

Attach Additional Sheet if Necessary

GLOSSARY

ACCOUNTING for medications is the system of recording, summarizing, analyzing, verifying, and reporting medication usage.

ADMINISTRATION OF MEDICATION is the act in which a single dose of an identified drug is given to a patient.

ADMINISTRATIVE MEETINGS are held at least quarterly between the health authority and the official legally responsible for the facility, or their designees. At these meetings, problems are identified and solutions sought.

ALCOHOL DETOXIFICATION: See DETOXIFICATION.

The ANNUAL STATISTICAL REPORT should indicate the number of inmates receiving health services by category as well as other pertinent information (e.g., operative procedures, referrals to specialists, ambulance services).

CHEMICAL DEPENDENCY refers to the state of physiological and/or psychological dependence on alcohol, opium derivatives, synthetic drugs with morphine-like properties (opioids), stimulants, and depressants.

CHRONIC CARE is medical service rendered to a patient over a long period of time (e.g., treatment of diabetes, asthma, and epilepsy).

CLINIC CARE is medical service rendered to an ambulatory patient with health care complaints that are evaluated and treated at sick call or by special appointment.

CONVALESCENT CARE is medical service rendered to a patient to assist in recovery from illness or injury.

A DEA-CONTROLLED SUBSTANCE is a drug regulated by the Drug Enforcement Administration under the authority of the Federal Controlled Substances Act.

The DENTAL EXAMINATION should include the taking or review of the patient's dental history; charting of teeth; examination of the hard and soft tissue of the oral cavity with a mouth mirror, explorer and adequate illumination; and x-rays if needed for diagnosis.

DENTAL SCREENING, a part of the initial health appraisal, includes visual observation of the teeth and gums.

DETOXIFICATION refers to the process by which an individual is gradually withdrawn from a drug by the administration of decreasing doses of the drug upon which the person is physiologically dependent, one that is cross-tolerant to it, or a drug that has been demonstrated to be effective on the basis of medical research.

DISASTER PLAN, HEALTH ASPECTS OF: Health aspects of the disaster plan, among other items, include the triaging process, outlining where care can be provided, and laying out a back-up plan.

73

74

DISPENSING OF MEDICATION is the issuance of one or more doses of a prescribed medication into containers that are correctly labeled with the name of the patient, the contents of the container and all other vital information needed to facilitate correct drug administration.

DISPOSAL OF MEDICATION refers to the destruction of the patient's medication upon his/her discharge from the facility, the return of sealed, unused, pre-packaged medication to the pharmacy, or the provision of the discharged patient, with the medication, in line with the principle of continuity of care.

DISTRIBUTION OF MEDICATION is the system of delivery and storage of and accounting for drugs from the source of supply to the facility or the point at which they are administered to the patient.

DOCUMENTED health complaints: Examples of the documentation of health complaints are (1) the recording on the complaint slip of the action taken regarding triaging and the filing of such slips in the patient's medical record, and (2) the use of a log to record the complaint and its disposition.

DRUG DETOXIFICATION: See DETOXIFICATION.

ECTOPARASITES are animals (such as insects) that infest human skin.

EMERGENCY CARE (MEDICAL, DENTAL, AND MENTAL) is care for an acute illness or unexpected health care need that cannot be deferred until the next scheduled sick call or clinic.

A FORMULARY is a written list of prescribed and non-prescribed medication stocked within the facility.

The FOUR BASIC FOOD GROUPS are milk and milk products; meat, fish, and other protein foods (e.g., eggs, dried beans and peas, cheese); breads and cereals; and vegetables and fruits.

A HEALTH ADMINISTRATOR is a person who by education (RN, MPH, MHA, or a related discipline) or experience is capable of assuming responsibility for arranging for all levels of health care and ensuring quality and accessibility of all services provided to inmates.

The HEALTH ASSESSMENT is the process whereby the health status of an individual is evaluated. The extent of the health appraisal, including medical examination, is defined by the responsible physician, but includes at least the items noted in standard P-32.

The HEALTH AUTHORITY is the individual to whom has been delegated the responsibility for the facility's health care services, including arrangements for all levels of health care and the ensuring of quality and accessibility of all health services provided to inmates.

75

HEALTH CARE is the sum of all actions taken, preventive and therapeutic, to provide for the physical and mental well-being of a population. Health care, among other aspects includes medical, psychiatric, and dental services, personal hygiene, dietary and food services, and environmental conditions.

