IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VURNIS L. GILLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. 04-921-SLR |
| ) | |
| STAN TAYLOR, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM ORDER**

At Wilmington this 17th day of July, 2013, having considered defendants' unopposed motion for reargument and the papers submitted in connection therewith;

IT IS ORDERED that said motion (D.I. 207) is granted. Consistent with the parties' consent,[1] the court will reconsider defendants' arguments in support of summary judgment in view of the full record that developed during post summary judgment discovery.[2]

1. **Background.** On August 26, 1986, plaintiff began serving a 25-year sentence at James T. Vaughn Correctional Center, Smyrna, Delaware ("JTVCC") after having been convicted of charges relating to robbery. (D.I. 152 at 7; D.I. 208 ex. A) In 1987, Dr. Robinson and Dr. Weiss[3] prescribed plaintiff, a diagnosed paranoid

---

[1](D.I. 208, 212)

[2]The court's memorandum order of March 25, 2013 (D.I. 207) provides a more comprehensive chronology of the case's complicated and extensive procedural history.

[3]Although Drs. Robinson and Weiss are named in plaintiff's complaint, the docket does not reflect that service of process has been accomplished on these, as well as twelve other, defendants named in the complaint.

schizophrenic,[4] a series of psychotropic medications.[5] (D.I. 2 at ¶ 27; D.I. 152 at 7) Although plaintiff complained to the prescribing physicians of "severe side effects, blurred vision and wild mood swings," he was told that these were normal reactions and that the effects would eventually dissipate. (*Id.* at ¶¶ 28-29) Plaintiff alleges that the side effects did not improve, but worsened and caused him to commit four separate crimes while incarcerated: (1) assault in a detention facility and conspiracy;[6] (2) carrying a concealed deadly weapon and promoting prison contraband;[7] (3) assault;[8] and (4) arson.[9] (D.I. 2 at ¶¶ 30-33) Plaintiff pled guilty to these four crimes and was sentenced to an additional 27 years of incarceration. (*Id.* at ¶ 35)

2. Medical records dated March 1989 reflect that plaintiff became upset over the existence of "poison gas" entering his cell and was unable to calm down or control his nerves. (D.I. 208, ex. A at 1)

3. On July 29, 1989, plaintiff placed towels over the air vents and flooded the area in an effort to prevent "poison gas" from entering his cell. (*Id.*) When correctional officers responded to the flood, they discovered plaintiff sharpening a shank and threatening to kill the first person to enter the cell. Plaintiff also complained of feeling

---

[4] Plaintiff "has well documented, early onset severe mental illness, most consistent with schizophrenia of the paranoid subtype" that started at age 15. (D.I. 208, ex. A at 4)
[5] Identified by plaintiff as "Haldol injections, Haldol pills, Grodon pills, Indern pills and Cogentine" (D.I. 2 at 27)
[6] Plaintiff pled guilty in 1988. (D.I. 152 at A00032-34)
[7] Plaintiff pled guilty in 1990. (D.I. 152 at A00035-38)
[8] Plaintiff pled guilty in 1991. (D.I. 152 at A00039-41)
[9] Plaintiff pled guilty in July 2000. (D.I. 152 at A00042-44) He appealed this conviction, asserting that he was under medication and not fully cognizant when entering the guilty plea. (*Id.* at A00069-71) The Delaware Superior Court denied the appeal, finding that plaintiff had knowingly, voluntarily and intelligently entered the guilty plea. (*Id.*)

2

his bones protruding through his feet and of needles being injected into his shoulders and knees. He was transferred to the infirmary for medical assessment and evaluation.

4. On August 4, 1989, plaintiff was prescribed Thorazine[10] and about two weeks later was prescribed Haldol Deconoate.[11] (*Id.*) By October 1989, plaintiff complained of hearing voices and "machines" in the cellblock and was increasingly agitated, with more somatic complaints. (*Id.*)

5. In 1990, plaintiff's agitation, delusions and anxiety continued. (*Id.* at 2) In October, plaintiff destroyed prison property, refused to work, was acting out and exhibited increasingly bizarre behavior, including: (1) pacing and talking to himself; (2) increased vengeance; (3) incessant masturbation; and (4) difficulty in expressing himself. (*Id.*) By November 2, 1990, plaintiff was verbally and physically threatening to staff and inmates.