HEALTH-TRAINED STAFF may include correctional officers and other personnel without health care licenses who are trained in limited aspects of health care, as determined by the responsible physician.

HOSPITAL CARE is inpatient care for an illness or diagnosis that requires observation and/or management in a licensed hospital.

An INFIRMARY is an area established within the confinement facility in which organized bed care facilities and services are maintained and operated to accommodate two or more patients, and which is operated for the express or implied purpose of providing skilled nursing care for persons who are not in need of hospitalization.

INFIRMARY CARE is defined as inpatient bed care by or under the supervision of a registered nurse for an illness or diagnosis that requires limited observation and/or management but does not require admission to a licensed hospital.

INFORMED CONSENT is the agreement by the patient to a treatment, examination, or procedure after the patient receives the material facts regarding the nature of, consequences of, risks of, and alternatives to the proposed treatment, examination, or procedure. The right to refuse treatment is inherent in this concept.

INITIAL HEALTH SCREENING: See RECEIVING SCREENING.

INTERMITTENT EXPLOSIVE DISORDER: According to the DSM-III, diagnostic criteria are as follows:

a. Several discrete episodes of loss of control of aggressive impulses resulting in serious assault or destruction of property.

b. Behavior that is grossly out of proportion to any precipating psychosocial stressor.

c. Absence of signs of generalized impulsivity or aggressiveness between episodes.

d. Not due to Schizophrenia, Antisocial Personality Disorder, or Conduct Disorder.

INTERNAL QUALITY ASSURANCE: See MONITORING OF SERVICES.

Examples of LARGE-MUSCLE ACTIVITY are walking, jogging in place, basketball, ping-pong, and isometrics.

The term MEDICAL includes "psychiatric."

76

MEDICAL PREVENTIVE MAINTENANCE: See PREVENTIVE MAINTENANCE.

MEDICAL RESTRAINTS: See RESTRAINTS.

MEDICATION ACCOUNTING: See ACCOUNTING.

MEDICATION ADMINISTRATION, DISPENSING, DISPOSAL, DISTRIBUTION: See ADMINISTRATION, DISPENSING, DISPOSAL, AND DISTRIBUTION OF MEDICATION.

MONITORING OF SERVICES is the process for ensuring that high-quality health care services are being rendered in the facility by all providers. The monitoring is accomplished by on-site observation and review (e.g., study of inmates' complaints about care; review of health records, pharmaceutical processes, standing orders, and performance of care). This process is also referred to as INTERNAL QUALITY ASSURANCE.

OPIOIDS are derivatives of opium, e.g., morphine and codeine, and synthetic drugs with morphine-like properties.

A PHYSICAL EXAMINATION is a review of the major organ systems for the detection of disease. It may be more extensive depending on the risk factors inherent in the population (to be outlined by the responsible physician).

Medical PREVENTIVE MAINTENANCE refers to health promotion and disease prevention. This includes the provision of individual or group health education and medical services, such as inoculations and immunizations provided to take advance measures against disease, and instruction in self-care for chronic conditions.

PROCUREMENT of medication is the system for ordering it for the pharmacy.

PROSTHESES are artificial devices to replace missing body parts or compensate for defective bodily functions. Examples are items such as artificial limbs, eyeglasses, and full or partial dental plates.

PSYCHIATRIC PERSONNEL or psychiatric services staff are psychiatrists, physicians with psychiatric experience, clinical psychologists, psychiatric nurses and clinically trained social workers.

QUALIFIED HEALTH PERSONNEL are physicians, dentists, and other professional and technical workers who by state law engage in activities that support, complement, or supplement the functions of physicians and/or dentists, and who are licensed, registered, or certified as is appropriate to their qualifications to practice; further, they practice only within their licenses, certification, or registration.

A QUALITY ASSURANCE COMMITTEE is a group of health providers working at the facility (the responsible physician and representatives of other departments) who meet on a fixed schedule to conduct chart reviews and/or to discuss the results of such reviews.

QUALITY ASSURANCE PROGRAMS ensure the quality and consistency of the health services provided in the facility, usually through periodic review of patients' charts.

RECEIVING SCREENING is a system of structured inquiry and observation designed to prevent newly arrived inmates who pose a health or safety threat to themselves or others from being admitted to the facility's general population, and to get newly admitted inmates to medical care rapidly. This process is also referred to as INITIAL HEALTH SCREENING.