6. On November 12, 1992, plaintiff was transferred to the Sussex Correctional Institute ("SCI"). (D.I. 153 at A000173-74) On October 31, 1994, plaintiff was transferred to the Crisis Care Unit at SCI.[12] (*Id.* at A000115)

---

[10]The generic name "chlorpromazine is an anti-psychotic medication in a group of drugs called phenothiazines. It works by changing the actions of chemicals in your brain. Chlorpromazine is used to treat psychotic disorders such as schizophrenia or manic-depression." *See* http://www.drugs.com/mtm/thorazine.html (July 10, 2013).

[11]Haldol deconate is an anti-psychotic agent, used in the long-term treatment of schizophrenia. *See* http://www.drugs.com/cdi/haloperidol-decanoate.html (July 10, 2013)

[12]Prison records indicate that plaintiff remained housed at the Crisis Care Unit until, at least, March 24, 2000. (*Id.* at A000115)

3

7. Medical records dated January 10, 1996, October 20, 1996 and July 15, 1997 reflect that plaintiff refused to take prescribed medication.[13] (Id. at A000109-111) On November 25, 1997, he experienced fixed delusions. (D.I. 208, ex. A at 2)

8. On March 31, 1999, Delaware Superior Court Judge Charles Toliver ordered that plaintiff be required to take any medications and/or other treatments as directed by the Forensic Evaluation team.[14] (D.I. 153 at A000112-13) On April 14, 1999, plaintiff again refused to take prescribed medication. (Id. at A000114-26)

9. On March 24, 2000, a supervisor of the Crisis Care Unit wrote to Judge Toliver requesting plaintiff's involuntary admission to the DPC for more intensive treatment and safety. (Id. at A000115) As she explained:

> Plaintiff has an extensive violent history while incarcerated and [is] not compliant with his treatment. Over the past few months, plaintiff has become extremely difficult to manage and stabilize and thus has decompensated. At this time, he is of great risk to himself and others. Earlier today he held another inmate hostage. . . . the situation was resolved without injury.

(Id.)

10. In June 2000, plaintiff's mental illness further deteriorated. (D.I. 208, ex. A at 2) He attempted suicide by hanging on June 2, 2000. Plaintiff was admitted into Beebe Medical Center for two days and then transferred back to the prison. (D.I. 153 at A000116)

---

[13] Cogentin 2mg, Theodure 300mg and Keflex 500mg. (D.I. 153 at A000109-111)
[14] Plaintiff had been evaluated and treated (pursuant to court order) at the Delaware Psychiatric Center ("DPC"). (Id. at A000112) The Forensic Evaluation team had concluded that plaintiff had received the maximum benefit from treatment provided at DPC and could return to the custody of the Department of Correction.

4

11. On August 15, 2000, the deputy warden issued a memorandum to all staff warning that plaintiff posed a "significant danger to himself and to the safety of staff and inmates." (*Id.* at A000117) After advising that plaintiff had threatened to harm a mental health supervisor earlier that day, the deputy warden implored correctional officers to "exercise caution in the management of plaintiff," including with his daily movement, proximity to others and the availability of means to inflict injury. (*Id.*) Additionally, two correctional officers were ordered to be present when interacting with plaintiff and no inmates were permitted to have any direct, unsupervised contact with him. (*Id.* at A000118)

12. On April 12, 2001, mental health personnel started monitoring plaintiff more closely due to his refusal to take prescribed medication. (*Id.* at A000121) Medical records reflect that plaintiff, again, refused to take his medication on September 24 and October 2, 2001. (*Id.* at A000122, 124)

13. On October 15, 2001, Dr. Mitchell Kho[15] updated Judge Toliver on plaintiff's condition. (*Id.* at A000125) Dr. Kho described plaintiff as "still actively psychotic, with fixed, irrational delusions of the 'technology [that] is taking over his body.'" (*Id.*) According to Dr. Kho, plaintiff "present(s) a potential danger to self and others, especially if he does not comply with his needed psychotropic medications. Without medications, he has been so distressed with the 'technology' that he has attempted suicide" and was threatening others. (*Id.*) Dr. Kho requested that Judge Toliver issue an updated order compelling plaintiff to comply with prescribed medications.