The RESPONSIBLE PHYSICIAN is the individual physician who is responsible for the final decisions regarding matters of medical judgment at the facility.

Medical RESTRAINTS are physical and chemical devices used to limit patient activity as a part of health care treatment. The kinds of restraints that are medically appropriate for the general population within the jurisdiction may likewise be used for medically restraining incarcerated individuals (e.g., leather or canvas hand and leg restraints, chemical restraints, strait-jackets).

SELF-CARE is defined as care for a condition that can be treated by the patient; it may include over-the-counter-type medications.

SEXUAL ASSAULT is a sexual act that includes penetration, that is coercive or assaultive in nature and where there is the use or the threat of force.

SICK CALL is the system through which each inmate reports for and receives appropriate medical services for non-emergency illness and injury. Some people refer to sick call as a CLINIC VISIT.

SKILLED NURSING CARE: See INFIRMARY CARE.

The SPECIAL MEDICAL PROGRAM refers to care developed for patients with certain medical conditions that dictate a need for close medical supervision (e.g., seizure disorders, diabetes, potential suicide, pregnancy, chemical dependency, and psychosis).

STANDING MEDICAL ORDERS are written medical orders that specify the same course of treatment for each patient suspected of having a given condition.

SUPERVISION is defined as the overseeing of an accomplishment of a function or activity.

A TREATMENT PLAN is a series of written statements that specify the particular course of therapy and the roles of medical and non-medical personnel in carrying out the current course of therapy. It is individualized

77

ed based on assessment of the individual patient's needs, and includes a statement of the short- and long-term goals and the methods by which the goals will be pursued.

TREATMENT PROTOCOL is a written order by a physician that specifies the steps to be taken in appraising a patient's physical status. It does not include any directions regarding dosages of prescription medication.

# INDEX

access
  to care and treatment, 23, 34
  to information about inmates, 5, 44-45

administration of medication, 12, 19, 27-28, Appendix II

administrative meetings and reports, 2-3

assessment, health, 23-24

autonomy, medical, 2

body cavity searches, 6-7

cardiopulmonary resuscitation, 12

chart review, 4

chemical dependency (SEE ALSO withdrawal), 35

chronic illness, 11, 28-29, 37-38

clinic (SEE ALSO infirmary), 17, 26

communicable disease, 28, 35-36

confidentiality (SEE ALSO privacy), 5, 44-45

confinement records, 5, 44

consent to examination and treatment, 6-7, 26, 48

continuity of care, 29, 45, Appendix V

convalescence, 37

dental care, 29-30, 41

detoxification, 34-35

developmental disability, 5-6, 25, 37

diagnostic services, 17, 44

diet, 30-31

mentation (health staff), 10-11
over-the-counter medication, 27-28
peer review, 5
personal hygiene, 32
pharmaceuticals, 18-20
physical disability, 37
physical examinations, 24, 34
policies and procedures, 3-4, Appendix I
postmortem examinations, 6
pregnancy and prenatal care, 3, 40
privacy, 5-7, 26, 44-45
prostheses, 41
psychiatric patients, 5-6, 25, 37, 49
publications, 16-17
qualified health personnel, 22, 24-26, 34-35, 40
quality assurance, 4, 27
rape. SEE sexual assault
receiving screening, 22-23, Appendix IV
records: SEE confinement; medical
refusing treatment, 48-49
research, medical, 49
responsible physician, 2, 4-5, 12, 23-24, 27-28, 30, 34-35, 41
restraints, 39-40
review of medical services, 4-5

sanitation, 8, 28, 30
segregation, 26, 34
sexual assault, 7, 39
sick call, 26
skilled nursing care, 36
smoking, 8, 28, 31
solitary confinement, 34
space, clinic, 17
"special needs" patients and treatment, 5-6, 37, 38
staff meetings, 2-3
staffing levels and patterns, 10, 36
standing orders, 27, Appendix III
suicide, 22-23, 38-39
supplies, 16-18
syringes and needles, 16, 18
therapeutic diets, 30-31
training (correctional staff), 11-12, 38, Appendix II
treatment philosophy, 26, 48-49
treatment plan, 37-38
treatment protocols, 27-28, Appendix III
triage, 25-26
withdrawal, 22-23, 34-35