---

[15]The medical records suggest that Dr. Kho, a psychiatric physician on staff at SCI, treated plaintiff for over ten years. (*Id.* at A000126)

14. On October 17, 2001, defendant Simms, mental health counselor, and a mental health supervisor requested a court order for a 12-month course of involuntary psychotropic medication because plaintiff was refusing "psychotropic medications prescribed to treat his severe and pervasive thought disorder." (*Id.* at A000126) They urged Judge Toliver to grant the court order to prevent plaintiff from harming himself and others.

15. On October 31, 2001, plaintiff attempted suicide (second time) and was admitted to Kent General Hospital. (*Id.* at A000127-132) Hospital records detail plaintiff's long history of schizophrenia and noncompliance with medication. (*Id.*)

16. On November 6, 2001, Judge Toliver ruled that the March 31, 1999 order was to remain in effect unless, or until, modified by the Delaware Superior Court. (*Id.* at A000133)

17. Records reflect that in 2002, plaintiff believed infrared beams were being shot at his groin making it difficult to defecate and causing his nose to run. (D.I. 208 ex. A at 2) Because he was threatening to himself and others, he was transferred to the infirmary. (*Id.*)

18. On April 26, 2004, plaintiff's delusions increased as he complained about electricity coming through the walls.

19. **Litigation.** In August 2004, plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 against defendants: (1) Stanley W. Taylor, Jr., former Commissioner of the Department of Correction of the State of Delaware; (2) Paul Howard, former Chief of the Bureau of Prisons of the Department of Correction of the State of Delaware; (3)

Thomas L. Carroll, former Warden, JTVCC; (4) Elizabeth Burris, former Deputy Warden, JTVCC; (5) Lawrence McGuigen, Deputy Warden, JTVCC;[16] and (6) Jim Simms, Counselor, JTVCC. (D.I. 2) Plaintiff alleges that defendants violated his constitutional rights to due process and freedom from cruel and unusual punishment by forcibly administering psychotropic medications to him.

20. In September 2008, the parties filed cross motions for summary judgment. In support thereof, defendants Taylor, Howard, Carroll and Burris filed affidavits denying: (1) knowledge of plaintiff; (2) involvement in plaintiff's mental health diagnosis or the decision to prescribe psychotropic medication; and (3) involvement in the administering of medication of any kind to plaintiff. (D.I. 153 at A000173-181) Defendant Simms averred to knowing plaintiff and having conversations with him. (Id. at A000183) However, defendant Simms can not recall the content of his conversations with plaintiff and he denies: (1) any involvement with plaintiff's schizophrenia diagnosis; (2) involvement in the initial decision to prescribe psychotropic medications; and (3) any involvement in the administering of psychotropic medications to plaintiff. (Id.)

21. In response, plaintiff argued that defendants' failure to produce his medical records (dating from 1986 to 1994) was highly prejudicial and prevented him from responding to the summary judgment assertions. (D.I. 149, 155)

---

[16]On April 27, 2007, counsel for defendants filed a suggestion of death, informing that defendant McGuigan died on September 18, 2006. (D.I. 99) Because more than 90 days have passed since the filing of the suggestion of death, the action against defendant McGuigan is dismissed pursuant to Fed. R. Civ. P. 25(a)(1).

22. On June 18, 2009, the court granted defendants' summary judgment motion[17] on the basis of plaintiff's failure to commence this action within the two-year period required by the statute of limitations. (D.I. 163) The court concluded that the equitable tolling and continuing violations doctrines did not apply to excuse the missed statute. (*Id.* at 7-8)

23. On July 17, 2009, plaintiff appealed the court's summary judgment decision to the United States Court of Appeals for the Third Circuit.[18] (D.I. 166) On September 28, 2009, plaintiff moved for reconsideration and to vacate summary judgment. (D.I. 171) Plaintiff also requested permission to reopen discovery. (D.I. 172-74) Following a series of discussions, the parties agreed to conduct additional fact discovery and to keep the summary judgment decision in place, pending the results of informal discovery. (D.I. 175) For over a year, the parties engaged in this limited discovery. (D.I. 175, 194)

24. Plaintiff moved to vacate the summary judgment order on May 23, 2011. (D.I. 195, 196) Defendants opposed the motion. (D.I. 198) Both parties submitted additional medical and educational records in support of their motions. (D.I. 200)

25. On December 5, 2011, the case was referred to mediation and several settlement conferences were held. (D.I. 201) On July 13, 2012, the parties entered

---

[17]Defendants also moved for summary judgment on the following grounds: (1) Rooker-Feldman; (2) Eleventh Amendment immunity; (3) lack of personal involvement; (4) exhaustion; (5) failure to train; (6) no due process or deliberate indifference in administering psychotropic medications; (7) State Tort Act immunity; and (8) qualified immunity doctrine. (D.I. 152) Given the conclusions that follow, it is unnecessary to address all the arguments raised.

[18]The Third Circuit dismissed the appeal on March 21, 2011. (D.I. 190)

8

into a stipulation wherein they agreed to have plaintiff examined by Dr. Neil S. Kaye, M.D.[19] for the "purposes of assessing plaintiff's current medical and/or psychological health, and determining what medications and treatment are presently appropriate." (D.I. 204)

26. In the Report, Dr. Kaye opined that schizophrenia does not resolve spontaneously and, despite the forced psychotropic medication, plaintiff continues to suffer with schizophrenia symptoms, including paranoia, delusions, and dangerous behavior. (D.I. 208 ex. A at 5) Dr. Kaye observed that the onset of plaintiff's schizophrenia occurred at age 15 and because of "limited compliance with medication and multiple aggressive and violent actions based on plaintiff's fixed delusional system," he is a "significant and permanent threat to himself and others." (Id. ex. A at 4) Dr. Kaye concluded that plaintiff's prognosis is poor and that his "psychotic delusional system is fixed, permanent, entrenched and will be with him forever." (Id. ex. A at 5) Moreover, Dr. Kaye found that court ordered anti-psychotic medication is helpful and necessary for plaintiff's safety and mental health as well as the safety of others. Without medication, plaintiff is more dangerous, violent, aggressive and prone to acting on his delusions.

27. By memorandum order dated March 25, 2013, the court granted plaintiff's motion to vacate, finding that the record submitted in support of defendants' motion for

---

[19]Dr. Kaye's September 6, 2012 Forensic Psychiatric Evaluation Report (the "Report") details plaintiff's mental illness and treatment, among other matters, from April 10, 1979 until August 27, 2012. (D.I. 208 ex. A) In reaching the opinions contained in the Report, Dr. Kaye interviewed plaintiff and reviewed over 5,000 pages of prison, medical and mental health records. For purposes of the analysis at bar, the court will consider the record up until the filing of the complaint in August 2004.

9

summary judgment was incomplete and prevented an adequate review of the merits of equitable tolling. (D.I. 206)

28. Defendants moved for reargument, arguing that the record demonstrated that the administration of forced psychotropic medication was medically necessary and supported by the original record as well as the record developed during limited fact discovery. (D.I. 207) Plaintiff did not oppose the motion; rather, plaintiff filed, under seal, the Report and requested that the remaining summary judgment arguments be examined under the now complete record.

29. **Summary judgment.** The court shall grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir.2007).

30. If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. " Matsushita Elec. Indus. Co., 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The mere existence of some evidence in support of the

nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, (1986). Moreover, a party opposing summary judgment must present more than just bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue. *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir.2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp.*, 477 U.S. at 322.

31. **Forced medication.** Plaintiff moved for summary judgment, asserting that the forced administration of psychotropic medications violates his rights under the 8th and 14th Amendments. (D.I. 150) Defendants contend that the use of psychotropic medication is necessary and in plaintiff's best interests. (D.I. 152) Further, they assert that the record demonstrates that plaintiff has received adequate medical care and treatment.

32. The United States Supreme Court has recognized a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs. *Washington v. Harper*, 494 U.S. 210, 221 (1990). Psychotropic medication, however, may be administered against an inmate's wishes where doing so is reasonably related to the prison's legitimate penological interests. *Id.* at 223. Those interests include "combating the danger posed by [the inmate] to both himself and others . . . in a prison environment,"

11

and "provid[ing] prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution." *Id.* at 225. Considering "the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with anti-psychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227.

33. Viewing this authority in light of the record, the court finds that there is insufficient evidence to enable a jury to reasonably find that plaintiff's Constitutional rights were violated by the administration of forced psychotropic medication. The record unequivocally demonstrates that plaintiff, a paranoid schizophrenic, poses a substantial and constant threat to himself, other inmates and correctional and medical staff. The onset of severe mental illness began when he was a teenager and prognosis for improvement is poor. Plaintiff's history of noncompliance with prescribed medication is well-documented. Similarly present throughout the record are the safety precautions and adjustments that were implemented by correctional and medical staff to prevent plaintiff from inflicting violence on others and himself. There is no dispute among the treating medical professionals that plaintiff's psychotropic medication is necessary and should be continued for his own mental health and the safety of others. Finally, although afforded ample opportunity, plaintiff has failed to proffer any medical testimony or evidence to bolster his claims or to refute the copiously documented record of severe mental illness which requires psychotropic medication to control plaintiff for his safety, the safety others and the integrity of the institution.

34. With respect to the alleged Eighth Amendment violation based on the

12

medical treatment and care provided, the court concludes that there is insufficient evidence for a jury to find for plaintiff on this issue. The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, plaintiff must allege (I) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Id.* at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 10405.

35. A prisoner has no right to choose a specific form of medical treatment, so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble,* 429 U.S. at 107. Additionally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir.2004) (citations omitted).

36. Further, prison administrators cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was

already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir.1993). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir.2004) (discussing *Durmer*, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236.

37. The undisputed record reflects that plaintiff has received substantial medical care for his serious mental illness. Inasmuch as plaintiff disagrees with the treatment for his schizophrenia, disputes over choice of medical treatment do not constitute a Constitutional violation. More importantly, it is undisputed that defendants Taylor, Howard, Carroll and Burris took no part in the diagnosis of plaintiff's mental condition or had any involvement in the decision to prescribe psychotropic medication or the administration thereof. Absent evidence to the contrary, these defendants were justified in believing that plaintiff was receiving adequate medical care. Plaintiff has failed to provide evidence to support his position that defendants were deliberately indifference to his medical needs.

38. With respect to defendant Simms, the record reflects that he and a mental health supervisor wrote to Judge Toliver requesting an order allowing a 12-month course of involuntary psychotropic medication for plaintiff. (D.I. 153 at A000126) Defendant Simms' letter relies on Dr. Kho's medical conclusions (and his simultaneously submitted letter request) and describes plaintiff's condition at the time.

14

Significantly, defendant Simms was not involved in initial diagnosis or request for medication; instead, the letter reflects an effort to obtain continuation of a proven and helpful course of treatment. Absent any contrary evidence from plaintiff, the court finds that, to the extent defendant Simms was involved, his conduct does not rise to the level of deliberate indifference.

39. **Jurisdiction.** Federal district courts are courts of original jurisdiction and have no authority to review final judgments of a state court in judicial proceedings. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *see Power v. Department of Labor*, 2002 WL 976001 (D. Del. May 3, 2002). The Rooker-Feldman doctrine applies in cases brought by "[a] state-court loser [ ] complaining of injuries caused by the state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).

40. As plaintiff seeks review and invalidation of Judge Toliver's orders, his claims implicate the Rooker-Feldman doctrine and the court cannot exercise jurisdiction. Allowing plaintiff's claims to proceed against defendants would allow him to use the federal courts to appeal state court judgments and, thus, would run afoul of the Rooker-Feldman doctrine.

41. **Personal involvement and respondeat superior.** A "defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a Constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007)

Case 1:04-cv-00921-SLR Document 213 Filed 07/17/13 Page 16 of 16 PageID #: 2247

(internal citations omitted). "Personal involvement can be shown through allegations of personnel direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988).

42. It is well established that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory. *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *Monell v. Department of Social Services,* 436 U.S. 658 (1978); *Rizzo v. Goode,* 423 U.S. 362 (1976). Purpose rather than knowledge is required to impose liability on an official charged with violations arising form his or her superintendent responsibilities. *Iqbal,* 566 U.S. at 677. "Absent vicarious liability, each government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* A plaintiff must show that an official's conduct caused the deprivation of a federally protected right. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985).

43. It appears that defendants were named as defendants based on their supervisory positions and, based on the authority outlined above, § 1983 liability cannot lie on the under a theory of respondeat superior. Further, the record fails to reflect any involvement by these defendants which rises to the level of a Constitutional violation.

44. **Conclusion.** For the reasons stated, defendants' motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. The clerk of court is directed to enter judgment in favor of defendants and against plaintiff.

/s/ Sue L. Robinson
United States District Judge

16